UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

**DOCKETED**

OCT 2 5 2004

OCT 2 6 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS HEALTH AND WELFARE FUND, and HOWARD McDOUGALL, trustee | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| ROSEMARY BONNER, DARRELL BONNER, GABRIELLE BONNER, GISELLE BONNER, AND SANDRA BONNER, as natural guardian for CLARENCIA BONNER, a minor, | ) ) ) ) ) |
| Defendants. | ) ) |

**04C 6839**

Case No.
Judge

**JUDGE FILIP**

MAGISTRATE JUDGE NOLAN

### COMPLAINT FOR INTERPLEADER

NOW COMES Plaintiffs, Central States, Southeast and Southwest Areas Health and

Welfare Fund and Howard McDougall, a Trustee thereof, in his representative capacity,

pursuant to Rule 22(1) of the Federal Rules of Civil Procedure, and complains of

Defendants Rosemary Bonner, Darrell Bonner, Gabrielle Bonner, Giselle Bonner, and

Sandra Bonner, as natural guardian for Clarencia Bonner, a minor, as follows:

### PARTIES, JURISDICTION, AND VENUE

1.     This action is brought by a fiduciary to enforce the provisions of Title I of the

Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, and the terms

of the Central States, Southeast and Southwest Areas Health and Welfare Plan ("Welfare

Plan") regarding payment of a Life Insurance Benefit to the proper beneficiary of a

deceased Covered Participant of the Welfare Plan.  Jurisdiction is proper pursuant to

Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), and pursuant to 28 U.S.C. §§ 1335,

1-1

1397, and 2361.

2.      Plaintiff Central States, Southeast and Southwest Areas Health and Welfare Fund ("Welfare Fund") is an "employee welfare benefit plan" as that term is defined in ERISA. 29 U.S.C. § 1002(1).  The Welfare Fund has its administrative office and principal and exclusive offices at 9377 West Higgins Road, Rosemont, Illinois.

3.      Plaintiff Howard McDougall is a Trustee and a "fiduciary" of the Welfare Fund as that term is defined in ERISA and brings this action in his capacity as a Trustee and fiduciary.  29 U.S.C. § 1002(13)(A).

4.      Venue is proper in this District pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), in that an action under Title I of ERISA may be brought in the District where the Plan is administered.

5.      Defendants Rosemary Bonner, Darrell Bonner, and Sandra Bonner, as natural guardian for Clarencia Bonner, a minor, reside in Alabama and Defendants Gabrielle Bonner and Giselle Bonner reside in Texas (hereinafter collectively referred to as "Claimants").

## BACKGROUND FACTS

6.      Pursuant to the terms of the Welfare Plan, Plaintiff Welfare Fund provides a Life Insurance Benefit payable to the beneficiary of a Covered Participant.

7.      Article XIV, Section 14.09 of the Welfare Plan Document states that it is the responsibility of each Covered Participant to supply the Welfare Fund with a properly executed Enrollment or Change of Beneficiary Card, designating the beneficiary of any Welfare Plan Life Insurance Benefit.  Upon the death of a Covered Participant, a Life Insurance Benefit will be paid to the designated beneficiary.  A true and genuine copy of the Welfare Plan Document is attached hereto as Exhibit 1.

8.     Clarence L. Bonner, Jr., deceased, ("Mr. Bonner") was a Covered Participant of the Welfare Fund.  On December 19, 2003, Mr. Bonner died and because he was a Covered Participant in the Welfare Fund there is a Life Insurance Benefit in the amount of $40,000.00 payable to his beneficiary.

9.     Mr. Bonner and Mildred Bonner had been married but their marriage ended in divorce.  This marriage resulted in three children, namely, Darrell Bonner, Gabrielle Bonner, and Giselle Bonner.

10.     Mr. Bonner and Sandra Bonner had been married but their marriage ended in divorce.  This marriage resulted in one child, namely, Clarencia Bonner.  Clarencia is a minor and Sandra Bonner filed a claim for the Life Insurance Benefit as the natural guardian of Clarencia Bonner, a minor.

11.     Mr. Bonner and Rosemary Bonner were married under common law until the date of Mr. Bonner's death.  This marriage resulted in one child, namely, Rita Bonner.

12.     Mr. Bonner executed a Request For Change Of Beneficiary Card dated September 30, 1993 ("September Card") designating Rosemary Bonner, Darrell Bonner, Gabrielle Bonner, Giselle Bonner, and Clarencia Boner to be the beneficiary of life insurance benefit payable by the Welfare Fund.  A true and genuine copy of the September Card is attached hereto as Exhibit 2.

13.     Mr. Bonner executed a Request For Change Of Beneficiary Card dated October 13, 1993 ("October Card") designating Clarencia Bonner to be the beneficiary of life insurance benefit payable by the Welfare Fund.  A true and genuine copy of the October Card is attached hereto as Exhibit 2.

14.     On February 16, 2004, the Welfare Fund received a Notice of Claim for the life insurance benefit payable as a result of the death of Mr. Bonner from Rosemary

Bonner ("Rosemary's Claim"). A true and genuine copy of Rosemary's Claim is attached hereto as Exhibit 3.

15.     On February 16, 2004, the Welfare Fund received a Notice of Claim for the life insurance benefit payable as a result of the death of Mr. Bonner from Sandra Bonner, as natural guardian for Clarencia Bonner, a minor, ("Clarencia's Claim"). A true and genuine copy of Clarencia's Claim is attached hereto as Exhibit 4.

16.     In support of Clarencia's Claim, Sandra Bonner submitted a copy of a Judgment of Decree dated December 10, 1992 entered by Circuit Judge Cain J. Kennedy in Mobile County, Alabama, Circuit Court, Case No. DR92-502152-K ("Divorce Decree"). Pursuant to the Divorce Decree, Mr. Bonner was required to:

> [M]aintain in full force and effect his present life insurance program and he shall maintain the minor child of this marriage [Clarencia] as beneficiary of at least one-half of said life insurance during the child's minority, and further the Defendant shall furnish proof to the Plaintiff within thirty days from the date of this decree as to same. Divorce Decree, ¶4.

A true and genuine copy of the Divorce Decree is attached hereto as Exhibit 5.

17.     On March 1, 2004, the Welfare Fund received a Notice of Claim for the life insurance benefit payable as a result of the death of Mr. Bonner from Darrell Bonner ("Darrell's Claim"). A true and genuine copy of Darrell's Claim is attached hereto as Exhibit 6.

18.     On March 1, 2004, the Welfare Fund received a Notice of Claim for the life insurance benefit payable as a result of the death of Mr. Bonner from Gabrielle Bonner ("Gabrielle's Claim"). A true and genuine copy of Gabrielle's Claim is attached hereto as Exhibit 7.

19.     On March 1, 2004, the Welfare Fund received a Notice of Claim for the life insurance benefit payable as a result of the death of Mr. Bonner from Giselle Bonner

("Giselle's Claim"). A true and genuine copy of Giselle's Claim is attached hereto as Exhibit 8.

20. By letters dated March 24, 2004, plaintiff Welfare Fund notified Darrell Bonner, Gabrielle Bonner, and Giselle Bonner, respectively, that their claims for the life insurance benefit were denied pursuant to the October Card which designated Clarencia Bonner as the beneficiary. A true and genuine copy of the March 24, 2004 letters are attached hereto as Exhibit 9.

21. By letter dated March 25, 2004, plaintiff Welfare Fund notified Rosemary Bonner that her claim for the life insurance benefit was denied pursuant to the October Card which designated Clarencia Bonner as the beneficiary. A true and genuine copy of the March 25, 2004 letter is attached hereto as Exhibit 10.

22. By letter dated March 25, 2004, plaintiff Welfare Fund notified Sandra Bonner that her claim for the life insurance benefit on behalf of Clarencia Bonner was approved. A true and genuine copy of the March 25, 2004 letter is attached hereto as Exhibit 11.

23. Pursuant to Article X of the Welfare Plan, any claimant for benefits payable under the terms of the Welfare Plan whose claim has been denied may submit an administrative appeal for review of the denial of the claim. The final step in the review procedure is an administrative appeal to the Trustees of the Welfare Fund. See Exhibit 1.

24. By Appeals Committee Review Procedure dated April 7, 2004, Rosemary Bonner submitted an appeal of plaintiff Welfare Fund's decision that the life insurance benefit should be paid to Clarencia Bonner. A true and genuine copy of the Appeals Committee Review Procedure dated April 7, 2004 and related enclosures are attached hereto as Exhibit 12.

25.     By Appeals Committee Review Procedure dated April 15, 2004, Darrell Bonner submitted an appeal of plaintiff Welfare Fund's decision that the life insurance benefit should be paid to Clarencia Bonner. A true and genuine copy of the Appeals Committee Review Procedure dated April 15, 2004 is attached hereto as Exhibit 13.

26.     By Pension Benefit Appeals Form received on April 26, 2004, Gabrielle Bonner submitted an appeal of plaintiff Welfare Fund's decision that the life insurance benefit should be paid to Clarencia Bonner. A true and genuine copy of the Pension Benefit Appeals Form is attached hereto as Exhibit 14.

27.     Claimants based their appeal on the allegation that there was an additional beneficiary card which named each of the Claimants as a beneficiary of life insurance benefit. See Exhibits 12-14.

28.     By letter dated May 5, 2004, plaintiff Welfare Fund notified Claimants that their appeal had been denied and advised Claimants of the right to appeal the denial to the Trustees. A true and genuine copy of the May 5, 2004 letter is attached hereto as Exhibit 15.

29.     By letter dated June 1, 2004, Rosemary Bonner submitted an appeal to the Trustees Appellate Review Committee and requested a copy of the Welfare Fund's file on this matter. A true and genuine copy of the June 1, 2004 letter is attached hereto as Exhibit 16.

30.     By letter dated July 7, 2004, plaintiff Welfare Fund provided Rosemary Bonner with a copy of the Welfare Fund's file which included a copy of the October Card. A true and genuine copy of the July 7, 2004 letter without enclosures is attached hereto as Exhibit 17; the documents enclosed in the July 7, 2004 letter have been previously attached hereto as Exhibits 1-15.

31.    By Trustee Committee Appeal Procedure dated July 20, 2004, Darrell Bonner claimed that the October Card was signed by Mr. Bonner under duress as a result of the divorce to Sandra Bonner. A true and genuine copy of the Trustee Committee Appeal Procedure dated July 20, 2004 is attached hereto as Exhibit 18.

32.    By letter dated August 4, 2004, Rosemary Bonner claimed that the October Card was either fraudulently completed or that Mr. Bonner's signature was forged. Rosemary also claimed that: (1) Mr. Bonner's name spelled wrong on the October Card; (2) Mr. Bonner's social security number was wrong on the October Card; (3) that Mr. Bonner's signature on the September Card and October Card are different; (4) that the Welfare Fund did not notify Mr. Bonner that his name and social security number were incorrect on the October Card; and (5) that Mr. Bonner's ex-wife, Sandra Bonner, may have had something to do with the completion of the October Card. A true and genuine copy of the August 4, 2004 letter is attached hereto as Exhibit 19.

33.    By letter dated August 26, 2004, plaintiff Welfare Fund requested that Rosemary Bonner submit any additional information or documentation in support of her allegations. A true and genuine copy of the August 26, 2004 letter and referenced enclosures are attached hereto as Exhibit 20.

34.    By letter dated September 7, 2004, plaintiff Welfare Fund requested that Darrell Bonner submit any additional information or documentation in support of his allegations. A true and genuine copy of the September 7, 2004 and referenced enclosures are attached hereto as Exhibit 21.

35.    By letter dated October 5, 2004, Rosemary Bonner reasserted the allegations in her August 4, 2004 letter and submitted documentation purportedly containing Mr. Bonner's signature. A true and genuine copy of the October 4, 2004 letter and referenced

enclosures are attached hereto as Exhibit 22.

## ISSUE OF THE PROPER BENEFICIARY

36.     Plaintiff Welfare Fund is in doubt as to the proper individual(s) entitled to receive the Life Insurance Benefit in the amount of $40,000.00 payable as a result of the death of Mr. Bonner.

37.     An ERISA Fund may properly file an interpreter action when the Fund is in great doubt as to the proper beneficiary of a life insurance benefit payable under the terms of the Plan.  See Metropolitan Life Ins. Co. v. Marsh, 119 F.3d 415 (6th Cir. 1997).  An interpreter action is proper when the Plan fiduciary can not safely determine the proper beneficiary of benefits due.  Federal Courts have jurisdiction under ERISA because an interpreter action is fundamentally equitable in nature.  Id. at 418.

38.     The Trustees of the Welfare Fund, as fiduciaries, are required by their fiduciary duties to administer the Welfare Plan pursuant to applicable law and the Welfare Plan Document.  29 U.S.C. § 1104(a)(1)(D).

39.     Section 14.09 of the Welfare Plan Document states that it is the responsibility of each Covered Participant to supply the Welfare Fund with a properly designated enrollment form designating the beneficiary of any life insurance benefit.  Exhibit 1.

40.     The September Card was submitted to plaintiff Welfare Fund designating the Claimants as beneficiary for life insurance benefit.  Exhibit 2.  Thus under the terms of the Welfare Plan, each Claimant would receive an amount equal to twenty percent (20%) of the life insurance benefit or the amount of $8,000.00.  Exhibit 2.

41.     The October Card was submitted to plaintiff Welfare Fund designating Clarencia Bonner as the sole beneficiary for life insurance benefit.  Exhibit 2.  Thus under the terms of the Welfare Plan, Clarencia Bonner would receive one hundred percent

(100%) of the life insurance benefit or the amount of $40,000.00. Exhibit 2.

42.    Rosemary Bonner and Darrell Bonner contend that: (1) Mr. Bonner intended for the life insurance benefit to be payable to all of his children; (2) Mr. Bonner did not intend to change his beneficiary after the September Card; (3) for the October Card, either Mr. Bonner's signature was forged or Mr. Bonner submitted the October Card under duress; and (4) the October Card should be considered a nullity.

43.    As a result of the allegations of forgery and duress, Plaintiff Welfare Fund is in great doubt as to whether Clarence L. Bonner, Jr. completed and submitted the October Card.

44.    Notwithstanding the alleged issues of forgery and duress, there is an issue whether the October Card is in substantial compliance with the terms of the Welfare Plan due to the mistakes on the October Card. Exhibit 2.

45.    The State law doctrine of substantial compliance is preempted by ERISA. 29 U.S.C. §1144. Nonetheless, under the federal common law doctrine of substantial compliance, a court may look to the insured's intent to change his beneficiary and examine whether the insured did everything he could reasonably have done under the circumstances to carry out his intention. Metropolitan Life Ins. Co. v. Johnson, 297 F.3d 558 (7th Cir. 2002).

46.    As a result of the mistakes on the October Card, Plaintiff Welfare Fund is in great doubt as to whether Clarence L. Bonner, Jr. substantially complied with the Welfare Plan when the October Card was submitted to the Welfare Fund.

47.    The Divorce Decree states that Clarencia Bonner is entitled to at least fifty percent (50%) of the Life Insurance Benefit. Exhibit 5. A divorce decree or Qualified Domestic Relations Order ("QDRO") may supercede a beneficiary designation and control

the distribution of the life insurance benefit.   ERISA shall supercede State law related to any

employee benefit plan with the exception of a QDRO.  29 U.S.C. § 1144(a), (b)(7); see also,

Metropolitan Life Ins. Co. v. Wheaton, 42 F.3d 1080, 1081 (7th Cir. 1994).

48.     Plaintiff Welfare Fund is in great doubt as to whether the Divorce Decree is

a QDRO and whether it supercedes either the September Card or the October Card to

determine the distribution of the Life Insurance Benefit.

49.     Therefore, plaintiff Welfare Fund is in great doubt as to the identity of the

beneficiary of the Life Insurance Benefit of Clarence L. Bonner, Jr. based upon the

information submitted to the Trustees and the issues raised by the Claimants during the

administrative appeals.  Because of that great doubt, the Trustees of the Welfare Fund

directed that this Interpleader action be filed.

50.     Plaintiffs stand ready, upon the filing of this Interpleader action, to pay the

amount of $40,000.00 to the Registry of the Court and thereupon, to request that this Court

discharge Plaintiffs from any liability for payment of the life insurance benefit of Clarence

L. Bonner, Jr. to the proper beneficiary.

WHEREFORE, plaintiffs Central States, Southeast and Southwest Health and

Welfare Fund, et al., respectfully pray that this Honorable Court enter the following relief:

a.      The proper beneficiary to receive the Life Insurance Benefit in the amount
        of $40,000.000 payable as a result of the death of Clarence L. Bonner, Jr.;

b.      That Defendants be restrained from instituting or proceeding with any action
        against Plaintiffs Central States, Southeast and Southwest Health and
        Welfare Fund, et al. for the recovery of the Life Insurance Benefit payable by
        Plaintiffs to the proper beneficiary of Clarence L. Bonner, Jr.;

c.      That Defendants be required to interplead and settle among themselves the
        rights to the Life Insurance Benefit payable as a result of the death of
        Clarence L. Bonner, Jr. and that Plaintiffs Central States, Southeast and
        Southwest Health and Welfare Fund, et al. be discharged from all liability for
        payment of the Life Insurance Benefit to any of the Defendants;

d.   That Plaintiffs Central States, Southeast and Southwest Health and Welfare Fund, et al. recover its costs and fees for bringing this action.

e.   For such further or different relief as the Court may deem proper and just.

Respectfully submitted,

Anthony E. Napoli
Attorney for Plaintiffs
Central States, Southeast and
Southwest Areas Health and
Welfare Fund
9377 W. Higgins Road
Rosemont, IL  60018-4938
(847) 518-9800, Ext. 3702

October 25, 2004

Ex. #1

# Central States, Southeast and Southwest Areas Health and Welfare Fund Active Plan Document



As Amended Through March 31, 2004

412

F:113360 / AD092500 / 03/31/04

## TABLE OF CONTENTS

ARTICLE I.      DEFINITIONS . . . . . . . . . . . . . . . . 1

ARTICLE II.     EFFECTIVE DATE OF GENERAL PROVISIONS   . . . . . . . . . . .15

       2.01   ALL GENERAL PROVISIONS OF THIS PLAN DOCUMENT ARE AFFECTIVE
             AND APPLICABLE WITH RESPECT TO EVERY LOSS OR OTHER BASIS OF
             COVERAGE THAT OCCURS ON OR AFTER NOVEMBER 17, 1999, SUBJECT
             THEREAFTER TO DULY ENACTED PLAN REVISIONS. . . . . . . . . 15

ARTICLE III.    PARTICIPATION AND COVERAGE . . . . . . . . . . . . . . . . 16

       3.01   QUALIFICATIONS AS A COVERED PARTICIPANT . . . . . . . . . . 16
       3.02   QUALIFICATIONS AS A COVERED DEPENDENT . . . . . . . . . . . 16
       3.03   COMMENCEMENT OF COVERAGE OF MEMBERS OF A NEW GROUP PREVIOUSLY
             INSURED . . . . . . . . . . . . . . . . . . . . . . . . . . 16
       3.04   COMMENCEMENT OF COVERAGE OF MEMBERS OF A NEW GROUP NOT
             PREVIOUSLY INSURED  . . . . . . . . . . . . . . . . . . . 16
       3.05   COMMENCEMENT OF COVERAGE OF NEW PARTICIPANTS . . . . . . . . 17
       3.06   COMMENCEMENT OF COVERAGE OF COVERED PARTICIPANTS FOR WHOM
             UNINTERRUPTED EMPLOYER CONTRIBUTIONS AND/OR SELF-PAYMENTS HAVE
             BEEN RECEIVED . . . . . . . . . . . . . . . . . . . . . . . 17
       3.07   COMMENCEMENT OF COVERAGE OF EMPLOYEES COVERED UNDER ANOTHER
             PLAN OFFERED BY THE FUND  . . . . . . . . . . . . . . . . 17
       3.08   COMMENCEMENT OF COVERAGE OF NEW PARTICIPANTS ELIGIBLE UNDER A
             PLAN OFFERED BY A LOCAL UNION  . . . . . . . . . . . . . 17
       3.09   EFFECT OF TEMPORARY WORK STOPPAGE ON COVERAGE . . . . . . . 18
       3.10   EFFECT ON COVERAGE OF ABSENCE FROM CONTINUOUS FUNDED EMPLOYMENT
             DURING, AND AS A RESULT OF SERVICE IN THE UNIFORMED SERVICES  18
       3.11   TERMINATION OF COVERAGE OF PARTICIPANTS HAVING TOTAL AND
             PERMANENT DISABILITY OR ON SICK LEAVE . . . . . . . . . . . 19
       3.12   TERMINATION OF COVERAGE OF PARTICIPANTS CHANGING EMPLOYEE
             STATUS  . . . . . . . . . . . . . . . . . . . . . . . . . 19
       3.13   TERMINATION OF COVERAGE DUE TO EMPLOYER WITHDRAWAL . . . . . 19
       3.14   RETURN TO COVERED EMPLOYMENT  . . . . . . . . . . . . . . . 19
       3.15   ELIGIBILITY TO ELECT CONTINUATION COVERAGE . . . . . . . . . 19
       3.16   DEFINITION OF QUALIFYING EVENT . . . . . . . . . . . . . . . 19
       3.17   NOTICE OF QUALIFYING EVENT  . . . . . . . . . . . . . . . . 20
       3.18   ELIGIBILITY FOR CONTINUATION COVERAGE . . . . . . . . . . . 20
       3.19   PROCEDURES TO ELECT CONTINUATION COVERAGE . . . . . . . . . 20
       3.20   SELF PAYMENTS TO MAINTAIN CONTINUATION COVERAGE . . . . . . 21
       3.21   TERMINATION OF CONTINUATION COVERAGE  . . . . . . . . . . . 21
       3.22   STATUS OF A COVERED PARTICIPANT WHEN EMPLOYER FAILS TO
             MAKE CONTRIBUTIONS  . . . . . . . . . . . . . . . . . . . 22
       3.23   STATUS AND COVERAGE OF A COVERED INDIVIDUAL WHEN EMPLOYER FAILS
             TO REMIT EMPLOYER CONTRIBUTIONS: SUSPENSION OF BENEFITS . . . 22
       3.24   CERTAIN PARTICIPANTS NOT TO BE CLASSIFIED AS COVERED
             DEPENDENT . . . . . . . . . . . . . . . . . . . . . . . . . 22

3.25   COMMENCEMENT OF COVERED DEPENDENT STATUS FOR SPOUSE OF A
       COVERED PARTICIPANT . . . . . . . . . . . . . . . . . . . . . . 22
3.26   COMMENCEMENT OF COVERED DEPENDENT STATUS FOR CHILD OF A
       COVERED PARTICIPANT . . . . . . . . . . . . . . . . . . . . . . 22
3.27   STATUS OF MENTALLY HANDICAPPED OR PERMANENTLY PHYSICALLY
       HANDICAPPED CHILD OF A COVERED PARTICIPANT . . . . . . . . . . 23
3.28   STATUS OF NEWBORN CHILD OF A COVERED PARTICIPANT . . . . . . 23
3.29   STATUS OF UNMARRIED CHILD OF A COVERED PARTICIPANT WHO IS A
       STUDENT BETWEEN THE AGES OF 19 AND 23 . . . . . . . . . . . . 23
3.30   LOSS OF DEPENDENT'S COVERAGE . . . . . . . . . . . . . . . . . 23
3.31   RESIDUAL COVERAGE OF FORMER COVERED PARTICIPANTS . . . . . . 24
3.32   ELIGIBILITY FOR FAMILY PROTECTION PLAN BENEFIT . . . . . . . 24

ARTICLE IV.   GENERAL EXCLUSIONS, LIMITATIONS AND CONDITIONS FOR PAYMENT OF
              CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

4.01   PAYMENT ONLY FOR COVERED CLAIMS OF COVERED INDIVIDUALS . . . 25
4.02   EXCLUSION OF PAYMENT FOR TREATMENT NOT CONSIDERED STANDARD
       MEDICAL CARE OR MEDICALLY NECESSARY . . . . . . . . . . . . . 25
4.03   LIMITATION ON PAYMENT OF CLAIMS ARISING FROM WORK-RELATED INJURY
       OR COVERED BY WORKER'S COMPENSATION . . . . . . . . . . . . . 25
4.04   EXCLUSION OF PAYMENT FOR TREATMENT OF INJURIES SUSTAINED WHILE
       IN ANY UNIFORMED SERVICE . . . . . . . . . . . . . . . . . . . 25
4.05   EXCLUSION OF PAYMENT FOR TREATMENT DUE TO ILLNESS OR INJURY
       ARISING OUT OF ANY ACT OF WAR OR CIVIL DISTURBANCE . . . . . 25
4.06   EXCLUSION OF PAYMENT FOR TREATMENT OF INJURIES ARISING AS A
       RESULT OF PARTICIPATION IN CRIMINAL CONDUCT . . . . . . . . . 26
4.07   LIMITATION ON PAYMENT FOR TREATMENT RECEIVED OUTSIDE THE
       UNITED STATES . . . . . . . . . . . . . . . . . . . . . . . . . 26
4.08   EXCLUSION OF PAYMENT FOR TREATMENT CONNECTED WITH SURGERY
       FOR COSMETIC PURPOSES . . . . . . . . . . . . . . . . . . . . . 26
4.09   EXCLUSION OF PAYMENT FOR TREATMENT OTHERWISE COVERED UNDER
       THE SOCIAL SECURITY ACT . . . . . . . . . . . . . . . . . . . . 27
4.10   EXCLUSION OF PAYMENT FOR TREATMENT NOT RELATED TO ILLNESS,
       INJURY OR PREGNANCY . . . . . . . . . . . . . . . . . . . . . . 27
4.11   EXCLUSION OF PAYMENT FOR CERTAIN DENTAL TREATMENTS . . . . . 27
4.12   EXCLUSION OF PAYMENT FOR TREATMENT OF NON-COMPENSABLE
       PROCEDURES . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
4.13   EXCLUSION OF PAYMENT FOR ROUTINE PHYSICAL EXAMINATIONS . . . 27
4.14   EXCLUSION OF PAYMENT FOR CERTAIN ITEMS . . . . . . . . . . . . 28
4.15   EXCLUSION OF PAYMENT FOR MAINTENANCE CARE . . . . . . . . . . 28
4.16   EXCLUSION OF PAYMENT OVER PRESCRIBED MAXIMUMS . . . . . . . . 28
4.17   LIMITATION ON ELIGIBILITY FOR COVERAGE OF CERTAIN ORGAN OR
       TISSUE TRANSPLANTS . . . . . . . . . . . . . . . . . . . . . . . 28
4.18   EXCLUSION OF PAYMENT FOR INFERTILITY TREATMENT . . . . . . . 29
4.19   EXCLUSION OF PAYMENT FOR CHARGES FOR WHICH THE COVERED INDIVIDUAL
       IS NOT RESPONSIBLE TO PAY . . . . . . . . . . . . . . . . . . . 30
4.20   LIMITATION ON PAYMENT OF CLAIMS FOR SERVICES BY PROVIDERS NOT
       IN PREFERRED PROVIDER ORGANIZATION NETWORK . . . . . . . . . . 30

ARTICLE V.        COORDINATION OF BENEFITS . . . . . . . . . . . . . 31

          5.01  PRIORITY OF COVERAGE WHERE COVERED INDIVIDUAL IS COVERED BY AN
                OTHER PLAN . . . . . . . . . . . . . . . . . . . . . 31
          5.02  EFFECT OF PRIORITY RULES ON AMOUNT OF PAYMENTS UNDER THE PLAN 32
          5.03  RECOVERY OF PAYMENTS WHEN AN OTHER PLAN IS INVOLVED . . . . . 32
          5.04  PAYMENTS TO OTHER PLANS . . . . . . . . . . . . . . . 32
          5.05  NO FAULT, PERSONAL INJURY PROTECTION OR FINANCIAL RESPONSIBILITY
                MOTOR VEHICLE INSURANCE COVERAGE . . . . . . . . . . . . 32
          5.06  COORDINATION OF BENEFITS WITH AN HMO . . . . . . . . . . . 32

ARTICLE VI.       CONTRIBUTIONS AND FUNDING OF BENEFITS . . . . . . . . . . 33

          6.01  EMPLOYER'S OBLIGATION TO CONTRIBUTE TO THE PLAN . . . . 33
          6.02  CREDITS FOR ERRONEOUS EMPLOYER CONTRIBUTIONS . . . . . 33
          6.03  IRREVOCABLE NATURE OF CONTRIBUTIONS . . . . . . . . . . 33
          6.04  SELF-PAYMENTS . . . . . . . . . . . . . . . . . . . . 33

ARTICLE VII.      AMENDMENTS AND PLAN TERMINATION . . . . . . . . . . . 34

          7.01  PROCEDURE FOR AMENDING THE PLAN . . . . . . . . . . . 34
          7.02  TERMINATION OF THE PLAN . . . . . . . . . . . . . . . 34

ARTICLE VIII.     PLAN ADMINISTRATION . . . . . . . . . . . . . . . . . 35

          8.01  TRUSTEE STATUS AS "NAMED FIDUCIARY" . . . . . . . . . . 35
          8.02  POWERS OF THE TRUSTEES . . . . . . . . . . . . . . . 35
          8.03  DECISIONS OF TRUSTEES . . . . . . . . . . . . . . . . 35
          8.04  EFFECT OF ANY MISREPRESENTATION WITH RESPECT TO CLAIMS . 35
          8.05  PAYMENTS TO PERSONS WHO HAVE FAILED TO INFORM THE TRUSTEES OF
                A CHANGE OF ADDRESS . . . . . . . . . . . . . . . . . 35
          8.06  INFORMATION CONCERNING COVERED INDIVIDUALS . . . . . . . 36
          8.07  USE AND DISCLOSURE OF PROTECTED HEALTH INFORMATION . . . . 36

ARTICLE IX.       BENEFIT CLAIMS . . . . . . . . . . . . . . . . . . . 38

          9.01  CLAIMS TO BE SUBMITTED IN WRITING ON AUTHORIZED FORMS . . . 38
          9.02  PROCESSING CLAIMS INVOLVING URGENT CARE . . . . . . . . 38
          9.03  PROCESSING CLAIMS FOR BENEFITS (OTHER THAN URGENT CARE
                CLAIMS) . . . . . . . . . . . . . . . . . . . . . . . 38
          9.04  NOTICE OF ADVERSE BENEFIT DETERMINATIONS . . . . . . . . 39
          9.05  CONCURRENT CARE DECISIONS . . . . . . . . . . . . . . 40
          9.06  MISCELLANEOUS BENEFIT CLAIMS PROVISIONS . . . . . . . . 41

ARTICLE X.        APPELLATE REVIEW PROCEDURES AND DETERMINATIONS . . . . . . . 42

          10.01 PROCEDURES  DURING  APPELLATE  REVIEW  OF  ADVERSE  BENEFIT
                DETERMINATIONS . . . . . . . . . . . . . . . . . . . 42
          10.02 DEFINITION OF TRUSTEE-REVIEWABLE DETERMINATIONS . . . . . . 43
          10.03 TIME  LIMITATIONS  FOR  APPELLATE  REVIEW  OF  ADVERSE  BENEFIT
                DETERMINATIONS . . . . . . . . . . . . . . . . . . . 44
          10.04 NOTICE OF BENEFIT DETERMINATIONS AFTER APPELLATE REVIEW . . . 45

10.05 MISCELLANEOUS APPELLATE REVIEW PROVISIONS . . . . . . . . . 46

ARTICLE XI.    MISCELLANEOUS PROVISIONS . . . . . . . . . . . . . . . 47

11.01 VALIDITY OF CHANGES IN THE PLAN . . . . . . . . . . . . . 47
11.02 CLAIM FORMS . . . . . . . . . . . . . . . . . . . . . . . 47
11.03 TIME WITHIN WHICH CERTAIN CLAIMS ARE TO BE FILED . . . . . 47
11.04 RECOVERY OF EXCESS PAYMENTS . . . . . . . . . . . . . . . . 47
11.05 FUND MAY ORDER PHYSICAL EXAMINATION AND/OR AUTOPSY . . . . . 47
11.06 TO WHOM BENEFITS ARE PAYABLE . . . . . . . . . . . . . . . 47
11.07 CERTAIN ACTS OF THE FUND DO NOT CONSTITUTE A WAIVER OF RIGHTS 47
11.08 NO MEDICAL EXAMINATION REQUIRED AS PREREQUISITE TO COVERAGE . 47
11.09 ALL BENEFIT PAYMENTS BASED ON REASONABLE AND CUSTOMARY CHARGES
      FOR THE SERVICE . . . . . . . . . . . . . . . . . . . . . 48
11.10 PERIOD DURING WHICH BENEFIT PAYMENTS MUST BE CLAIMED . . . . 48
11.11 APPLICABLE LAW . . . . . . . . . . . . . . . . . . . . . . 48
11.12 SEVERABILITY OF PLAN PROVISIONS . . . . . . . . . . . . . . 48
11.13 RIGHT TO REVIEW ALL CLAIMS . . . . . . . . . . . . . . . . 48
11.14 SUBROGATION . . . . . . . . . . . . . . . . . . . . . . . 48
11.15 WORKER'S COMPENSATION SUBROGATION . . . . . . . . . . . . . 51
11.16 RIGHT TO PROVIDE ALTERNATIVE CARE . . . . . . . . . . . . . 52

ARTICLE XII.   BASIC BENEFITS . . . . . . . . . . . . . . . . . . . . 53

12.01 OUTLINE OF BASIC BENEFITS . . . . . . . . . . . . . . . . 53
12.02 LOSS OF TIME BENEFIT—PARTICIPANT ONLY . . . . . . . . . . 53
12.03 HOSPITAL EXPENSE BENEFIT . . . . . . . . . . . . . . . . . 54
12.04 SURGICAL AND OBSTETRICAL EXPENSE BENEFIT . . . . . . . . . 55
12.05 OUTPATIENT DIAGNOSTIC X-RAY AND LABORATORY EXPENSE BENEFIT . 55
12.06 OUTPATIENT ACCIDENTAL BODILY INJURY EXPENSE BENEFIT . . . . 56
12.07 PRESCRIPTION DRUG BENEFIT . . . . . . . . . . . . . . . . 56
12.08 PSYCHIATRIC, ALCOHOLISM AND DRUG ABUSE—INPATIENT TREATMENT
      BENEFIT . . . . . . . . . . . . . . . . . . . . . . . . . 57
12.09 PSYCHIATRIC, ALCOHOLISM AND DRUG ABUSE—OUTPATIENT TREATMENT
      BENEFIT . . . . . . . . . . . . . . . . . . . . . . . . . 58
12.10 ORGAN TRANSPLANT DONOR BENEFIT . . . . . . . . . . . . . . 59
12.11 HEARING AID BENEFIT . . . . . . . . . . . . . . . . . . . 59
12.12 OUTPATIENT CANCER TREATMENT BENEFIT . . . . . . . . . . . . 60
12.13 AMBULANCE SERVICE BENEFIT . . . . . . . . . . . . . . . . 60
12.14 CHIROPRACTIC EXPENSE BENEFIT . . . . . . . . . . . . . . . 61
12.15 WOMEN'S HEALTH BENEFIT . . . . . . . . . . . . . . . . . . 61
12.16 MAYO CLINIC TREATMENT . . . . . . . . . . . . . . . . . . 62
12.17 WAIVER OF DEDUCTIBLE/COPAYMENT REQUIREMENT (OFFICE VISITS) . 62
12.18 PAYMENT BASED ON PROPRIETY OF PROCEDURES . . . . . . . . . 62
12.19 PAYMENT OF CERTAIN BASIC BENEFITS FOR TREATMENT CONTINUING
      AFTER TERMINATION OF COVERAGE UNDER THE PLAN . . . . . . . 62
12.20 TERMINATION OF THE BASIC BENEFIT EXTENSION . . . . . . . . 63

ARTICLE XIII.  MAJOR MEDICAL EXPENSE BENEFITS . . . . . . . . . . . . 64

13.01 OUTLINE OF MAJOR MEDICAL BENEFITS . . . . . . . . . . . . 64

13.02 PAYMENT BASED ON PROPRIETY OF PROCEDURES . . . . . . . . . . 64
13.03 MAXIMUM MAJOR MEDICAL EXPENSE BENEFITS . . . . . . . . . . . 64
13.04 EXTENSION OF THE MAJOR MEDICAL EXPENSE BENEFIT . . . . . . . 64
13.05 TERMINATION OF THE MAJOR MEDICAL EXTENSION . . . . . . . . . 65

ARTICLE XIV.    LIFE INSURANCE BENEFITS . . . . . . . . . . . . . . . . . . . . 66

14.01 BENEFITS . . . . . . . . . . . . . . . . . . . . . . . . . 66
14.02 LIFE INSURANCE BENEFIT . . . . . . . . . . . . . . . . . . 66
14.03 DEPENDENT LIFE INSURANCE BENEFIT . . . . . . . . . . . . . 66
14.04 TOTAL AND PERMANENT DISABILITY INSTALLMENT/WAIVER OF PREMIUM
      DISABILITY BENEFITS . . . . . . . . . . . . . . . . . . . 66
14.05 TOTAL AND PERMANENT DISABILITY INSTALLMENT BENEFIT . . . . . 67
14.06 WAIVER OF PREMIUM DISABILITY BENEFIT . . . . . . . . . . . 67
14.07 ELIGIBILITY AND ADMINISTRATION . . . . . . . . . . . . . . 68
14.08 ACCIDENTAL DEATH AND DISMEMBERMENT BENEFIT . . . . . . . . 68
14.09 BENEFICIARY AND MODE OF SETTLEMENT . . . . . . . . . . . . 69
14.10 GRACE PERIOD . . . . . . . . . . . . . . . . . . . . . . . 70

ARTICLE XV.     DENTAL BENEFITS . . . . . . . . . . . . . . . . . . . . . . . 71

15.01 PAYMENT FOR CERTAIN TREATMENT PERFORMED BY A DENTIST . . . . 71
15.02 COVERED DENTAL PROCEDURES AND MAXIMUM AMOUNT PAYABLE . . . . 71
15.03 LIMITATIONS ON PAYMENT OF DENTAL BENEFITS . . . . . . . . . 71
15.04 ORTHODONTIA BENEFIT—DEPENDENT CHILDREN ONLY . . . . . . . . 73
15.05 EXTENSION OF DENTAL BENEFITS . . . . . . . . . . . . . . . 74
15.06 LISTING OF COVERED DENTAL PROCEDURES . . . . . . . . . . . 74

ARTICLE XVI.    VISION BENEFITS . . . . . . . . . . . . . . . . . . . . . . . 82

16.01 COVERED VISION EXPENSES . . . . . . . . . . . . . . . . . . 82
16.02 COVERED VISION PROCEDURES AND MAXIMUM AMOUNT PAYABLE . . . . 82
16.03 LIMITATION ON PAYMENT FOR VISION BENEFITS . . . . . . . . . 82

ARTICLE XVII.   OUT-OF-POCKET EXPENSE LIMIT . . . . . . . . . . . . . . . . . 83

17.01 THE TERM OUT-OF-POCKET EXPENSE IS DEFINED AS THE PORTION OF
      ELIGIBLE    EXPENSES    INCURRED    THAT    ARE    THE    PARTICIPANT'S
      RESPONSIBILITY AFTER THE PLAN HAS PAID ITS REQUIRED BENEFITS.    THE
      FUND MAY PROVIDE COVERED INDIVIDUALS WITH AN OUT-OF-POCKET EXPENSE
      LIMIT TO BE ADMINISTERED AS SET FORTH IN THIS ARTICLE.    HOWEVER,
      THE LIMIT LEVELS, IF ANY, AND/OR PROGRAM LIMITATIONS SPECIFIC TO
      THE COVERED INDIVIDUAL'S PLAN ARE DETERMINED BY REFERENCING SECTION
      20.05. . . . . . . . . . . . . . . . . . . . . . . . . . . 83

ARTICLE XVIII.  PLAN BENEFIT LIMIT . . . . . . . . . . . . . . . . . . . . . 84

18.01 THE TERM PLAN BENEFIT LIMIT IS DEFINED AS THE MAXIMUM PAYABLE BY
      THE PLAN IN A GIVEN CALENDAR YEAR UNDER ANY OR ALL APPLICABLE
      PLAN BENEFITS.    THE PLAN MAY INCLUDE SUCH PLAN BENEFIT LIMIT
      AS DESCRIBED.    THE AMOUNT OF THE PLAN BENEFIT LIMIT, IF ANY,
      IS DETERMINED BY REFERENCING SECTION 20.06. . . . . . . . . 84

18.02 IN ADDITION TO ALL OTHER LIMITATIONS, THERE IS A SEPARATE
COVERAGE LIMIT OF $1,000,000 PER COVERED INDIVIDUAL PER
CALENDAR YEAR: PAYMENTS BY THE FUND, UPON ALL COVERAGE
CLAIMS INCURRED BY ANY COVERED INDIVIDUAL IN ANY CALENDAR
YEAR (2001 OR LATER), SHALL NOT EXCEED $1,000,000.  THIS
COVERAGE LIMIT IS TO BE CALCULATED AND APPLIED SEPARATELY,
WITHOUT ANY REGARD FOR ANY OTHER LIMIT THAT MAY ALSO BE
APPLICABLE.. . . . . . . . . . . . . . . . . . . . . . . 84

ARTICLE XIX.    EFFECTIVE DATE OF PLAN SPECIFIC PROVISIONS (PLAN C-6) . . . . . . . 85

19.01 ALL PLAN SPECIFIC PROVISIONS OF THIS PLAN DOCUMENT ARE AFFECTIVE
AND APPLICABLE TO PLAN C-6 WITH RESPECT TO EVERY LOSS OR OTHER
BASIS OF COVERAGE THAT OCCURS ON OR AFTER NOVEMBER 17, 1999,
SUBJECT THEREAFTER TO DULY ENACTED PLAN REVISIONS.  . . . . . 85

ARTICLE XX.     SCHEDULE OF BENEFITS (PLAN C-6) . . . . . . . . . . . . . . . . 86

20.01 BASIC BENEFITS AND MAJOR MEDICAL EXPENSE BENEFITS . . . . . . 86
20.02 DENTAL BENEFITS . . . . . . . . . . . . . . . . . . . . . . 88
20.03 VISION BENEFITS . . . . . . . . . . . . . . . . . . . . . . 88
20.04 LIFE INSURANCE BENEFIT, ACCIDENTAL DEATH AND DISMEMBERMENT
BENEFIT, TOTAL AND PERMANENT DISABILITY INSTALLMENT BENEFIT AND
THE WAIVER OF PREMIUM DISABILITY BENEFIT . . . . . . . . . . 89
20.05 OUT OF POCKET EXPENSE LIMIT . . . . . . . . . . . . . . . . 89
20.06 PLAN BENEFIT LIMIT . . . . . . . . . . . . . . . . . . . . 89
20.07 PLAN DEDUCTIBLE . . . . . . . . . . . . . . . . . . . . . . 89

ARTICLE XIX.    EFFECTIVE DATE OF PLAN SPECIFIC PROVISIONS (Plan C-5) . . . . . . . 90

19.01 ALL PLAN SPECIFIC PROVISIONS OF THIS PLAN DOCUMENT ARE AFFECTIVE
AND APPLICABLE TO PLAN C-5 WITH RESPECT TO EVERY LOSS OR OTHER
BASIS OF COVERAGE THAT OCCURS ON OR AFTER NOVEMBER 17, 1999,
SUBJECT THEREAFTER TO DULY ENACTED PLAN REVISIONS.  . . . . . 90

ARTICLE XX.     SCHEDULE OF BENEFITS (PLAN C-5) . . . . . . . . . . . . . . . . 91

20.01 BASIC BENEFITS AND MAJOR MEDICAL EXPENSE BENEFITS . . . . . . 91
20.02 DENTAL BENEFITS . . . . . . . . . . . . . . . . . . . . . . 93
20.03 VISION BENEFITS . . . . . . . . . . . . . . . . . . . . . . 93
20.04 LIFE INSURANCE BENEFIT, ACCIDENTAL DEATH AND DISMEMBERMENT
BENEFIT, TOTAL AND PERMANENT DISABILITY INSTALLMENT BENEFIT AND
THE WAIVER OF PREMIUM DISABILITY BENEFIT . . . . . . . . . . 94
20.05 OUT OF POCKET EXPENSE LIMIT . . . . . . . . . . . . . . . . 94
20.06 PLAN BENEFIT LIMIT . . . . . . . . . . . . . . . . . . . . 94
20.07 PLAN DEDUCTIBLE . . . . . . . . . . . . . . . . . . . . . . 94

ARTICLE XIX.    EFFECTIVE DATE OF PLAN SPECIFIC PROVISIONS  (Plan C-4) . . . . . . . 95

19.01 ALL PLAN SPECIFIC PROVISIONS OF THIS PLAN DOCUMENT ARE AFFECTIVE
AND APPLICABLE TO PLAN C-4 WITH RESPECT TO EVERY LOSS OR OTHER

BASIS OF COVERAGE THAT OCCURS ON OR AFTER NOVEMBER 17, 1999, SUBJECT THEREAFTER TO DULY ENACTED PLAN REVISIONS. . . . . . 95

ARTICLE XX.    SCHEDULE OF BENEFITS (PLAN C-4) . . . . . . . . . . . . . . . . 96

20.01 BASIC BENEFITS AND MAJOR MEDICAL EXPENSE BENEFITS . . . . . . 96
20.02 DENTAL BENEFITS    . . . . . . . . . . . . . . . . . . . . 98
20.03 VISION BENEFITS    . . . . . . . . . . . . . . . . . . . . 99
20.04 LIFE INSURANCE BENEFIT, ACCIDENTAL DEATH AND DISMEMBERMENT
      BENEFIT, TOTAL AND PERMANENT DISABILITY INSTALLMENT BENEFIT AND
      THE WAIVER OF PREMIUM DISABILITY BENEFIT  . . . . . . . . . 99
20.05 OUT OF POCKET EXPENSE LIMIT . . . . . . . . . . . . . . . 99
20.06 PLAN BENEFIT LIMIT    . . . . . . . . . . . . . . . . . . 99
20.07 PLAN DEDUCTIBLE . . . . . . . . . . . . . . . . . . . . . 99

ARTICLE XIX.    EFFECTIVE DATE OF PLAN SPECIFIC PROVISIONS (PLAN
                      MODIFIED C-4) . . . . . . . . . . . . . . . . . . 100

19.01 ALL PLAN SPECIFIC PROVISIONS OF THIS PLAN DOCUMENT ARE
      AFFECTIVE AND APPLICABLE TO PLAN MODIFIED C-4 WITH RESPECT TO
      EVERY LOSS OR OTHER BASIS OF COVERAGE THAT OCCURS ON OR AFTER
      NOVEMBER 17, 1999, SUBJECT THEREAFTER TO DULY ENACTED PLAN
      REVISIONS. . . . . . . . . . . . . . . . . . . . . . . . . 100

ARTICLE XX.    SCHEDULE OF BENEFITS (PLAN MODIFIED C-4)  . . . . . . . . . . 101

20.01 BASIC BENEFITS AND MAJOR MEDICAL EXPENSE BENEFITS . . . . . 101
20.02 DENTAL BENEFITS    . . . . . . . . . . . . . . . . . . . . 103
20.03 VISION BENEFITS . . . . . . . . . . . . . . . . . . . . . 104
20.04 LIFE INSURANCE BENEFIT, ACCIDENTAL DEATH AND DISMEMBERMENT
      BENEFIT, TOTAL AND PERMANENT DISABILITY INSTALLMENT BENEFIT AND
      THE WAIVER OF PREMIUM DISABILITY BENEFIT  . . . . . . . . . 104
20.05 OUT OF POCKET EXPENSE LIMIT . . . . . . . . . . . . . . . 104
20.06 PLAN BENEFIT LIMIT  . . . . . . . . . . . . . . . . . . . 104
20.07 PLAN DEDUCTIBLE . . . . . . . . . . . . . . . . . . . . . 104

ARTICLE XIX.    EFFECTIVE DATE OF PLAN SPECIFIC PROVISIONS (Plan A) . . . . . . 105

19.01 ALL PLAN SPECIFIC PROVISIONS OF THIS PLAN DOCUMENT ARE AFFECTIVE
      AND APPLICABLE TO PLAN A WITH RESPECT TO EVERY LOSS OR OTHER
      BASIS OF COVERAGE THAT OCCURS ON OR AFTER NOVEMBER 17, 1999,
      SUBJECT THEREAFTER TO DULY ENACTED PLAN REVISIONS. . . . . 105

ARTICLE XX.    SCHEDULE OF BENEFITS (PLAN A) . . . . . . . . . . . . . . . . 106

20.01 BASIC BENEFITS AND MAJOR MEDICAL EXPENSE BENEFITS . . . . . 106
20.02 DENTAL BENEFITS    . . . . . . . . . . . . . . . . . . . . 108
20.03 VISION BENEFITS . . . . . . . . . . . . . . . . . . . . . 108
20.04 LIFE INSURANCE BENEFIT, ACCIDENTAL DEATH AND DISMEMBERMENT
      BENEFIT, TOTAL AND PERMANENT DISABILITY INSTALLMENT BENEFIT AND
      THE WAIVER OF PREMIUM DISABILITY BENEFIT  . . . . . . . . . 109
20.05 OUT OF POCKET EXPENSE LIMIT . . . . . . . . . . . . . . . 109

20.06 PLAN BENEFIT LIMIT . . . . . . . . . . . . . . . 109
20.07 PLAN DEDUCTIBLE . . . . . . . . . . . . . . . . . 109

ARTICLE XIX.    EFFECTIVE DATE OF PLAN SPECIFIC PROVISIONS (Plan B) . . . . . . . 110

19.01 ALL PLAN SPECIFIC PROVISIONS OF THIS PLAN DOCUMENT ARE AFFECTIVE
      AND APPLICABLE TO PLAN B WITH RESPECT TO EVERY LOSS OR OTHER
      BASIS OF COVERAGE THAT OCCURS ON OR AFTER NOVEMBER 17, 1999,
      SUBJECT THEREAFTER TO DULY ENACTED PLAN REVISIONS. . . . . 110

ARTICLE XX.    SCHEDULE OF BENEFITS (PLAN B) . . . . . . . . . . 111

20.01 BASIC BENEFITS AND MAJOR MEDICAL EXPENSE BENEFITS . . . . . 111
20.02 DENTAL BENEFITS . . . . . . . . . . . . . . . . . 113
20.03 VISION BENEFITS . . . . . . . . . . . . . . . . . 113
20.04 LIFE INSURANCE BENEFIT, ACCIDENTAL DEATH AND DISMEMBERMENT
      BENEFIT, TOTAL AND PERMANENT DISABILITY INSTALLMENT BENEFIT AND
      THE WAIVER OF PREMIUM DISABILITY BENEFIT . . . . . . . . 114
20.05 OUT OF POCKET EXPENSE LIMIT . . . . . . . . . . . . . 114
20.06 PLAN BENEFIT LIMIT . . . . . . . . . . . . . . . 114
20.07 PLAN DEDUCTIBLE . . . . . . . . . . . . . . . . . 114

ARTICLE XIX.    EFFECTIVE DATE OF PLAN SPECIFIC PROVISIONS (Plan S) . . . . . . . 115

19.01 ALL PLAN SPECIFIC PROVISIONS OF THIS PLAN DOCUMENT ARE AFFECTIVE
      AND APPLICABLE TO PLAN S WITH RESPECT TO EVERY LOSS OR OTHER
      BASIS OF COVERAGE THAT OCCURS ON OR AFTER NOVEMBER 17, 1999,
      SUBJECT THEREAFTER TO DULY ENACTED PLAN REVISIONS. . . . . 115

ARTICLE XX.    SCHEDULE OF BENEFITS (PLAN S) . . . . . . . . . . 116

20.01 BASIC BENEFITS AND MAJOR MEDICAL EXPENSE BENEFITS . . . . . 116
20.02 DENTAL BENEFITS . . . . . . . . . . . . . . . . . 118
20.03 VISION BENEFITS . . . . . . . . . . . . . . . . . 118
20.04 LIFE INSURANCE BENEFIT, ACCIDENTAL DEATH AND DISMEMBERMENT
      BENEFIT, TOTAL AND PERMANENT DISABILITY INSTALLMENT BENEFIT AND
      THE WAIVER OF PREMIUM DISABILITY BENEFIT . . . . . . . . 118
20.05 OUT OF POCKET EXPENSE LIMIT . . . . . . . . . . . . . 118
20.06 PLAN BENEFIT LIMIT . . . . . . . . . . . . . . . 118

ARTICLE XIX.    EFFECTIVE DATE OF PLAN SPECIFIC PROVISIONS (Plan MM-100) . . . . 119

19.01 ALL PLAN SPECIFIC PROVISIONS OF THIS PLAN DOCUMENT ARE AFFECTIVE
      AND APPLICABLE TO PLAN MM-100 WITH RESPECT TO EVERY LOSS OR
      OTHER BASIS OF COVERAGE THAT OCCURS ON OR AFTER NOVEMBER 17,
      1999, SUBJECT THEREAFTER TO DULY ENACTED PLAN REVISIONS. . 119

ARTICLE XX.    SCHEDULE OF BENEFITS (PLAN MM-100) . . . . . . . . . . 120

20.01 BASIC BENEFITS AND MAJOR MEDICAL EXPENSE BENEFITS . . . . . 120
20.02 DENTAL BENEFITS . . . . . . . . . . . . . . . . . 122
20.03 VISION BENEFITS . . . . . . . . . . . . . . . . . 123

20.04 LIFE INSURANCE BENEFIT, ACCIDENTAL DEATH AND DISMEMBERMENT
BENEFIT, TOTAL AND PERMANENT DISABILITY INSTALLMENT BENEFIT AND
THE WAIVER OF PREMIUM DISABILITY BENEFIT . . . . . . . . . 123
20.05 OUT OF POCKET EXPENSE LIMIT . . . . . . . . . . . . . . 123
20.06 PLAN BENEFIT LIMIT . . . . . . . . . . . . . . . . . . . 123
20.07 PLAN DEDUCTIBLE . . . . . . . . . . . . . . . . . . . . . 123

ARTICLE XIX.    EFFECTIVE DATE OF PLAN SPECIFIC PROVISIONS (Plan MM-200) . . . . . 124

19.01 ALL PLAN SPECIFIC PROVISIONS OF THIS PLAN DOCUMENT ARE AFFECTIVE
AND APPLICABLE TO PLAN MM-200 WITH RESPECT TO EVERY LOSS OR
OTHER BASIS OF COVERAGE THAT OCCURS ON OR AFTER NOVEMBER 17,
1999, SUBJECT THEREAFTER TO DULY ENACTED PLAN REVISIONS.    . 124

ARTICLE XX.    SCHEDULE OF BENEFITS (PLAN MM-200) . . . . . . . . . . . . . . . 125

20.01 BASIC BENEFITS AND MAJOR MEDICAL EXPENSE BENEFITS . . . . . 125
20.02 DENTAL BENEFITS . . . . . . . . . . . . . . . . . . . . . 127
20.03 VISION BENEFITS . . . . . . . . . . . . . . . . . . . . . 128
20.04 LIFE INSURANCE BENEFIT, ACCIDENTAL DEATH AND DISMEMBERMENT
BENEFIT, TOTAL AND PERMANENT DISABILITY INSTALLMENT BENEFIT AND
THE WAIVER OF PREMIUM DISABILITY BENEFIT . . . . . . . . . 128
20.05 OUT OF POCKET EXPENSE LIMIT . . . . . . . . . . . . . . 128
20.06 PLAN BENEFIT LIMIT . . . . . . . . . . . . . . . . . . . 128
20.07 PLAN DEDUCTIBLE . . . . . . . . . . . . . . . . . . . . . 128

## ARTICLE I.  DEFINITIONS

The terms used in this Plan shall have the following meanings.

1.01  **Accidental Bodily Injury:**  Physical damage to the body, e.g. a hurt, a wound, a trauma, resulting from a sudden and unexpected event, injury or external force occurring without forewarning.

1.02  **Accidental Death:**  Any death directly and solely resulting from external means or an external cause, as opposed to a death caused or contributed to by a disease or infirmity.  Benefits are not payable if death occurs in a manner excluded by Section 14.08.

1.03  **Accidental Death and Dismemberment Benefit:**

    (a)  The benefit payable to the beneficiary of a Covered Participant upon the death of the Covered Participant resulting from Accidental Bodily Injury; or

    (b)  The benefit payable to a Covered Participant upon the accidental loss of a limb or an eye as set forth in Sections 14.08 and 20.04.

1.04  **Active Employee:**  A person who is actively at work as an Employee, after the commencement date of coverage, except that an Employee on vacation or involved in a Temporary Work Stoppage shall be considered an Active Employee.  An Employee on Leave of Absence, Sick Leave, confined to a hospital, on Layoff, or otherwise unable to actively work, is not an Active Employee. An Employee on Leave of Absence is an Active Employee only if such Leave of Absence is also a Family Medical Leave under federal law.

1.05  **Alcoholism or Drug Abuse Treatment Facility:**  A treatment facility or clinic which provides a program of effective medical and therapeutic treatment for either alcoholism and/or drug abuse approved by the attending Physician and the Fund, and which:

    (a)  Is licensed, certified or approved as an Alcoholism and/or Drug Abuse Treatment Facility by the state or jurisdiction in which it is located, and does not have a license as a "Hospital";

    (b)  Has or maintains a specific and detailed program requiring full residence or full participation by the patient; and

    (c)  Provides at least the following basic services:

(1)   Room and board (inpatient);

(2)   Evaluation and diagnosis;

(3)   Counseling; and

(4)   Referral and orientation to specialized community resources.

**1.06  Basic Benefits:**    Basic Benefits are described in detail in Article XII and Section 20.01 a) through o).

**1.07  Bone Marrow Transplant:**    Any care, treatment services or supplies related to the transfer of stem cells into (or back into) the patient, including bone marrow or stem cell harvesting and all steps involved in the administration of chemotherapy at doses higher than standard.

**1.08  Child:**    A Participant's natural child, adopted child, step-child; a child placed with a Participant for adoption; or a child for whom the Participant is obligated to provide support pursuant to a Qualified Medical Child Support Order. A child whose legal guardian or custodian is a Participant shall only be considered a "Child" under this definition if the Participant establishes that the guardianship or custodianship is permanent and established pursuant to court order and the Participant (or the Participant and spouse) is the sole support of the child unless that child is a beneficiary under a Qualified Medical Child Support Order under federal law. Temporary designation of guardianship entered into primarily for the purpose of obtaining coverage for a person under this Plan shall not qualify that person as a "Child" eligible for coverage. The term "Child" shall not include a child who is married, or who has been legally adopted and who is no longer dependent upon a Participant for support, and shall not include any child who is not dependent upon the Participant for support other than the coverage provided by this Plan, unless that child is a beneficiary under a Qualified Medical Child Support Order under federal law.

**1.09  Chiropractor:**    A legally qualified and licensed Chiropractor.

**1.10  Clinical Psychologist:**

(a)   A person who is licensed or certified as a Psychologist by the appropriate governmental authority having jurisdiction over such licensure or certification, as the case may be, in the jurisdiction where such person renders service to the Covered Individual; or

(b)   A person who is a Member or Fellow of the American Psychological Association, if

there is no licensure or certification in the jurisdiction where such person renders service to the Covered Individual.

**1.11  Collective Bargaining Agreement:**

An agreement reached by bargaining as to wages and conditions of work and to which the Union is a party.

**1.12  Continuation Coverage:**

A continuation of the same terms, conditions, limitations and exclusions of Coverage as are provided by the Fund to a Covered Individual on the day before a Qualifying Event upon completion of election procedures pursuant to Section 3.19.

**1.13  Continuous Funded Employment:**

Uninterrupted employment of a Participant during which continuous Employer Contributions have been made on his behalf, by an Employer, to the Fund or to any Other Plan having a Reciprocity Agreement in effect with the Fund.

**1.14  Cosmetic:**

Care, treatment, services or supplies the primary effect of which is to improve the physical appearance of a Covered Individual. The fact that there may be an incidental medical benefit does not prevent a determination that the care, treatment, services or supplies are cosmetic.

**1.15  Coverage:**

Full entitlement to all benefits of this Plan by a Participant or Dependent, unless limited or excluded by any provision of this Plan.

**1.16  Covered Dependent:**

A Dependent who qualifies for Coverage under this Plan in accordance with the provisions of Article III of this Plan.

**1.17  Covered Individual:**

A Covered Participant or a Covered Dependent. See also Section 3.31.

**1.18  Covered Participant:**

A Participant who qualifies for Coverage under this Plan in accordance with the provisions of Article III of this Plan.

**1.19  Dental Benefits:**

The benefits set forth in Article XV and Section 20.02.

**1.20  Dentist:**

A legally qualified and licensed Dentist.

**1.21  Dependent:**

A Participant's Spouse or Child.

**1.22  Disability:**

An illness, injury or pregnancy, except as provided in Section 12.10.

**1.23  Discharge:**                    A permanent termination of employment initiated by the Employer.

**1.24  Eligible Major Medical Expenses:**

(a)    The Reasonable and Customary charges incurred by a Covered Individual for medical services, supplies and treatments performed or prescribed by a Physician, including:

(1)    Charges by a Hospital for room and board and other services required for purposes of treatment. The allowance for a Private Room is limited to the Hospital's average Semi-Private Room rate;

(2)    Charges by a Physician or surgeon for professional services, except those related to a routine physical examination;

(3)    Charges for services of legally licensed physiotherapists, graduate registered nurses and other allied licensed health professionals, provided such services are not rendered by a member of the person's family;

(4)    Charges for drugs and medicines purchased with a Physician's prescription, dispensed by a pharmacist and bearing the Federal or State Legend;

(5)    Charges for rental of braces, crutches, wheelchairs, hospital-type beds and such durable medical equipment as may be approved by the Fund. Rental charges payable shall in no event exceed the Reasonable and Customary purchase price of such items. Purchase of such items will be approved only if deemed by the Fund to be more economical than rental;

(6)    Charges for prosthetics or prosthetic devices;

(7)    Charges for X-ray and laboratory procedures, except those related to a routine physical examination;

(8)   Charges by a Hospital or by a professional licensed ambulance service for necessary transportation by ambulance to and from the Hospital;

(9)   Charges by a Dentist or dental surgeon for repair of the jaws and for repair or replacement of natural teeth damaged through accidental bodily injury;

(10)  Charges for chemotherapy or radiation treatments;

(11)  Charges for contact lenses and/or glasses prescribed to treat glaucoma, keratoconus or resulting from cataract surgery, once in a lifetime;

(12)  Charges for treatment or service for the prevention or cure of alcoholism or drug abuse, or for psychiatric treatment while confined in, or as an outpatient of, a Hospital or licensed psychiatric facility;

(13)  Charges for conventional hearing aids and one (1) set of batteries, once every three (3) years;

(14)  Charges for surgical assistance;

(15)  Charges for renal dialysis; and

(16)  Charges for outpatient cardiac rehabilitation programs which began less than six (6) months after onset of heart attack or other invasive cardiac procedure, are performed at a qualified hospital, and do not exceed three (3) months in duration.

(b)   The following are not considered Eligible Major Medical Expenses:

(1)   Any charge excluded under Article IV, General Exclusions, Limitations And Conditions For Payment Of Claims, or under Article V, Coordination Of Benefits;

(2)   Any charge for eye examinations for the correction of vision, fitting of glasses or contact lenses, except as otherwise

provided in Section 1.24(a)(11);

(3) Medicines or drugs which can be purchased over the counter, dietary supplements, vitamins and any contraceptive drug or device, or any other drugs not specifically authorized by the Board of Trustees;

(4) Any charge, or any portion of any charge, covered by any benefit of this Plan, other than the Major Medical Expense Benefit under Article XIII;

(5) Any portion of a provider charge that exceeds the Reasonable and Customary charge;

(6) Cost of transportation and lodging in connection with medical treatment, transportation equipment, construction modifications, clothing (including undergarments) and capital asset items;

(7) Specialized furniture and equipment unless approved by the Fund;

(8) Any dental service or appliance, even if performed in conjunction with medical treatment, except as otherwise provided in Section 1.24(a)(9); and

(9) Any charge for educational programs or materials.

1.25 **Employee:**

(a) All persons who are accepted by the Trustees for participation in the Fund, under the terms and conditions stated by the Trustees for participation, and who are Active Employees of an Employer under the terms and conditions of a Collective Bargaining Agreement which requires Employer contributions be made to the Fund, and such other employees of the Employer as are proposed and accepted by the Trustees for participation, on whose behalf payments are required by the agreement of the Employer or applicable law to be made to the Fund;

(b) All persons employed by the Union upon being proposed by the Union and accepted by the Trustees; as to such Union personnel,

the Union shall be considered an Employer solely for the purpose of contributions within the meaning of the Agreement and Declaration of Trust, as herein defined, and shall, on behalf of such personnel, make payments to the Trust at the same times and at the rate of payment equal to that made by any other Employer who is a party to the Trust Agreement;

(c) All persons employed by Central States, Southeast and Southwest Areas Health and Welfare Fund or Central States, Southeast and Southwest Areas Pension Fund upon acceptance by the Trustees; as to such Trust Fund personnel, the Trustees shall be deemed an Employer solely for the purpose of contributions within the meaning of the Agreement and Declaration of Trust and shall, on behalf of such personnel, make payments to the Trust at the times and at the rate of payment equal to that made by any other Employer who is a party to the Trust Agreement; or

(d) All persons who are Trustees of Central States, Southeast and Southwest Areas Health and Welfare Fund or Central States, Southeast and Southwest Areas Pension Fund upon acceptance by the Trustees; on behalf of such persons who are Trustees, their Employers shall make contributions to the Trust at the times and at the rate of payment equal to that required by any other Employer who is a party to the Trust Agreement.

In all instances the common-law test for, or the applicable statutory definition of, master-servant relationship shall control Employee status. The continuation of Employee status shall be subject to such rules as the Trustees may adopt.

1.26  Employer:

Any Employer (including an Association of Employers) who is or becomes a party to a Collective Bargaining Agreement and who, with the acquiescence of the Trustees, agrees to be bound by the Trust Agreement and this Plan and is accepted for participation in the Plan by the Trustees, subject to such rules as the Trustees may in their discretion adopt. The Union, the Health and Welfare Fund and the Pension Fund shall be deemed to be Employers of those persons employed and proposed by such organizations and accepted by the Trustees.

1.27  Employer Contributions:

Contributions made by Employers to the Fund; contributions made by the Union or the Fund on behalf of their Employees; and, amounts set aside by the Fund on behalf of its Employees.

**1.28  Employer Obligation Date:**    The date on which an Employer first becomes obligated, by reason of contract or agreement with the Fund, to make contributions to the Fund on behalf of a group of Employees.

**1.29  Family Medical Leave:**    A voluntary absence from work taken by an employee pursuant to the provisions of the federal Family Medical Leave Act.

**1.30  Former Covered Participant:**    A person who was a Covered Participant but presently has no Coverage.

**1.31  Fund:**    The Central States, Southeast and Southwest Areas Health and Welfare Fund.

**1.32  Health Maintenance Organization (HMO):**    An organization operating as a Health Maintenance Organization.

**1.33  Hospital:**    A facility licensed by the State or jurisdiction in which it is located and operated for the care and treatment of sick and injured persons, with organized facilities for surgery and diagnosis and a twenty-four (24) hour nursing service.

**1.34  Hospital Confinement:**    A hospital stay of at least overnight duration. An emergency room visit is not part of a Hospital Confinement unless it leads directly to a stay in a hospital room.

**1.35  Immediate Coverage:**    Full entitlement to all benefits of this Plan without fulfilling the Initial Contribution Period.

**1.36  Initial Contribution Period:**    A period of consecutive days beginning on the day an Employer becomes obligated to make Employer Contributions for a Participant and ending on the Sunday of the eighth (8th) week thereafter, provided the Employer remains obligated to make weekly Employer Contributions on behalf of the Participant throughout the period.

**1.37  Lay-Off:**    An involuntary separation from employment caused by an Employer suspending Employees. Individuals shall not be deemed on Lay-off if they engage in gainful employment for any other employer, nor shall Lay-Off status continue when an individual retires or otherwise terminates the employment relationship.

**1.38  Leave of Absence:**    An Employee's voluntary temporary absence from employment, approved by the Employer. Individuals on Leave of Absence shall not engage in gainful employment for any other employer, nor

shall Leave of Absence status continue when an individual retires.

1.39 **Life Insurance Benefit:**

(a) The benefit payable at a Covered Participant's death as set forth in Article XIV and Section 20.04 of the applicable plan.

(b) The benefit payable to a Covered Participant upon the death of a Dependent Spouse or Child as set forth in Article XIV and Section 20.04 of the applicable plan.

1.40 **Local Union:**

Those Local Unions affiliated with the International Brotherhood of Teamsters who have executed Collective Bargaining Agreements which require contributions to be made to the Fund on behalf of the covered employees, and such other Unions as the Trustees may agree upon.

1.41 **Loss of Time Benefit:**

The benefits set forth in Sections 12.02 and 20.01(a).

1.42 **Loss of Time Disability Coverage:**

Coverage for a Covered Participant and his eligible Covered Dependents which may be available during periods when the Covered Participant is eligible for the Loss of Time Benefit. See Section 20.01(a) for application, if any.

1.43 **Maintenance Care:**

Maintenance Care is care provided to a person who needs assistance or support for the essence of daily living but who is not under a course of treatment which will improve his condition to the extent necessary to enable him to function without such assistance or support, except for care which is necessary to treat a curable illness. A maintenance care determination is not precluded by the fact that a patient is under the care of a Physician and that the services are provided at the Physician's request.

1.44 **Major Medical Expense Benefit:**

The benefits set forth in Article XIII and Section 20.01(p).

1.45 **New Group:**

A group of Employees who become Participants when their Employer first becomes obligated to make Employer Contributions on their behalf.

1.46 **New Participant:**

An Employee who becomes a Participant by joining a group after the Employer of the group became obligated to make Employer Contributions to the Fund on behalf of the group.

**1.47  Other Plan:**  Any group plan, insurance policy or contract which provides benefits for hospital, surgical, dental, psychiatric, chiropractic or other medical treatment, and any plan or insurance coverage hereafter described in subparagraph (f). Other Plan includes a plan providing benefits through:

(a)  Group blanket or franchise insurance coverage;

(b)  Group Blue Cross, Group Blue Shield, group practice or other prepayment coverage;

(c)  Any coverage under labor-management trusteed plans, union welfare plans, employer organizations or employee benefits organization plans;

(d)  Any coverage under government programs or any coverage required or provided by statute;

(e)  Any other arrangement providing hospital, surgical, dental, psychiatric, chiropractic or other medical treatment for members of a group; and

(f)  No fault, personal injury protection or financial responsibility motor vehicle insurance coverage which provides benefits to or for a Covered Individual for bodily or psychological injury, including but not limited to, benefits for hospital, surgical, dental, psychiatric, chiropractic and other medical treatment.

The term "Other Plan" shall be construed separately with respect to each policy, contract or other arrangement for benefits or services and separately with respect to that portion of any such policy, contract or other arrangement which reserves the right to take the benefits or services of Other Plans into consideration in determining its benefits and that portion which does not.

**1.48  Out of Pocket Expense Limit:**  A maximum liability per Covered Individual or per family per calendar year as set forth in Article XVII and Section 20.05.

**1.49  Participant:**  An Employee for whom an Employer is obligated to make Employer Contributions or an Employee who is entitled to and who does make Self-Payments to the Fund.

**1.50  Pension Fund:**  The Central States, Southeast and Southwest Areas Pension Fund.

**1.51  Physician:**  A legally qualified and licensed Physician.

1.52  **Plan:**                                  The Central States, Southeast and Southwest Areas
                                                 Health and Welfare Plan as set forth herein and
                                                 as hereafter amended.

1.53  **Plan Benefit Limit:**                    A maximum payout per calendar year for combined
                                                 benefits as set forth in Article XVIII and
                                                 Section 20.06.

1.54  **Prescription Drug:**                     A drug or medicine prescribed by a Physician or
                                                 Dentist, dispensed by a pharmacist, not available
                                                 over the counter (except for insulin and insulin
                                                 syringes) and bearing the Federal or State
                                                 Legend.

1.55  **Prior Carrier:**                         Any insurance company, welfare plan or other
                                                 entity which provided life, hospital, surgical,
                                                 dental or medical coverage for a group of
                                                 Employees and their Dependents immediately before
                                                 the group of Employees became Participants under
                                                 this Plan.

1.56  **Privacy Rule:**                          The Standards for Privacy of Individually
                                                 Identifiable Health Information published at 45
                                                 C.F.R Part 160 and 45 C.F.R. Part 164, Subparts A
                                                 and E.

1.57  **Protected Health Information:**          Shall have the same meaning as the term
                                                 "protected health information" as defined at 45
                                                 C.F.R § 164.501.

1.58  **Psychiatric Treatment
       Facility:**                               A facility that is:

                                                 (a)   Primarily engaged in providing, under the
                                                       supervision of a Physician, psychiatric
                                                       services for the diagnosis and treatment of
                                                       mentally ill persons; and

                                                 (b)   Licensed, certified or approved as a
                                                       Psychiatric Treatment Facility, and not as
                                                       a Hospital, by the state or jurisdiction in
                                                       which it is located.

1.59  **Qualified Medical Child
       Support Order:**                          Any order entered by a court of competent
                                                 jurisdiction that complies with requirements of
                                                 the federal Qualified Medical Child Support Act
                                                 and which requires coverage for one or more
                                                 dependent children.

1.60  **Qualifying Event:**                      Any of the events described in Section 3.16 which
                                                 would result in a loss of coverage of the Covered
                                                 Individual unless continuation coverage is
                                                 elected.

1.61  **Quit:**                                  A permanent termination of employment initiated
                                                 by the Employee.

1.62   **Reasonable and Customary:**   The usual, Reasonable and Customary charge for the treatment, supply, or service, determined by comparison with the charges customarily made for similar treatments, supplies or services to individuals with similar medical conditions within a given geographical area.

1.63   **Self-Payments:**   Contributions to the Fund under this Plan by a Participant on his own behalf.

1.64   **Service in the Uniformed Services:**   Service by a Covered Individual in the Uniformed Services, which means and includes the Armed Forces, the Army National Guard and the Air National Guard when engaged in active duty for training, inactive duty training, or full-time National Guard duty, the commissioned corps of the Public Health Service, and any other category of persons designated by the President in time of war or emergency, provided that such services includes the performance of duty by the Covered Participant on a voluntary or involuntary basis in a Uniformed Service under competent authority and also includes any period during which a Covered Participant is absent from employment for the purpose of an examination to determine the Covered Participant's fitness to perform any such duty, and provided further that such service results in the absence of the Covered Participant from Continuous Funded Employment by an Employer.

1.65   **Sick Leave:**   A temporary absence from work caused by an Employee's illness, injury or pregnancy.

1.66   **Spouse:**   An individual who is married to a Participant in a legally recognized civil or religious ceremony. A Participant's common-law Spouse shall be considered a Spouse for purposes of the Plan, if:

(a)   The Participant's state of domicile recognizes common-law marriage; and

(b)   The Participant furnishes the Fund with appropriate documentation that the couple has fulfilled all conditions which his state of domicile requires for such a marriage.

1.67   **Standard Medical Care, Treatment, Services or Supplies:**   Care, treatment, services or supplies which are uniformly and professionally endorsed by the general medical community as Standard Medical Care, Treatment, Services, or Supplies.

1.68   **TeamCare®:**   A program of preferred providers who agree to negotiated rates for medical services and supplies for the Fund, in exchange for which the Fund provides financial incentives for

Participants to use the services of these providers. The Fund publishes a list of TeamCare providers periodically, as well as the benefit modifications which apply and the areas covered by a TeamCare network.

1.69 **Teamsters:**

The International Brotherhood of Teamsters, and its affiliated Local Unions.

1.70 **Temporary Work Stoppage:**

A strike by Participants which is sanctioned by the Teamsters.

1.71 **Terminated Employee:**

An individual who is separated from his employment by reason of Quit or Discharge.

1.72 **Total and Permanent Disability:**

A disease or bodily injury which will permanently, continuously and wholly prevent a person from engaging in any occupation or employment for wage or profit for the duration of his life. Additionally, the complete and irrecoverable loss of the sight of both eyes, or the use of both hands, or of both feet, or of one hand and one foot.

1.73 **Total and Permanent Disability Installment Benefit:**

The benefit set forth in Sections 14.05 and 20.04 provided to those Covered Participants under the age of fifty (50), who become totally and permanently disabled, as defined in Section 1.70 of this Document.

1.74 **Trust Agreement:**

The Agreement and Declaration of Trust made and entered into on the fourteenth (14th) day of March, 1950, by and between Central Conference of Teamsters, Southern Conference of Teamsters and their affiliated Local Unions, and the Southeastern Area Motor Carriers Labor Relations Association; Southwest Operators Association; and Motor Carriers Employers Conference—Central States, and as amended from time to time thereafter by the Trustees.

1.75 **Trustees:**

The Trustees designated and appointed in accordance with the terms of the Trust Agreement.

1.76 **Trust Fund:**

All assets, including principal and interest, of the Trust created by the Trust Agreement.

1.77 **Vision Benefits:**

The benefits set forth in Article XVI and Section 20.03.

1.78 **Waiver of Premium Disability Benefit:**

The benefit set forth in Sections 14.06 and 20.04 provided to those Covered Participants, between the ages of fifty (50) and fifty-nine (59) inclusive, who become totally and permanently disabled by bodily injury or disease, as defined in Section 1.70 of this document.

## ARTICLE II.   EFFECTIVE DATE OF GENERAL PROVISIONS

2.01   ALL GENERAL PROVISIONS OF THIS PLAN DOCUMENT ARE AFFECTIVE AND APPLICABLE WITH RESPECT TO EVERY LOSS OR OTHER BASIS OF COVERAGE THAT OCCURS ON OR AFTER NOVEMBER 17 , 1999, SUBJECT THEREAFTER TO DULY ENACTED PLAN REVISIONS.

## ARTICLE III.   PARTICIPATION AND COVERAGE

### 3.01   QUALIFICATIONS AS A COVERED PARTICIPANT

Unless otherwise provided herein, a Participant shall become a Covered Participant when his period of Continuous Funded Employment equals or exceeds his Initial Contribution Period and, unless otherwise provided herein, a Participant shall be a Covered Participant only in the period for which his Employer is required to make Employer Contributions on his behalf pursuant to the Collective Bargaining Agreement or applicable law.

### 3.02   QUALIFICATIONS AS A COVERED DEPENDENT

Unless otherwise provided herein, a Dependent shall be considered a Covered Dependent when the person upon whom he is dependent is considered a Covered Participant.

### 3.03   COMMENCEMENT OF COVERAGE OF MEMBERS OF A NEW GROUP PREVIOUSLY INSURED

If an Employer of a New Group had provided group life, hospital, surgical, dental or medical insurance coverage for members of the New Group and their Dependents immediately prior to the Employer Obligation Date, members of the New Group shall have Coverage under the Plan as follows:

(a)   A member of the New Group who is an Active Employee on the Employer Obligation Date shall receive Immediate Coverage retroactive to the Employer Obligation Date when the following is received from the Employer:

(1)   An initial list of Active Employees (as of the Employer Obligation Date) on the "509-New Group Report" form which includes the name of such Active Employee; and

(2)   A copy of the Prior Carrier's policy or welfare plan or sufficient proof of said policy.

(b)   A member of the New Group who is not an Active Employee on the Employer Obligation Date shall receive Immediate Coverage on the later of (1) the date he becomes an Active Employee or (2) the date the Fund receives from the Employer a seniority list of his Employees.

### 3.04   COMMENCEMENT OF COVERAGE OF MEMBERS OF A NEW GROUP NOT PREVIOUSLY INSURED

If an Employer of a New Group had not provided group life, hospital, surgical, dental or medical insurance coverage for members of the New Group and their Dependents immediately prior to the Employer Obligation Date, members of the New Group shall have Coverage under the Plan as follows:

(a)   A member of the New Group who is an Active Employee on the Employer Obligation Date shall have Coverage under the Plan on the first (1st) day following the Initial Contribution Period, provided the Fund receives from the Employer an initial list of Active Employees (as of the Employer Obligation Date) on the "509-New Group Report" form which includes the name of such Active Employee.

(b)   A member of the New Group who is not an Active Employee shall become a Participant only upon becoming an Active Employee, at which time his Initial Contribution Period shall commence and his Coverage shall be determined in accordance with the rules in Section 3.05.

## 3.05  COMMENCEMENT OF COVERAGE OF NEW PARTICIPANTS

A New Participant shall have Coverage under the Plan on the first (1st) day following the Initial Contribution Period, provided the Participant is an Active Employee on this day.  The Fund shall accept Self-Payments from the Participant during the Initial Contribution Period only after the first contribution has been made by the Employer.

A New Participant who previously had Coverage and then terminated employment with an Employer in order to enter Service in the Uniformed Services shall receive Immediate Coverage upon his return to covered employment provided it is within twenty-six (26) weeks of his discharge from Service in the Uniformed Services.

A New Participant whose Coverage is terminated and returns to Coverage within twenty-six (26) weeks of the date that his previous Coverage (including Loss of Time Coverage) terminated shall have Immediate Coverage.

A Former Covered Dependent who goes to work for an Employer who is obligated to make contributions to the Fund shall receive Immediate Coverage upon the date the Employer becomes required to make contributions on behalf of this former Covered Dependent, provided such contributions are required to begin within sixty (60) days after the termination of Dependent Coverage.

## 3.06  COMMENCEMENT OF COVERAGE OF COVERED PARTICIPANTS FOR WHOM UNINTERRUPTED EMPLOYER CONTRIBUTIONS AND/OR SELF-PAYMENTS HAVE BEEN RECEIVED

If the Fund has received uninterrupted Employer Contributions and/or Self-Payments on behalf of a Covered Participant, such Covered Participant shall have Immediate Coverage when he commences employment for any Employer required to make contributions under the Plan on his behalf.

## 3.07  COMMENCEMENT OF COVERAGE OF EMPLOYEES COVERED UNDER ANOTHER PLAN OFFERED BY THE FUND

An Employee and his Dependents covered under one plan offered by the Fund shall be considered a Covered Participant and Covered Dependents under a successor plan offered by the Fund on the date the Employer of the Covered Participant becomes obligated to make the amount of contributions required for the successor plan, with the exception of the Total and Permanent Disability Installment Benefit.

      (a)    Payment of the Loss of Time Benefit will be governed by the terms and conditions of the successor plan if the Disability began while the first plan was in effect.

      (b)    A Participant under one plan offered by the Fund who is making Self-Payments in accordance with that Plan may not elect to gain Coverage under a different plan by increasing or decreasing the level of his Self-Payments.

      (c)    Payment of the Total and Permanent Disability Installment Benefit will be governed by the terms and conditions of the first plan if the Disability began while the first plan was in effect.

## 3.08  COMMENCEMENT OF COVERAGE OF NEW PARTICIPANTS ELIGIBLE UNDER A PLAN OFFERED BY A LOCAL UNION

A New Participant who has, through his previous Employer, established eligibility for benefits under a health and welfare plan offered by a Local Union affiliated with the Teamsters and not offered by the Fund, shall receive Immediate Coverage on the date he begins to work for an Employer, subject to the following conditions:

      (a)    His coverage must be continuous, and

(b)    On the date he begins to work for an Employer, there must be a reciprocity agreement in effect between the Fund and the Local Union.

## 3.09   EFFECT OF TEMPORARY WORK STOPPAGE ON COVERAGE

Unless the Trustees in their sole discretion decide at any time to disallow or terminate Plan Coverage before or during a specific Temporary Work Stoppage, a Covered Participant who is absent from employment because of a Temporary Work Stoppage (but not Covered Participants who elect to return to work during the Temporary Work Stoppage) shall receive Plan Coverage regardless of whether contributions to the Fund are actually made, subject to the following conditions:

(a)    The Temporary Work Stoppage must be sanctioned by the Teamsters;

(b)    Except for a Temporary Work Stoppage by Employees subject to the National Master Freight Agreement, the Local Union involved must provide the Fund with confirmation of the sanctioning, the inception and termination dates thereof, and a list of Employers and Employees involved in said Temporary Work Stoppage; and

(c)    The Covered Participant must be an Active Employee when the Temporary Work Stoppage begins.

A Participant who has not established Coverage and who is absent from employment because of a Temporary Work Stoppage shall, unless the Trustees in their sole discretion decide at any time to disallow or terminate Plan Coverage before or during a Temporary Work Stoppage, receive Coverage on the first (1st) day after the Initial Contribution Period would have ended had the Employer remained obligated to make Employer Contributions throughout the Temporary Work Stoppage, regardless of whether contributions to the Fund are actually made subject to the conditions set forth in (a) and (b) above. If a Temporary Work Stoppage is in progress before the Trustees decide to disallow or terminate Plan Coverage during that Temporary Work Stoppage, that decision by the Trustees will be applied prospectively and will not result in a loss of Coverage during periods prior to the decision.

## 3.10   EFFECT ON COVERAGE OF ABSENCE FROM CONTINUOUS FUNDED EMPLOYMENT DURING, AND AS A RESULT OF SERVICE IN THE UNIFORMED SERVICES

A Covered Participant who is absent from Continuous Funded Employment by an Employer for a period of less than thirty-one (31) days during, and as a result of, Service in the Uniformed Services, shall receive Coverage for himself and all of his Covered Dependents throughout such period, without making Self-Payments, regardless of whether Employer Contributions are actually made to the Fund during such period. A Covered Participant who is absent from Continuous Funded Employment for a period of more than thirty (30) days during, and as a result of, Service in the Uniformed Service, shall be eligible (as will all of his Covered Dependents) to elect Continuation Coverage in accordance with the provisions of Sections 3.15 through 3.21. If Coverage of a Covered Participant (and his Covered Dependents) is terminated at any time during his absence from Continuous Funded Employment by an Employer as a result of Service in the Uniformed Services and he makes a timely application for reemployment by the same Employer at the conclusion of such Service in the Uniformed Services, any such reinstatement of Coverage of the Covered Participant (and his Covered Dependents) shall be Immediate Coverage, provided that there shall be no such Immediate Coverage relative to any illness or injury of the Covered Participant which is determined by the Secretary of Veterans Affairs to have been incurred or aggravated during performance of Service in the Uniformed Services. As used in the preceding sentence, "a timely application for reemployment by the same Employer" means such application within the following time limitations (except as those limitations are required by law to be extended):

(a)    within ninety (90) days after completion of a period of Service in the Uniformed Services that was more than one hundred eighty (180) days; and

(b) within thirty (30) days after completion of a period of Service in the Uniformed Services that was more than 30 days and less than one hundred eighty-one(181) days.

**3.11 TERMINATION OF COVERAGE OF PARTICIPANTS HAVING TOTAL AND PERMANENT DISABILITY OR ON SICK LEAVE**

A Covered Participant who has a Total and Permanent Disability or who goes on Sick Leave shall lose his Coverage after the Saturday of the last week for which Employer Contributions are required to be made on his behalf under the applicable law or Collective Bargaining Agreement, unless Loss of Time Disability Coverage is in effect (see Section 20.01(a) for application, if any). Upon exhaustion of his Coverage, such Former Covered Participant may maintain Coverage if he elects to make Self-Payments pursuant to Section 3.20.

**3.12 TERMINATION OF COVERAGE OF PARTICIPANTS CHANGING EMPLOYEE STATUS**

A Covered Participant who goes on Lay-Off or a Leave of Absence, whose employment relationship is terminated, or whose employer is the subject of a voluntary or involuntary petition in bankruptcy shall lose his Coverage after the Saturday of the last week for which Employer Contributions are required to be made on his behalf or (in the case of bankruptcy) after the Saturday of the week of filing. A Former Covered Participant may maintain Coverage by making Self-Payments pursuant to the Plan's Continuation Coverage provisions.

**3.13 TERMINATION OF COVERAGE DUE TO EMPLOYER WITHDRAWAL**

A Covered Participant shall lose his Coverage after the Saturday of the last week for which Employer Contributions are required to be made on behalf of any Employees of the Employer of the Covered Participant, including a cessation of Employer Contributions that results from a rejection by the Trustees, acting pursuant to the Trust Agreement, of a Collective Bargaining Agreement of the Employer. Such a Former Covered Participant may not maintain Coverage by making Self-Payments, and the Fund will not accept Self-Payments from such a Former Covered Participant, except as authorized by any other applicable section of this Plan.

**3.14 RETURN TO COVERED EMPLOYMENT**

A Former Covered Participant who returns to covered employment that requires Employer Contributions on his behalf may re-establish eligibility for Coverage by making Self-Payments for periods in which his status permits him to do so. All Employer Contributions and/or Self-Payments must be submitted on a consecutive basis for eight (8) weeks to re-establish Coverage, and at least one week of Employer Contributions must precede Self-Payments for this purpose. Any Self-Payments made pursuant to this section must be received within forty-five (45) days after the week to which they are to be applied.

**3.15 ELIGIBILITY TO ELECT CONTINUATION COVERAGE**

Each Covered Individual who would lose Coverage under this Plan as a result of a Qualifying Event, as defined in Section 3.16, is eligible to elect Continuation Coverage, as defined in Section 3.18, upon compliance with notice requirements and election procedures described in Sections 3.17 and 3.19.

**3.16 DEFINITION OF QUALIFYING EVENT**

For purposes of Sections 3.15 through 3.21, the term "Qualifying Event" means, with respect to any Covered Individual, any of the following events which, unless there is an election of Continuation Coverage pursuant to Section 3.19, would result in a loss of Coverage of the Covered Individual under this Plan:

(a)     the death of a Covered Participant;

(b)     the termination, or reduction of hours, of a Covered Participant's employment (including an absence and/or separation from employment caused by Sick Leave Disability, Leave of Absence, Lay-Off, Quit, Discharge and the pendency of any bankruptcy proceeding filed by or against the Covered Participant's Employer; and including an absence and/or separation from employment, for a period of more than thirty (30) days, during and as a result of Service in the Uniformed Services);

(c)     the divorce or legal separation of a Covered Participant from the Covered Participant's Spouse;

(d)     the commencement of entitlement of a Covered Participant to Medicare benefits under Title XVIII of the Social Security Act (42 U.S.C. § 1395 et seq.); and

(e)     the termination of Coverage of a Child as a Covered Dependent because of a loss of dependent status, relative to a Covered Participant, under generally applicable terms of this Plan, including Sections 3.29 and 3.30.

## 3.17   NOTICE OF QUALIFYING EVENT

With respect to each Qualifying Event defined in Section 3.16, notice shall be provided in accordance with the following requirements:

(a)     General notice by the Fund -- at the time of commencement of Coverage of a Covered Participant under this Plan, the Fund shall provide written notice to the Covered Participant and his or her Spouse (if any) of their rights pursuant to Sections 3.15 through 3.21.

(b)     Specific notice by Employers -- within sixty (60) days after a Qualifying Event defined in any of Sections 3.16(a), 3.16(b) and 3.16(d), the Employer (relative to any Covered Participant affected by the event) shall provide written notice of the Qualifying Event to the Fund.

(c)     Specific notice by Covered Individuals -- within sixty (60) days after a Qualifying Event defined in either of Sections 3.16(c) and 3.16(e), either the Covered Participant or another Covered Individual affected by the event (or both) shall provide written notice of the Qualifying Event to the Fund.

(d)     Specific notice by the Fund -- within fourteen (14) days after notice of a Qualifying Event has been provided to the Fund in compliance with subsection (b) or (c) of this section, the Fund shall provide written notice of the Qualifying Event to the Covered Participant affected by the event (if living), to his or her Spouse (if any) and to any other Covered Individual who is both affected by the event and not residing with either the Covered Participant's Spouse.

## 3.18   ELIGIBILITY FOR CONTINUATION COVERAGE

After the occurrence of a Qualifying Event and upon timely election pursuant to Section 3.19, a Covered Individual is eligible to receive Continuation Coverage until termination of eligibility pursuant to Section 3.21, subject to the same modifications of coverage that apply to Covered Individuals to whom no Qualifying Event has occurred. As an alternative, the affected Covered Individual may elect to receive a reduced plan of coverage.

### 3.19 PROCEDURES TO ELECT CONTINUATION COVERAGE

After occurrence of a Qualifying Event and timely notice to the Fund is received in compliance with Section 3.17(b) or Section 3.17(c), a Covered Individual may elect Continuation Coverage by providing written election of Continuation Coverage to the Fund, in such form as the Fund prescribes, before expiration of the "election period." The "election period" begins on the date of the Qualifying Event and ends on the sixtieth (60th) day after the date of the Qualifying Event or, if later and if the Fund received timely notice of the Qualifying Event pursuant to Section 3.17(b) or Section 3.17(c), on the sixtieth (60th) day after notice of Qualifying Event is provided by the Fund to the Covered Individual pursuant to Section 3.17(d). A timely election shall be deemed to include Continuation Coverage for each Covered Individual who would otherwise lose coverage as a result of the Qualifying Event.

### 3.20 SELF PAYMENTS TO MAINTAIN CONTINUATION COVERAGE

If a written election of Continuation Coverage is provided to the Fund in compliance with Section 3.19, Self-Payments must be remitted to the Fund on behalf of the Covered Individuals on whose behalf the election is made, in order to maintain their eligibility for Continuation Coverage. Self-Payments must be remitted for all periods of Continuation Coverage in such amounts, form and manner as the Fund prescribes, except that the Fund will not require any Self-Payments to be remitted prior to expiration of forty-five (45) days after the initial written election of Continuation Coverage is provided to the Fund in compliance with Section 3.19. A Covered Participant who is absent from employment by a Contributing Employer for a period of less than thirty-one (31) days during, and as a result of, Service in the Uniformed Services shall receive coverage for himself and all of his Covered Dependents throughout such period without making self-payments.

### 3.21 TERMINATION OF CONTINUATION COVERAGE

Continuation Coverage provided to a Covered Individual pursuant to an election in compliance with Section 3.19 shall begin on the date of the Qualifying Event and shall terminate on the earliest of:

    (a)    For a Qualifying Event defined in Section 3.16(b), the date twenty-four (24) months after the Qualifying Event; except, that if during the initial period, another Qualifying Event, as defined in Section 3.16, occurs, the termination date is the date thirty-six (36) months after the initial Qualifying Event;

    (b)    For a Qualifying Event defined in Section 3.16 other than Section 3.16(b), the date thirty-six (36) months after the date of the Qualifying Event;

    (c)    The date which is 31 days after the date on which Self-Payments pursuant to Section 3.20 (and related procedures) are owed to the Fund but remain unpaid (unless such Self-Payments are remitted to the Fund within such thirty-one (31)-day period);

    (d)    The date on which the Covered Individual first becomes, after the date of the election, covered under any other employee welfare benefit plan providing coverage for medical care (as defined in Section 213[d] of Title 26 of the United States Code) to participants and beneficiaries directly or through insurance, reimbursement or otherwise, if such Other Plan does not contain any applicable exclusion or limitation with respect to any preexisting condition of the Covered Individual, except that, on such date of coverage by another plan, the Continuation Coverage of only Covered Individuals covered under such other employee welfare benefit plan will be terminated, subject to the provisions of Section 3.30;

    (e)    The date on which the Covered Individual becomes entitled to Medicare benefits under Title XVIII of the Social Security Act (42 U.S.C. § 1395 et seq.), except that on such date the Continuation Coverage of only the

(f)     Covered Individual thus entitled to Medicare benefits will be terminated; or

(g)     the date on which this Plan is terminated.

Continuation Coverage for a Qualifying Event described in Section 3.16(b) may be extended to twenty-nine (29) months if a Covered Individual is determined under Title II or XVI of the Social Security Act to have been disabled during the first sixty (60) days of Continuation Coverage and if a Covered Individual notifies the plan administrator of the determination within sixty (60) days of the determination and before the end of the initial twenty-four (24)-month period of Continuation Coverage.   This extension will terminate if there is a final determination under Title II or XVI of the Social Security Act that the disability has ended, but the termination will apply only to the formerly disabled Covered Individual.   The termination of the extension in such a case will be effective on the first day of the first month which begins more than thirty (30) days after such final determination, so long as the final determination is after the twenty-four (24)-month initial Continuation Coverage period.

### 3.22   STATUS OF A COVERED PARTICIPANT WHEN EMPLOYER FAILS TO MAKE CONTRIBUTIONS

Default by an Employer in making Employer Contributions on behalf of a Participant shall not prevent such person from being a Covered Participant, except in the case of a Suspension of Benefits as described in Section 3.23.

### 3.23   STATUS AND COVERAGE OF A COVERED INDIVIDUAL WHEN EMPLOYER FAILS TO REMIT EMPLOYER CONTRIBUTIONS: SUSPENSION OF BENEFITS

Except as otherwise provided herein, any default by an Employer in remitting Employer Contributions on behalf of a Participant who is otherwise entitled to Coverage shall not disqualify such Participant as a Covered Participant.   However, all benefits payable by the Plan to or on behalf of a Participant or his Dependent shall be suspended during certain periods, established by the Trustees, in which the Employer of such Participant remains continuously delinquent in his obligations to remit Employer Contributions. During such benefits suspension periods the Participant shall have the right to remit Self-Payments subject to rules established by the Trustees.   No benefits suspension period shall commence until the expiration of a reasonable and adequate period (as determined by the Trustees) and after advance written notice of such suspension to all affected Participants.   After any benefits suspension period is concluded by remittance of all delinquent Employer Contributions or by alternative commitments by the Employer approved by the Trustees, all proper benefit claims accrued but unpaid during the suspension period will be paid by the Plan to or on behalf of Covered Participants and their Covered Dependents and all Self-Payments will be reimbursed.

### 3.24   CERTAIN PARTICIPANTS NOT TO BE CLASSIFIED AS COVERED DEPENDENT

A Participant's Child shall not be a Covered Dependent if that Child is also a Participant.   A Participant's Spouse shall not be a Covered Dependent if that Spouse is also a Participant, except as provided in Article V.

### 3.25   COMMENCEMENT OF COVERED DEPENDENT STATUS FOR SPOUSE OF A COVERED PARTICIPANT

The Spouse of a Covered Participant shall be a Covered Dependent and shall participate in and have Coverage under this Plan on the date of marriage to the Participant or on the date the Participant becomes a Covered Participant, whichever occurs later.

### 3.26   COMMENCEMENT OF COVERED DEPENDENT STATUS FOR CHILD OF A COVERED PARTICIPANT

A Child of a Covered Participant shall be a Covered Dependant and shall participate in and have Coverage under this Plan on the date such status as Child begins or on the date the Participant becomes a Covered Participant, whichever occurs later.

**3.27  STATUS OF MENTALLY HANDICAPPED OR PERMANENTLY PHYSICALLY HANDICAPPED CHILD OF A COVERED PARTICIPANT**

A Covered Participant's unmarried Child who is incapable of independent financial self-support because of mental retardation or a permanent physical handicap and who is dependent on the Covered Participant for support and maintenance, shall remain a Covered Dependent or be eligible to receive benefits (except the Life Insurance Benefit) beyond attaining nineteen (19) years of age subject to the following conditions:

    (a)    The Child must be a Covered Dependent prior to reaching nineteen (19) years of age.

    (b)    If the Child reached nineteen (19) years of age, the Fund may, at its discretion, require that a certification, signed by a licensed Physician and stating that the Child is mentally retarded or permanently physically handicapped, accompany each claim.

    (c)    In no case will the Child be a Covered Dependent or be eligible to receive benefits unless the mental retardation or permanent physical handicap is sustained prior to the Child's nineteenth (19th) birthday and the Child's Disability has been continuous.

    (d)    A Child meeting the requirements of this Section may be employed and maintain his accident and health benefits under this Plan, provided he is not covered by any Other Plan.

**3.28  STATUS OF NEWBORN CHILD OF A COVERED PARTICIPANT**

A Covered Participant's newborn Child shall become a Covered Dependent or eligible to receive benefits at the time of birth.

**3.29  STATUS OF UNMARRIED CHILD OF A COVERED PARTICIPANT WHO IS A STUDENT BETWEEN THE AGES OF 19 AND 23**

A Covered Participant's unmarried Child who is a full-time student at an accredited high school, trade school, vocational school, junior college, college or university shall have Coverage, except for Dental, Vision and Life Insurance Benefits, under the Plan, until he reaches twenty-three (23) years of age, subject to the following conditions:

    (a)    The Covered Participant must submit to the Fund, along with the claim for benefit, a notarized statement signed by a representative of the institution attended by the Child and stating that the Child was, at the time the claim for benefits arose, a full-time student at the educational institution; and

    (b)    The Fund may, at its discretion, require the Covered Participant to supply additional documentation of the information required in Paragraph (a) above.

A Child who loses his student status may re-establish his Coverage upon resumption of being a student, provided he meets the requirements of this Section.

**3.30  LOSS OF DEPENDENT'S COVERAGE**

A Covered Dependent shall lose his Coverage on the earliest of the dates below:

    (a)    On the date the Covered Participant loses Coverage.  In the case of the Covered Participant's death, Coverage will be extended to Dependents for thirty-one (31) days following the last day of the week in which Employer Contributions end.  The Spouse of the deceased Covered Participant may elect to make Self-Payments in accordance with the terms and procedures

specified in Section 3.20. However, the initial Self-Payment will be applied to the thirty-one (31) day period following the termination of Employer Contributions;

(b) On the contribution due date, if the Covered Participant is making Self-Payments and fails to do so;

(c) In the case of a Child, on the date he becomes a Participant;

(d) In the case of a Spouse, on the day which said Spouse ceases to be legally married to a Covered Participant;

(e) In the case of a Child, on the day he enters Service in the Uniformed Services;

(f) Subject to the provisions of Sections 3.27 and 3.29, on the day a Child reaches nineteen (19) years of age;

(g) On the day a Child assumes full-time employment. A student meeting the requirements of Section 3.29 and who has a full-time job for a duration of less than four (4) months shall not be deemed to have assumed full-time employment; or

(h) On the day which a Child becomes married; however, he may regain his Coverage if he ceases to be married and meets all the applicable eligibility requirements.

## 3.31  RESIDUAL COVERAGE OF FORMER COVERED PARTICIPANTS

In the remaining provisions of the Plan, the term "Covered Participant" shall be extended to include a Former Covered Participant, and the term "Covered Individual" shall be extended to include a Former Covered Participant and/or his Dependents during the period that such Former Covered Participant and/or his Dependents were eligible to receive benefits provided according to Plan provisions.

## 3.32  ELIGIBILITY FOR FAMILY PROTECTION PLAN BENEFIT

A Covered Dependent shall be eligible, subject to the conditions described below, for a family protection plan benefit, consisting of the extension of coverage of Covered Dependents of a Participant who dies while residing in an area covered by a TeamCare network or while recorded by the Fund as an enrolled participant of such a network (regardless of residence), for a maximum of five (5) years after the date of death. This benefit shall terminate upon the earlier of the following:  reinsurance, remarriage, Medicare eligibility, or loss of dependent status by a Dependent Child as set forth in Section 3.30(c) through (h) of the Active Plan Document. This benefit is subject to the following conditions:

(a) If a different family protection plan benefit has been established and published to Participants in a specific TeamCare area, it shall apply in lieu of the benefit set forth in this provision.

(b) The family protection plan benefit will be lost if, within twenty-four (24) months prior to the Participant's death, charges payable by the Fund are incurred by the Participant or a Covered Dependent through non-emergency use of a Hospital or Physician outside the Participant's TeamCare network.

(c) If eligibility for the Family Protection Plan Benefit has been granted, services from TeamCare providers for non-emergency care will be required for benefits to be payable.

## ARTICLE IV.   GENERAL EXCLUSIONS, LIMITATIONS AND CONDITIONS FOR PAYMENT OF CLAIMS

### 4.01   PAYMENT ONLY FOR COVERED CLAIMS OF COVERED INDIVIDUALS

A Covered Individual shall not be entitled to any payment on a claim for benefits unless the benefits are provided by the Plan, the claimant is a Covered Individual and the claim for benefits is submitted in proper form as determined by the Fund.

### 4.02   EXCLUSION OF PAYMENT FOR TREATMENT NOT CONSIDERED STANDARD MEDICAL CARE OR MEDICALLY NECESSARY

A Covered Individual shall not be entitled to payment of any charges for care, treatment, services or supplies which are not medically necessary or are not uniformly and professionally endorsed by the general medical community as Standard Medical Care, Treatment, Services or Supplies.

### 4.03   LIMITATION ON PAYMENT OF CLAIMS ARISING FROM WORK-RELATED INJURY OR COVERED BY WORKER'S COMPENSATION

A Covered Individual shall not be entitled to payment on a claim for any charge incurred for any treatment or service for any illness or injury which is sustained as a result of any enterprise or occupation for wage or profit or is an illness or injury of the type covered by any applicable Worker's Compensation Act or similar law providing benefits to employees for on-the-job injuries.

In the event that a Covered Individual is awaiting disposition of a Worker's Compensation claim (or a similar claim arising as a result of an on-the-job injury) and coverage for the illness or injury is disputed, the Covered Individual may be eligible to receive some benefits if the Covered Individual agrees to reimburse the Fund for any benefits advanced in the event he settles or receives an award from any Employer or insurance company relating to his on-the-job injury.

After a five (5) year period from the date of Disability, any complication arising from the illness or injury shall be deemed payable in accordance with the Plan provisions, unless it is still compensable under Worker's Compensation.

### 4.04   EXCLUSION OF PAYMENT FOR TREATMENT OF INJURIES SUSTAINED WHILE IN ANY UNIFORMED SERVICE

A Covered Individual shall not be entitled to payment for any charge incurred for treatment or service due to illness or injury sustained while in any Uniformed Service, except short-term service provided for in Section 3.20, or for treatment of any complication of such illness or injury. After a five (5) year period from the date of Disability, any complication arising from the illness or injury shall be deemed payable in accordance with the Plan provisions.

### 4.05   EXCLUSION OF PAYMENT FOR TREATMENT DUE TO ILLNESS OR INJURY ARISING OUT OF ANY ACT OF WAR OR CIVIL DISTURBANCE

A Covered Individual shall not be entitled to payment for any charge incurred for treatment or service due to illness or injury arising out of declared or undeclared war or any act of war or civil disturbance, including riots, demonstrations and marches or for treatment of any complication of such illness or injury. After a five (5) year period from the date of Disability, any complication arising from the illness or injury shall be deemed payable in accordance with the Plan provisions, unless it is compensable by an Other Plan or government agency.

**4.06   EXCLUSION OF PAYMENT FOR TREATMENT OF INJURIES ARISING AS A RESULT OF PARTICIPATION IN CRIMINAL CONDUCT**

A Covered Individual shall not be entitled to payment for any charge incurred for treatment or services due to any injury, and any complication thereof, sustained as a result of participation in conduct which results in a conviction under any state or federal criminal statute.   The Fund shall have the right to recover the amount of any payment upon discovery that the injury for which payment was made resulted from participation in conduct which may result in a conviction under any state or federal criminal statute.

**4.07   LIMITATION ON PAYMENT FOR TREATMENT RECEIVED OUTSIDE THE UNITED STATES**

A Covered Individual shall not be entitled to payment for treatment outside the United States if it is not care, treatment, services or supplies that is medically necessary and is uniformly and professionally endorsed by the general medical community in the United States as Standard Medical Care, Treatment, Services or Supplies.   All exclusions and limitations of the Plan shall be fully applicable to all such care, treatment, services and supplies to the same extent as if it were provided within the United States. Interpretations relative to these exclusions and limitations will be resolved by the Fund at its discretion, assisted by the Fund's medical consultants.   Benefits will be paid in United States currency.

**4.08   EXCLUSION FOR PAYMENT FOR TREATMENT CONNECTED WITH SURGERY FOR COSMETIC PURPOSES**

A Covered Individual shall not be entitled to payment on a claim for benefits for any charge incurred for treatment or service connected with a cosmetic procedure, even if performed for psychological reasons, unless the treatment or service is medically required as a result of an Accidental Bodily Injury incurred while a Covered Individual.

This exclusion includes, but is not limited to:

(a)   Any surgery primarily for obesity, including gastric bypass, gastric stapling, intestinal bypass, lipectomy, suction lipectomy, panniculectomy, and any other surgical procedure, a purpose and result of which is primarily to remove adipose tissue;

(b)   Augmentation mammoplasty, unless part of reconstructive surgery for the treatment of malignancy of the breast necessitating removal of a portion or all of the breast tissue;

(c)   Rhinoplasty, unless the patient has sustained a traumatic fracture of the nasal septum, or unless the patient has chronic nasal obstruction and the procedure is undertaken to relieve this obstruction;

(d)   Otoplasty for irregular deformity or macrotia.   This is sometimes referred to as plastic surgery for lop ears or cauliflower ears;

(e)   Blepharoplasty, or repair of drooping eyelids, unless the droop of the eyelids is such as to restrict the field of vision and the visual field restriction is documented by the ophthalmological consultant;

(f)   Radical Keratectomy or Keratotomy, unless the patient has myopia of such a severe degree that it cannot be corrected by lenses;

(g)   Rhytidectomy (face lift);

(h)   Dyschromia (tattoo removal); and

(i)   Genioplasty (chin augmentation).

**4.09  EXCLUSION OF PAYMENT FOR TREATMENT OTHERWISE COVERED UNDER THE SOCIAL SECURITY ACT**

A Covered Individual shall not be entitled to payment for any charge incurred for treatment or service to the extent that such charge is covered or provided by the Social Security Act, as amended, except as provided in Article V.

**4.10  EXCLUSION OF PAYMENT FOR TREATMENT NOT RELATED TO ILLNESS, INJURY OR PREGNANCY**

Except as otherwise provided herein, a Covered Individual shall not be entitled to payment of  a claim for Basic Benefits or Major Medical Expense Benefits unless the Covered Individual is ill, injured, pregnant or an organ transplant donor, and receives treatment, compensable under this Plan, related to the illness, injury, pregnancy or organ donation.

**4.11  EXCLUSION OF PAYMENT FOR CERTAIN DENTAL TREATMENTS**

Except as provided below, a Covered Individual shall only be entitled to payment of Basic Benefits, as outlined in Article XII, and Major Medical Expense Benefits, as outlined in Article XIII, for charges incurred in connection with dental operations, if prescribed by a Physician as a result of a medical condition and as approved by the Fund, or for Hospital Confinements where the patient or condition is any one of the following:

    (a)    Dependent Child three years or younger;

    (b)    Physically handicapped Child or adult;

    (c)    Mentally handicapped Child or adult (includes those with Cerebral Palsy);

    (d)    Bell's Palsy;

    (e)    Hemophilia;

    (f)    Asthma, Chronic Obstructive Lung Disease, or Chronic Obstructive Pulmonary Disease; or

    (g)    Heart Disease, Diabetes or Hypertension, provided that eligibility for benefits is approved by Fund Medical Consultants prior to hospital confinement.

The Plan shall not pay Basic Benefits or Major Medical Expense Benefits for dental materials or dental procedures, except as outlined in Section 15.06.

**4.12  EXCLUSION OF PAYMENT FOR TREATMENT OF NON-COMPENSABLE PROCEDURES**

A Covered Individual shall not be entitled to payment for any charge incurred for treatment of complications arising from the performance of any procedure not compensable under this Plan.

**4.13  EXCLUSION OF PAYMENT FOR ROUTINE PHYSICAL EXAMINATIONS**

A Covered Individual shall not be entitled to payment for any charge incurred in connection with routine physical examinations, including diagnostic procedures, except as provided in Section 12.15.

**4.14 EXCLUSION OF PAYMENT FOR CERTAIN ITEMS**

A Covered Individual shall not be entitled to payment for any charge incurred for sales taxes, surcharges, interest, late charges, completion of any claim form or missed appointments.

**4.15 EXCLUSION OF PAYMENT FOR MAINTENANCE CARE**

A Covered Individual shall not be entitled to payment for any charge incurred for Maintenance Care, as defined in Section 1.43.

**4.16 EXCLUSION OF PAYMENT OVER PRESCRIBED MAXIMUMS**

A Covered Individual shall not be entitled to payment for any charge which would exceed the stated maximum, scheduled fee or stated percentage of covered charges payable as set forth in Article XX of the Plan unless "balance under Major Medical" immediately follows such reference.

**4.17 LIMITATION ON ELIGIBILITY FOR COVERAGE OF CERTAIN ORGAN OR TISSUE TRANSPLANTS**

Benefits for bone marrow, heart, heart/lung, liver, lung and pancreas transplants, including all related services, are payable only if the recipient provides requested documentation for consideration by the Fund's Medical Consultants on a pre-admission basis. Such documentation will include, but may not be limited to, written opinions by Physicians associated with the case testifying to the following:

    (a)    Absence of significant co-existing morbidity;

    (b)    Evidence of medical suitability of candidate for transplantation;

    (c)    Criteria for patient selection is in agreement with published medical literature;

    (d)    Alternative procedures, services or courses of treatment are not effective or available; and

    (e)    Facility and physicians involved in transplant services have appropriate approval by regulatory agencies and from internal authorities.

After consideration by the Fund's Medical Consultants, each case will be brought to the Trustees for their review. No organ or tissue transplant proposed for coverage under this Section will be payable unless there is prior approval by the Trustees following their consideration of the circumstances of each case.

The Fund's financial responsibility for Hospital medical and other expenses incident to, or resulting from, any transplant of any Covered Individual, including expenses incurred in any post-transplant treatment and in any complications arising from the transplant at any time shall be limited to the following lifetime aggregate amount:

| Transplant | Surgical Benefits (1) | Lifetime Follow-up Benefits (2) |
|---|---|---|
| Heart | $150,000 | $75,000 |
| Heart/Lung | 200,000 | 75,000 |
| Lung | 200,000 | 75,000 |
| Liver | 150,000 | 75,000 |
| Pancreas | 100,000 | 75,000 |
| Kidney | 80,000 | 75,000 |
| Autologous | 200,000 | 75,000 |
| Allogenic | 225,000 | 75,000 |

The Fund is not responsible for any expense of any other type of transplant, or for any expense incident to a transplant of an animal organ or a mechanical device to replace a natural human organ. A Covered Individual, after he has received any organ transplant and the Fund has paid all or any part of Hospital, medical or other expenses incident to the transplant, shall no longer be eligible to claim that the Fund is responsible for any expense incident to a subsequent transplant of the same organ.

Note (1)   Surgical Benefits include Hospital and related facility charges, Physician professional fees, ancillary charges and all related expenses associated with the surgical transplant procedure. Organ procurement expenses are included, to the extent they are covered.

The benefit payments for human organ transplants under Benefit Plan S will not be subject to the overall benefit plan limit.

Note (2)   Lifetime Follow-Up Benefits include all professional fees, Hospital and related facility charges, Prescription Drugs, ancillary charges and all expenses which result directly from the transplant procedure and which are incurred after discharge from the Hospital stay during which the transplant occurred. Subsequent hospitalizations and outpatient costs resulting directly from the transplant are included in follow-up costs. If actual surgical costs are less than the maximum Surgical Benefits, unused Surgical Benefits may be added to Lifetime Follow-Up Benefits. Lifetime Follow-Up Benefits apply for a three (3) year period subsequent to the transplant.

## 4.18   EXCLUSION OF PAYMENT FOR INFERTILITY TREATMENT

A Covered Individual shall not be entitled to payment for any charge incurred in connection with the treatment of infertility. This limitation includes but is not limited to:

(a)   charges incurred in connection with in vitro fertilization;

(b)   Charges incurred in connection with artificial insemination;

(c)    Charges for prescription drugs designed to enhance the ability to conceive, used in connection with (a) and (b) above, including but not limited to Clomid, Milophene, Metrodin, Lutrepulse, Pergonal and human chorionic gonaditropin in any form; and

(d)    Charges incurred in connection with reversal of prior sterilization procedures.

## 4.19 EXCLUSION OF PAYMENT FOR CHARGES FOR WHICH THE COVERED INDIVIDUAL IS NOT RESPONSIBLE TO PAY

A Covered Individual shall not be entitled to payment for any charge incurred for any Care, Treatment, Services or Supplies if the medical service provider has waived any co-payments due from the Covered Individual or has otherwise relieved the Covered Individual from an obligation to pay for the Care, Treatment, Services or Supplies or agrees to accept as full payment whatever amount is payable under this Plan.

In no event will the Fund pay for any Care, Treatment, Services or Supplies which have been represented by the person supplying those examinations, services or supplies to be free to the Covered Individual.

## 4.20 LIMITATION ON PAYMENT OF CLAIMS FOR SERVICES BY PROVIDERS NOT IN PREFERRED PROVIDER ORGANIZATION NETWORK

(a)    Benefits otherwise payable shall be reduced by 10% if there exists a TeamCare network covering the Participant; and

(b)    The charges were incurred by the Participant or Covered Dependent through non-emergency use of a Hospital or Physician outside of the TeamCare network.

## ARTICLE V.   COORDINATION OF BENEFITS

### 5.01   PRIORITY OF COVERAGE WHERE COVERED INDIVIDUAL IS COVERED BY AN OTHER PLAN

If the benefits of this Plan duplicate or overlap with benefits for hospital, surgical, dental, psychiatric, chiropractic or other medical treatment provided by an Other Plan, such duplication or overlapping shall be avoided.  In this regard, primary responsibility for providing benefits shall be determined in the following order:

(a)   An Other Plan shall have primary responsibility if it has no coordination of benefits provision or if the Other Plan provides specific risk coverage, including but not limited to, premises liability or medical benefits coverage.

(b)   An Other Plan providing no fault, personal injury protection or financial responsibility motor vehicle insurance coverage or benefits shall have primary responsibility.

(c)   Whichever of this Plan or an Other Plan that provides benefits for the person, other than as a Dependent, shall have primary responsibility.

(d)   If there is coverage for a Child by more than one (1) plan, the plan which covers the Spouse who has the earliest birthday (month and day) shall have primary responsibility, except that in the case of a Child whose parents are separated or divorced, the following rules apply:

(1)   The benefits of the plan of the custodial parent shall be primary to the benefits of the plan of the non-custodial parent;

(2)   If the parents have joint custody, the plan which covers the parent who has the earliest birthday (month and day) shall have primary responsibility;

(3)   If the custodial parent has remarried, the benefits of the plan of the custodial parent shall be primary to the benefits of a plan which covers the Child as a dependent of a step-parent, and the benefits of a plan which covers the Child as a dependent of a step-parent shall be primary to the benefits of a plan which covers the non-custodial parent; and

(4)   Notwithstanding (1), (2), and (3) above, if there is a court decree which establishes responsibility for the medical, dental, or other health care of the Child, the plan of the parent with such responsibility shall be primary.  If the parent with such responsibility has no coverage, but that parent has remarried and that parent's new spouse has coverage, that spouse's plan is primary.

(e)   If there is coverage provided for a Participant or Dependent by more than one (1) plan, the plan which is providing coverage through active employment shall have primary responsibility.

(f)   If a Covered Individual whose coverage is provided under a right of continuation provided by federal or state law also is covered under an Other Plan, the plan covering the person as an employee, member, subscriber or retiree (or as that person's dependent) is primary, and the continuation coverage is secondary.

(g)   If both the husband and wife are Covered Participants of the Central States Health and Welfare Fund, this Plan will be considered an Other Plan.

    (h)    Whichever of this Plan or the Other Plan that has covered the person for the longer period of time shall have primary responsibility.

    (i)    If there is coverage provided by a governmental program, that coverage shall have primary responsibility unless prohibited by federal law.

## 5.02  EFFECT OF PRIORITY RULES ON AMOUNT OF PAYMENTS UNDER THE PLAN

Whenever this Plan is determined to have primary responsibility, the Covered Individual shall receive benefits without regard to coverage under the Other Plan. Whenever this Plan is determined not to have primary responsibility, this Plan shall pay, after the Other Plan has paid its maximum allowable benefits, any remaining covered charges up to the amount this Plan would have paid if this Plan had primary responsibility and without the payments from the Other Plan being taken into account in applying the specific benefit maximums indicated in this Plan.

## 5.03  RECOVERY OF PAYMENTS WHEN AN OTHER PLAN IS INVOLVED

Whenever this Plan has made benefit payments which exceed the amount of benefits payable under the terms of this Plan or which an Other Plan was required to make under Section 5.01, the Fund shall have the right to recover the amount of such payments from any persons receiving such payments or from any Other Plans having primary responsibility for the payment of benefits. The Trustees are authorized to file suit on behalf of the Fund to recover any such payments or to seek a judicial declaration that an Other Plan has primary responsibility for the payment of benefits.

## 5.04  PAYMENTS TO OTHER PLANS

Whenever payments should have been made by this Plan pursuant to the provisions of Article V, but are made by an Other Plan, the Fund shall have the right to pay over to such Other Plan any amounts this Plan should have paid under the provisions of Article V.

## 5.05  NO FAULT, PERSONAL INJURY PROTECTION OR FINANCIAL RESPONSIBILITY MOTOR VEHICLE INSURANCE COVERAGE

Benefits under no fault, personal injury protection or financial responsibility motor vehicle insurance coverage, as described in Section 1.47(f), shall be primary to benefits under this Plan notwithstanding state or local law or regulation to the contrary. In the event an Other Plan, as described in Section 1.47(f), fails or refuses to assume primary responsibility for the payment of benefits, the Fund may provide the Covered Individual with benefits under this Plan. Such benefits shall be provided under a reservation of rights and without prejudice to the Fund's right to recover the amount of such benefits from the Other Plan.

A Covered Individual shall cooperate with this Plan in any attempt to recover the amount of benefits paid under a reservation of rights pursuant to this Section. Upon request by the Fund, the Covered Individual shall execute an assignment of rights and any other documents the Fund deems necessary to effect a recovery of the amount of benefits paid under such reservation of rights. A Covered Individual shall do nothing to prejudice the Fund's rights under Article V and is not authorized to subordinate no fault, personal injury protection, financial responsibility or medical reimbursement benefits to benefits under this Plan.

## 5.06  COORDINATION OF BENEFITS WITH AN HMO

When a Covered Individual has primary coverage through an Other Plan, such as an HMO, this Plan will coordinate benefits as described in Section 5.01 provided the Covered Individual is utilizing the HMO network of Hospitals, Physicians and ancillary providers. If the Covered Individual is denied benefits by the HMO for using out of network providers or not obtaining proper referrals or authorization, this Plan will deny benefits.

## ARTICLE VI.   CONTRIBUTIONS AND FUNDING OF BENEFITS

### 6.01   EMPLOYER'S OBLIGATION TO CONTRIBUTE TO THE PLAN

Each Employer shall make continuing and prompt Employer Contributions to the Fund, as required by the Plan, applicable law, or the applicable Collective Bargaining Agreement. The obligation to make Employer Contributions shall continue during periods when the Collective Bargaining Agreement is being negotiated, but such Employer Contributions shall not be required in case of strike or after termination of the Collective Bargaining Agreement, unless the parties mutually agree otherwise.

### 6.02   CREDITS FOR ERRONEOUS EMPLOYER CONTRIBUTIONS

The Fund shall credit the Employer's account for contributions that have been billed to an Employer only if permitted by Article XI, Section 1 of the Fund's Trust Agreement.

### 6.03   IRREVOCABLE NATURE OF CONTRIBUTIONS

Except as provided in Section 6.02, any and all contributions made by or on behalf of an individual shall be irrevocable and shall be transferred to the Trustees and held as provided in this Plan and in the Trust Agreement, to be used in accordance with the provisions of this Plan in providing benefits and paying the expenses of the Fund.

### 6.04   SELF-PAYMENTS

All Participants making Self-Payments shall comply with Fund procedures, including the submission of prescribed forms to confirm the Participant's status.

## ARTICLE VII.   AMENDMENTS AND PLAN TERMINATION

### 7.01   PROCEDURE FOR AMENDING THE PLAN

This Plan may be amended, from time to time, by majority vote of the Trustees.  A copy of each amendment of this Plan shall be adopted and filed by the Trustees as part of the records and minutes of the Trustees.

### 7.02   TERMINATION OF THE PLAN

This Plan shall be maintained and operated in full force and effect until the occurrence of any of the following events, in which case the Plan shall be terminated:

      (a)    The Trust Fund, in the opinion of the Trustees, shall be inadequate to effectuate the intent and purposes of the Trust Agreement.

      (b)    The Trust Fund, in the opinion of the Trustees, shall be inadequate to meet payments due, or to become due, to persons already drawing benefits.

      (c)    There are no individuals living who can qualify as Employees, as defined in Article I of this Plan.

      (d)    All contracts between the Fund and Employers expire, terminate or are canceled.

In the event of termination, the Trust Fund shall be distributed by the Trustees in accordance with any plan which conforms to the intent and purposes of the Trust Agreement and the "Employee Retirement Income Security Act of 1974".

## ARTICLE VIII.   PLAN ADMINISTRATION

### 8.01   TRUSTEE STATUS AS "NAMED FIDUCIARY"

Each Trustee by reason of his position is a "named fiduciary" of this Plan within the meaning of the "Employee Retirement Income Security Act of 1974".

### 8.02   POWERS OF THE TRUSTEES

The Trustees shall have authority to jointly control and manage the operation and administration of the Fund and of this Plan, in accordance with the terms of the Trust Agreement and of this Plan, including the authority to allocate fiduciary responsibilities among the Trustees and the authority to designate persons other than Trustees to carry out fiduciary responsibilities in the administration of the Fund and this Plan, except that the Trustees may allocate only a committee of Trustees or one (1) or more "investment managers" (as defined by the "Employee Retirement Income Security Act of 1974") to administer investment and other responsibilities relating to assets of the Fund. All questions or controversies, of whatsoever character, arising in any manner or between any parties or persons in connection with any claim for any benefits preferred by any Participant, beneficiary, or any other person, or whether as to the construction of the language or meaning of the rules and regulations contained in this Plan, shall be submitted to the Trustees, or to a Committee of the Trustees, and the decision of the Trustees or of such Committee thereof shall be binding upon all persons dealing with the Fund or claiming any benefit under the terms of this Plan.

### 8.03   DECISIONS OF TRUSTEES

All decisions by the Trustees, including all rules and regulations adopted by the Trustees, all amendments of the Trust Agreement and this Plan by the Trustees and all interpretations by the Trustees of any of said documents shall be binding upon all parties to the Trust Agreement, the Union, each Employer, all individuals claiming benefits pursuant to this Plan or any amendment thereof and all other individuals engaging in any transaction with the Fund. The Trustees are vested with discretionary and final authority in making all such decisions, including Trustee decisions upon claims for benefits by Covered Participants, Covered Dependents and other claimants, and including Trustee decisions interpreting plan documents of the Fund.

### 8.04   EFFECT OF ANY MISREPRESENTATION WITH RESPECT TO CLAIMS

Any misrepresentation in any claim or document submitted by a claimant to the Fund shall constitute grounds for rejection of the claim, for the denial of any requested benefits, and for the recovery by the Fund of all benefit payments made in reliance upon said misrepresentation.

### 8.05   PAYMENTS TO PERSONS WHO HAVE FAILED TO INFORM THE TRUSTEES OF A CHANGE OF ADDRESS

If any person who is entitled to receive payment of benefits, in accordance with this Plan, fails to inform the Trustees in writing and by registered mail of a change of address, and if the Trustees are unable to communicate with such person at the address last recorded by the Fund, and if a letter sent by registered mail from the Fund to such person is returned because it is not deliverable, all payments due such person shall be held without interest until a claim has been received and approved by the Trustees.

**8.06  INFORMATION CONCERNING COVERED INDIVIDUALS**

For purposes of implementing the terms of the Plan, the Fund may, without notice to or consent of any Covered Individual, obtain from any person or entity such information concerning the Covered Individual as the Fund deems necessary.  Any person claiming benefits under the Plan shall furnish the Fund with such information as the Fund deems necessary to implement the Plan.  When any claim for benefits under the terms of this Plan is submitted by a Covered Individual or any medical service provider that provided care, treatment services or supplies to a Covered Individual then, the furnishing of such claim shall act as a release by the Covered Individual to any medical service provider to allow the Fund, without further notice or consent of any Covered Individual, to obtain any medical records of the Covered Individual from any medical service provider whose claims for treatment of the Covered Individual are submitted for payment.

Failure on the part of any Covered Individual or medical service provider that provided Care, Services, Treatment or Supplies to any Covered Individual to supply or furnish any information requested by the Fund or its agent may result in the rejection of a claim for benefits.

**8.07  USE AND DISCLOSURE OF PROTECTED HEALTH INFORMATION**

The Plan may make any use and disclosure of Protected Health Information to the extent of and in accordance with the uses and disclosures permitted or required by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) as amended.

Protected Health Information concerning employees of the Fund (including, for purposes of this section 8.07, all former employees of the Fund) may be disclosed to other employees of the Fund to carry out plan administration functions as set forth in this section.  The Fund may make any use and disclosure of Protected Health Information concerning employees of the Fund that are required or permitted by law.  Protected Health Information concerning employees of the Fund may only be disclosed to other employees of the Fund after the Trustees of the Fund have certified that the Plan document has been amended to incorporate all provisions required by law.

The Trustees agree and hereby certify that:

(a)  Protected Health Information concerning employees of the Fund shall not be used or disclosed other than as permitted or required by the Plan documents or as required by law;

(b)  Protected Health Information concerning employees of the Fund shall not be used or disclosed to any agents, including a subcontractor, to whom the Fund provides Protected Health Information concerning the employees of the Fund until such agents agree to the same restrictions and conditions that apply to the Plan sponsor with respect to such information;

(c)  Protected Health Information shall not be used or disclosed for employment - related actions and decisions or in connection with any other benefit or employee benefit plan of the Plan sponsor without a valid authorization;

(d)  Any use or disclosure of such information that is inconsistent with the uses or disclosures permitted by the plan shall be reported to the Fund's Privacy Officer;

(e)  Protected Health Information concerning the employees of the Fund will be made available in accordance with 45 C.F.R. Section 164.524;

(f)  Protected Health Information concerning the employees of the Fund will be made available for amendment in accordance with 45 C.F.R. Section 164.526;

(g)  Any and all Protected Health Information concerning employees of the Fund will be made available to provide an accounting of disclosures in accordance with 45 C.F.R. Section 164.528;

(h)  The internal practices, books, and records relating to the use and disclosure of Protected Health Information relating to employees from the Fund that was received from the Plan will be made available to the secretary of Health and Human Services for purposes of determining compliance by the Plan with the privacy rule;

(i)    That any and all Protected Health Information concerning employees of the Fund received from the Plan will, if feasible, be returned or destroyed and no copies of such information will be retained when no longer needed for the purpose for which disclosure was made, except that, if such return or destruction is not feasible, any further use or disclosure of such information will be limited to the purposes that make the return or destruction of the information infeasible.

The Plan sponsor will insure that adequate separation between the Plan and the Plan sponsor will be established in accordance with the Privacy Rule. To insure that adequate separation between the Plan and the Plan sponsor exists, access to the Protected Health Information of the employees of the Fund will be limited to the following classes of employees: (1) Manager of Human Resources Information Systems; (2) Benefits Coordinator; and (3) Human Resources Generalist. The access to, and used by, such classes of employees shall be limited to the plan administration functions that these employees perform for the Plan. In order to provide an effective mechanism for resolving any issues of non-compliance by such employees with the Plan document provisions set forth herein, all such employees shall be expressly subject to all of the Fund's Privacy Policies and Procedures. In no event shall Protected Health Information concerning employees of the Fund be used for the purpose of employment-related actions or decisions or in connection with any other benefit or employee benefit plan of the Plan sponsor.

## ARTICLE IX.  BENEFIT CLAIMS

### 9.01  CLAIMS TO BE SUBMITTED IN WRITING ON AUTHORIZED FORMS

Claims for benefits shall be submitted electronically or in writing, within the time limits specified in Section 11.03, in a method or form authorized by the Fund.

### 9.02  PROCESSING CLAIMS INVOLVING URGENT CARE

(a)  The Fund, upon its receipt of a claim involving urgent care (as defined in Section 9.02[c]), shall notify the claimant of the Fund's benefit determination (whether adverse or not) as soon as possible, taking into account the medical exigencies, but not later than 72 hours after the Fund receives the claim unless the claimant fails to provide sufficient information to determine whether and/or to what extent benefits are covered or payable in accordance with this Plan.  If the claimant fails to provide such sufficient information, the Fund shall notify the claimant as soon as possible, but not later than 24 hours after the Fund receives the claim, of the specific information necessary to complete the claim.  The claimant shall then be afforded a reasonable amount of time, taking into account the circumstances, but not less than 48 hours, to provide the specified information, and the Fund shall thereafter notify the claimant of the Fund's benefit determination as soon as possible, but in no case later than 48 hours after the earlier of:

    (1)  the Fund's receipt of the specified information;

    (2)  the end of the period afforded the claimant to provide the specified additional information.

(b)  Notice of any adverse benefit determination pursuant to this Section 9.02 shall be provided in accordance with Section 9.04.

(c)  A "claim involving urgent care" is any claim for medical care or treatment with respect to which the application of the time periods for making non-urgent care determinations (as those periods are specified in Section 9.03):

    (1)  could seriously jeopardize the life or health of the claimant or the ability of the claimant to regain maximum function; or

    (2)  would, in the opinion of a physician with knowledge of the claimant's medical condition, subject the claimant to severe pain that cannot be adequately managed without the care or treatment that is the subject of the claim.

Any claim that a physician with knowledge of the claimant's medical condition determines is a "claim involving urgent care" shall be treated by the Fund as a "claim involving urgent care".  In the absence of such a physician's determination, any question whether or not a claim is a "claim involving urgent care" is to be determined by an individual acting on behalf of the Fund and applying the judgment of a prudent layperson who has average knowledge of health and medicine.

### 9.03  PROCESSING CLAIMS FOR BENEFITS (OTHER THAN URGENT CARE CLAIMS)

(a)  The Fund, upon its receipt of a claim that is neither a claim involving urgent care nor a claim involving a benefit described in Section 9.03(b) (which relates to benefits requiring the Fund's pre-approval), shall notify the claimant of the Fund's benefit determination (if it is an adverse benefit determination) within a reasonable

period of time and not later than 30 days after the Fund receives the claim, provided that this period may be extended for an additional 15 days if the Fund both determines that such an extension is necessary due to matters beyond the control of the Fund and notifies the claimant, prior to the expiration of the initial 30-day period, of the circumstances requiring the extension of time and the date by which the Fund expects to render a decision. If such an extension is necessary due to a failure of the claimant to submit the information necessary to decide the claim, the notice of extension shall specifically describe the required information, and the claimant shall be afforded at least 45 days from receipt of the notice within which to provide the specified information.

(b)    The Fund, upon its receipt of a claim (not involving urgent care) for a benefit, the receipt of which is conditioned by this Plan upon required approval by the Fund in advance of obtaining the medical care, shall notify the claimant of the Fund's benefit determination (whether adverse or not) within a reasonable period of time appropriate to the medical circumstances but not later than 15 days after the Fund receives the claim, provided that this period may be extended for an additional 15 days if the Fund both determines that such an extension is necessary due to matters beyond the control of the Fund and notifies the claimant, prior to the expiration of the initial 15-day period, of the circumstances requiring the extension of time and the date by which the Fund expects to render a decision. If such an extension is necessary due to a failure of the claimant to submit the information necessary to decide the claim, the notice of extension shall specifically describe the required information, and the claimant shall be afforded at least 45 days from receipt of the notice within which to provide the specified information.

(c)    In the event that a time period for notice of any benefit determination by the Fund is extended pursuant to this Section 9.03 in order for the claimant to submit information necessary to decide the claim, the time period for making the benefit determination and providing related notice shall be tolled (i.e., not counted) from the date on which the notification of the extension is sent to the claimant until the date on which the claimant responds to the request for additional information.

(d)    Notice of any adverse benefit determination pursuant to this Section 9.03 shall be provided in accordance with Section 9.04.

## 9.04  NOTICE OF ADVERSE BENEFIT DETERMINATIONS

(a)    Whenever an adverse benefit determination (as defined in Section 9.04[c]) is made by the Fund, except upon a claim involving urgent care (in which instance Section 9.04[b] governs the notice), the Fund shall provide the claimant with written (or electronic) notice of the determination that shall include statements, in a manner calculated to be understood by the claimant, of the following:

(1)    the specific reason or reasons for each adverse benefit determination;

(2)    references to the specific provisions of this Plan on which each adverse benefit determination is based;

(3)    a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;

(4)    a description of the Fund's appellate review procedures and the time limitations applicable to those procedures, including a statement of the claimant's right to bring a civil action pursuant to Section 502 of the Employee Retirement Income Security Act following an adverse benefit determination at the end of appellate review by the Fund;

(5)    in the case of any adverse benefit determination,

(i)   if an internal rule, guideline, protocol or other similar criterion was relied upon in making the adverse benefit determination, either a statement of the contents of the specific rule, guideline, protocol or other criterion or a statement that the specific rule, guideline, protocol or other criterion will be provided free of charge to the claimant upon request; and

(ii)   if the adverse benefit determination is based on a medical-necessity requirement or an experimental-treatment exclusion or a similar exclusion or limitation, either an explanation of the scientific or clinical judgment for the determination, applying the terms of this Plan to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge to the claimant upon request; and

(6)   in the case of any adverse benefit determination of a claim involving urgent care, a description of the expedited review process that is applicable to such claims.

(b)   Whenever an adverse benefit determination (as defined in Section 9.04[c]) is made by the Fund upon a claim involving urgent care, the Fund may provide the information described in Section 9.04(a) to the claimant by oral notification within the time limitations prescribed in Section 9.02(a), provided that written (or electronic) notice of the determination that includes the information described in Section 9.04(a) is also to be furnished to the claimant not later than 3 days after the oral notification.

(c)   An "adverse benefit determination" means any of the following: a denial, reduction or termination of, or a failure to provide or make payment (in whole or in part) for, a benefit, including any such denial, reduction, termination, or failure to provide or make payment that is based on a Plan exclusion of Coverage or a Plan limitation of Coverage as applied to a claim for benefits, or that is based on a determination relative to the question of a Covered Individual's or any other individual's eligibility for Coverage.

## 9.05   CONCURRENT CARE DECISIONS

(a)   If the Fund has approved an ongoing course of treatment to be provided over a period of time and/or to include a number of treatments, any reduction or termination by the Fund of such course of treatment (other than by plan amendment or termination) before the end of such period of time or number of treatments shall constitute an adverse benefit determination for all purposes of this Plan. In such an event, the Fund shall notify the claimant, in accordance with Section 9.04, of the adverse benefit determination at a time sufficiently in advance of the reduction or termination to allow the claimant to appeal and to obtain a determination on review of that adverse benefit determination before the benefit is reduced or terminated.

(b)   Any request by a claimant to extend such an ongoing course of treatment, previously approved by the Fund, beyond the approved period of time or the approved number of treatments shall, if the course of treatment is a claim involving urgent care, be decided as soon as possible, taking into account the medical exigencies, and the Fund shall notify the claimant of the Fund's benefit determination (whether adverse or not) within 24 hours after receipt of the request by the Fund, provided that any such request is received by the Fund at least 24 hours prior to the expiration of the prescribed period of time or number of treatments.

(c)   Whenever an adverse benefit determination (as defined in Section 9.04[c]) is made by the Fund upon a request by a claimant to extend an ongoing course of treatment, previously approved by the Fund, beyond the approved period of time or the approved number of treatments, whether or not urgent care is involved, notice of the determination shall be provided in accordance with Section 9.04.

**9.06 MISCELLANEOUS BENEFIT CLAIMS PROVISIONS**

(a)   Any time limitation specified in this Article IX for a determination and/or a notice by the Fund may be waived and/or modified at any time on the basis of a request, agreement or consent by the claimant or by an authorized representative of the claimant, including a retroactive waiver and/or modification of an applicable time limitation after it has expired.

(b)   The burden of proof in demonstrating any fact essential to the approval of any claim for benefits, including eligibility for any claimed benefit and the extent to which a claimed benefit is covered or payable in accordance with this Plan, shall at all times be the responsibility of the claimant.

(c)   It is a condition precedent to any civil action by a Covered Individual or other individual to recover benefits covered or payable in accordance with this Plan and/or to clarify the individual's rights to past, present or future benefits covered or payable in accordance with this Plan, including any civil action pursuant to Section 502 of the Employee Retirement Income Security Act, that the claimant or other individual files a benefit claim and initiates and actively pursues appellate review of any adverse benefit determination upon any claim, and secures all related benefit determinations by the Fund, in accordance with Articles IX and X of this Plan, prior to the commencement of any civil action.

(d)   To the extent that a Hospital, Physician or other provider or person is assigned a claim of a Covered Individual for reimbursement by the Fund of the costs of medical or other services or benefits, any and all rights and authority of such assignee:

(1)   are limited by the validity, enforceability and terms of the assignment;

(2)   are limited by all exclusions, limitations, terms and provisions of this Plan;

(3)   are subordinate to any claims and defenses of the Fund against the Covered Individual; and

(4)   are conditioned upon complete compliance by the assignee with all conditions and requirements imposed upon claimants by Articles IX and X of this Plan, including the requirement that the assignee (as claimant) files a benefit claim and initiates and actively pursues appellate review of any adverse benefit determination upon any claim, and secures all related benefit determinations by the Fund, in accordance with Articles IX and X, prior to the commencement of any civil action.

## ARTICLE XI.  MISCELLANEOUS PROVISIONS

### 11.01 VALIDITY OF CHANGES IN THE PLAN

No agent has authority to change the terms of this Plan or to waive any of its provisions.  No change in this Plan shall be valid unless adopted by the Trustees of the Fund.

### 11.02 CLAIM FORMS

The Fund, upon written request of the claimant, will furnish to the claimant such forms as are required for filing a claim.

### 11.03 TIME WITHIN WHICH CERTAIN CLAIMS ARE TO BE FILED

A Claim for any loss (excluding Total and Permanent Disability Installment Benefit or Waiver of Premium) must be filed within one (1) year after the date of such loss.  A claim for Life Insurance, Accidental Death and Dismemberment, Total and Permanent Disability Installment Benefit or Waiver of Premium must be filed within three years (3) after the date of the event.

### 11.04 RECOVERY OF EXCESS PAYMENTS

Whenever this Plan has made benefit payments which exceed the amount of benefits payable under the terms of this Plan, the Fund shall have the right to recover the excess payments from any responsible persons or entities, including the right to deduct the amount of excess payments from any subsequent payable benefits.

### 11.05 FUND MAY ORDER PHYSICAL EXAMINATION AND/OR AUTOPSY

The Fund shall have the right and opportunity to have a claimant examined by a medical service provider, of the Fund's choosing and at the Fund's expense, when, and so often as it may reasonably require during the pendency of a claim.  In the case of death, the Fund shall also have the right to request an autopsy where it is not forbidden by law.

### 11.06 TO WHOM BENEFITS ARE PAYABLE

All benefits are payable to, or for the benefit of, a Covered Individual or his estate, except as otherwise provided in this Plan.

### 11.07 CERTAIN ACTS OF THE FUND DO NOT CONSTITUTE A WAIVER OF RIGHTS

The furnishing of forms by the Fund for filing a claim for benefits, or the acceptance of such filings or the investigation of any claim hereunder, shall not operate as a waiver of any rights of the Fund.

### 11.08 NO MEDICAL EXAMINATION REQUIRED AS PREREQUISITE TO COVERAGE

In no case shall any individual be required to submit to a medical examination as a prerequisite to Coverage under this Plan.

## 11.09 ALL BENEFIT PAYMENTS BASED ON REASONABLE AND CUSTOMARY CHARGES FOR THE SERVICE

In all instances, other than when a specific dollar amount is the stated allowance, benefits to be paid by the Fund will be based upon a charge which is the usual, Reasonable and Customary charge for the treatment, supply or service, determined by comparison with the charges customarily made for similar treatments, supplies or services to individuals with similar medical conditions within a given geographical area.

## 11.10 PERIOD DURING WHICH BENEFIT PAYMENTS MUST BE CLAIMED

Any benefit amounts payable under this Plan must be claimed by the proper beneficiaries within a period of six (6) years from the date that such amounts become due and payable to such beneficiaries. Benefits unclaimed after this six (6) year period shall be considered the property of the Fund which shall have the immediate right to recover the amount of any unclaimed benefits from any persons in possession of said benefit amounts or from any Other Plans having primary responsibility for payment of such benefits.

## 11.11 APPLICABLE LAW

The Trust Agreement was created and accepted in the State of Illinois. All questions pertaining to the validity or construction of the Trust Agreement shall be determined in accordance with the laws of the State of Illinois.

The Fund is a self-funded employee benefit plan governed by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 et seq. All questions concerning the validity of the terms of the Plan shall be determined under ERISA. Any state law that relates to the operation or administration of the Plan is preempted by ERISA and this Plan. The Fund shall be entitled to assert a lien against third parties, insurers and attorneys when necessary to protect the rights of the beneficiaries of the Plan or when necessary to protect the Fund's rights to recover any reimbursements provided for by the terms of this Plan.

## 11.12 SEVERABILITY OF PLAN PROVISIONS

Should any provision of this Plan be held null and void by a court of competent jurisdiction, such holding shall not adversely affect any other provision of this Plan.

## 11.13 RIGHT TO REVIEW ALL CLAIMS

The Fund reserves the right to question any charge or procedure and to have the same professionally reviewed to determine if it is covered under the Plan. The results of said professional review shall not be binding on the Trustees.

## 11.14 SUBROGATION

(a)  The Fund, whenever it makes any payment for any benefits on behalf of a Covered Individual or other person related to any illness, injury or disability (collectively and separately "Disability") of the person, is immediately subrogated and vested with subrogation rights ("Subrogation Rights") to all present and future rights of recovery ("Loss Recovery Rights") arising out of the Disability which that person and his parents, heirs, guardians, executors, attorneys, agents and other representatives (individually and collectively called the "Covered Individuals") may have. The Fund's Subrogation Rights extend to all Loss Recovery Rights of the Covered Individual. The Loss Recovery Rights of the Covered Individual include, without limitation, all rights based upon any one or more of the following:

(1)    Any act or omission by any person or entity, including the Covered Individual; and/or

(2)    Any policy, contract, plan or other document creating responsibility for any insurance, indemnity or reimbursement (collectively "insurance") (including but not limited to every document within the definition of "Other Plan" in Section 1.47 and also including every other form of no-fault liability insurance, personal-injury-protection insurance, financial responsibility insurance, uninsured and/or underinsured motorist insurance and any casualty liability insurance or medical payments coverage including, but not limited to, homeowners or premises insurance, school insurance, workers' compensation insurance, athletic team insurance and any other specific risk insurance or coverage; and/or

(3)    Any medical reimbursement insurance not purchased by the Participant who is the source of Coverage of the Covered Individual; and/or

(4)    Any government-funded or government-sponsored financial entity which may be a source of payment or reimbursement of Loss Recovery Rights to a Covered Individual.

(b)    The Covered Individual shall fully cooperate with the Fund in enforcement of the Fund's Subrogation Rights, shall make prompt, full, accurate and continuous disclosures to the Fund's representatives of all information about all circumstances of his Disability and about all other specifics of his Loss Recovery Rights (including prompt, full, accurate and continuous disclosures of the specifics of applicable insurance and all other potential sources of recovery), shall upon request by a Fund representative execute whatever documents are appropriate to enforce and preserve the Fund's Subrogation Rights, shall perform whatever acts are requested by a Fund representative to enable the Fund to effectively prosecute a civil action in the name of the Covered Individual and/or the Fund and one or more Trustees if the Fund deems such action necessary or appropriate and shall refrain from any act or omission that would to any extent prejudice or impair the Fund's Subrogation Rights.

(c)    The payment by the Fund for any benefits on behalf of a Covered Individual related to his Disability, and simultaneous creation of the Fund's Subrogation Rights to the full extent of present and future payments, shall by itself (without any documentation from, or any act by, the Covered Individual) result in an immediate assignment to the Fund of all right, title and interest of the Covered Individual to and in any and all of his Loss Recovery Rights to the extent of such payments.

(d)    No Covered Individual (including his attorneys and other representatives) is authorized to act on behalf of the Fund with respect to the Fund's Subrogation Rights, or to receive any payment or reimbursement on behalf of the Fund or to release or impair the Fund's Subrogation Rights to any extent. The Fund is entitled to receive payment and reimbursement in the full amount of the Fund's Subrogation Rights before the Covered Individual receives any settlement proceeds or other proceeds (collectively "Proceeds") in full or partial satisfaction of his or her Loss Recovery Rights. If the Fund is vested with Subrogation Rights pursuant to this Section 11.14, then, before the Covered Individual receives any Proceeds, the Covered Individual, and every person and entity that provides any recovery of Proceeds to or on behalf of a Covered Individual, are obligated to cause all such Proceeds to be paid primarily and directly to the Fund until the Fund has received full payment and reimbursement of the Fund's Subrogation Rights.

(e)    If at any time, either before or after the Fund becomes vested with Subrogation Rights pursuant to this Section 11.14, a Covered Individual directly or indirectly receives any Proceeds as full or partial satisfaction of his Loss Recovery Rights, including arrangements for an

annuity or other similar installment benefit plan, and including any payment or reimbursement of expenses (including attorneys' fees) incurred by or on behalf of the Covered Individual, without prior written approval of an authorized Fund representative, the Fund shall be vested with each of the following mutually independent rights:

(1)    The right, at any time, to decline to make any payment for any benefits on behalf of the Covered Individual related to the Disability on which the Proceeds were based;

(2)    The right, at any time after the Fund becomes vested with Subrogation Rights, to decline to make any payment for any benefits on behalf of the Covered Individual, related to any circumstance or condition for which the Fund otherwise has a Coverage obligation, until the amount of such unpaid Coverage is equal to and offset by the unrecovered amount of the Fund's Subrogation Rights; and

(3)    The right, at any time after the Fund becomes vested with Subrogation Rights, to prosecute a civil action against the Covered Individual and/or against any person and/or any other entity (including any insurance company) which the Fund claims to be responsible, in whole or in part, to provide payment or reimbursement to the Fund of the unrecovered amount of the Fund's Subrogation Rights.

(f)    The Fund may assert a lien, for recovery of the Fund's Subrogation Rights against any person or entity. The fact that the Fund does not initially assert or invoke its Subrogation Rights until a time after a Covered Individual, acting without prior written approval of an authorized Fund representative, has made any settlement or other disposition of, or has received any Proceeds as full or partial satisfaction of, his Loss Recovery Rights, shall not relieve the Covered Individual of his obligation to reimburse the Fund in the full amount of the Fund's Subrogation Rights.

(g)    The Fund shall not be financially responsible for any expenses, including attorneys' fees, incurred by or on behalf of a Covered Individual in the enforcement of his Loss Recovery Rights, except to the extent such responsibility is formally accepted by written agreement of an authorized Fund representative.

(h)    The Fund is authorized but not required to bring civil actions in enforcement of the Fund's Subrogation Rights, including direct actions (as subrogee or otherwise) against any person or other entity which the Fund claims to be responsible, in whole or in part, to provide payment or compensation or reimbursement to the Fund of the unrecovered amount of the Fund's Subrogation Rights, and including actions against any person or other entity to enjoin any act or practice which violates the Fund's Subrogation Rights and/or to obtain other appropriate equitable relief to redress such violations and/or to enforce the Fund's Subrogation Rights.

(i)    The Trustees are vested with discretionary and final authority in making decisions that interpret plan documents of the Fund that relate to subrogation. Any one or more Trustees and the Executive Director, and any other person authorized by the Executive Director, may, in his sole discretion, compromise or settle any Fund claim of Subrogation Rights.

(j)    This subsection (j) is added by the Trustees at a board meeting on June 14, 2000, effective immediately and retroactively, in order to add clarification to what have long been intended and understood to be the intention and the purposes of the Trustees in providing the Subrogation Rights of the Fund (this section was most recently revised by the Trustees at a board meeting on July 18, 1994). Subsection (d) has long provided in part that '[t]he Fund is entitled to receive payment and

reimbursement in the full amount of the Fund's Subrogation Rights before the Covered Individual receives any settlement proceeds or other proceeds (collectively "Proceeds') in full or partial satisfaction of his or her Loss Recovery Rights....[and] all such Proceeds [are] to be paid primarily and directly to the Fund until the Fund has received full payment and reimbursement of the Fund's Subrogation Rights' (emphasis added). The Fund's entitlement to full payment and reimbursement of its Subrogation Rights is absolute and unqualified, and is not to be reduced or impaired by the relationship of the gross or net amount of the Proceeds to the aggregate monetary damages sustained, or claimed to be sustained, by the Covered Individual in connection with the Disability related to his or her Loss Recovery Rights. The Fund's Subrogation Rights are not in any way subordinate to or affected by any 'make whole' rule. Subsection (g) has long provided in part that, unless otherwise expressly agreed in a specific instance, "[t]he Fund shall not be financially responsible for any expenses, including attorneys' fees, incurred by or on behalf of a Covered Individual in the enforcement of his or her Loss Recovery Rights...' The Fund's Subrogation Rights are not in any way subordinate to or affected by any 'common fund' principle or factor -- sometimes described as the equitable concept of a 'common fund' which governs the allocation of attorney's fees in any case in which a lawyer hired by one party creates through his efforts a fund in which others are entitled to share as well -- the acceptance of plan benefits from the Fund entirely subordinates the Loss Recovery Rights of the Covered Individual to the Subrogation Rights of the Fund (without any 'common fund' reduction or other reduction of those Subrogation Rights). Every payment and reimbursement to the Fund based upon its Subrogation Rights results in a monetary benefit to all of the Covered Individuals of the Fund. The Fund does maintain systematic procedures to ascertain the extent to which its Subrogation Rights should be compromised and not fully enforced in specific instances, and each Covered Individual is free to invoke the appeals procedures of this Plan document in any instance in which he or she claims that the Fund's application of its Subrogation Rights is unfair and/or unreasonable and/or unsatisfactory."

## 11.15 WORKER'S COMPENSATION SUBROGATION

If any Covered Individual has a claim denied pursuant to Section 4.03 of this Plan and the Covered Individual's claim for Worker's Compensation benefits is denied by the Worker's Compensation Carrier, the Fund may enter into an agreement with the Covered Individual to provide benefits during the appeal of the denial. Such an agreement would be entitled "Agreement to Reimburse Central States Health and Welfare Fund".

The Fund will enter into such an Agreement subject to the following conditions:

(a)   The Covered Individual provides proof that a claim is pending before the appropriate Compensation Commission or court;

(b)   The Covered Individual agrees to pursue the claim for Worker's Compensation benefits to a final disposition;

(c)   The Covered Individual agrees to notify the Fund of the disposition of his claim and to notify the Worker's Compensation Carrier of the Agreement;

(d)   The Covered Individual establishes sufficient need for the Fund to consider application of this Section; and

(e)   The Covered Individual agrees to reimburse the Fund for benefits paid from the proceeds of any recovery.

The Agreement described in this Section is a binding contract between the Covered Individual and the Fund, and in the event the Covered Individual does not honor this Agreement, the Fund reserves the right to take any necessary step to protect its interest.

## 11.16 RIGHT TO PROVIDE ALTERNATIVE CARE

The Trustees reserve the right to provide benefits for medical care not addressed in this Plan where such alternative care is in the best interest of the Fund and its beneficiaries, and where the Covered Individual or his or her legal guardian and, in the case of a Child, the Covered Participant agree in writing to such alternative care. Alternative care options will be examined on a case by case basis and subject to the approval of the Trustees.

## ARTICLE XII. BASIC BENEFITS

### 12.01 OUTLINE OF BASIC BENEFITS

The Sections of Article XII describe policies and procedures applicable to all Plans offering the referenced Basic Benefit. However, levels of payment, if any, and/or program limitations specific to the Covered Individual's Plan are determined by referencing the appropriate sub-section of Section 20.01.

The specific Basic Benefits and the Sections of this Article pertaining to the same are as follows:

| | Section |
|---|---|
| Loss of Time Benefit—Participant Only | 12.02 |
| Hospital Expense Benefit | 12.03 |
| Surgical and Obstetrical Expense Benefit | 12.04 |
| Outpatient Diagnostic X-ray and Laboratory Expense Benefit | 12.05 |
| Outpatient Accidental Bodily Injury Expense Benefit | 12.06 |
| Prescription Drug Benefit | 12.07 |
| Psychiatric, Alcoholism and Drug Abuse—Inpatient Treatment Benefit | 12.08 |
| Psychiatric, Alcoholism and Drug Abuse—Outpatient Treatment Benefit | 12.09 |
| Organ Transplant Donor Benefit | 12.10 |
| Hearing Aid Benefit | 12.11 |
| Outpatient Cancer Treatment Benefit | 12.12 |
| Ambulance Service Benefit | 12.13 |
| Chiropractic Expense Benefit | 12.14 |
| Women's Health Benefit | 12.15 |
| Mayo Clinic Treatment | 12.16 |

### 12.02 LOSS OF TIME BENEFIT—PARTICIPANT ONLY

A Covered Participant may receive from the Plan a Loss of Time Benefit as follows:

**Periods of Disability for the Loss of Time Benefit—Participant Only**

(a)   A Covered Participant shall receive from the Plan a weekly Loss of Time Benefit in the amount and for the maximum benefit period referenced under Section 20.01(a) during a single period of Disability, as determined in Sub-Section (c) of this Section, for loss of time from employment as a result of being unable to work because of illness, injury or pregnancy. To qualify for the Loss of Time Benefit a Covered Participant must:

(1)   Be absent from work because of a Disability, the treatment of which is compensable under this Plan;

      (2)    Be an Active Employee at the onset of the Disability for which the Loss of Time Benefit is claimed; and

      (3)    Be under the regular care of a Physician.

  (b)    Benefits shall begin to accrue as follows:

      (1)    For loss of time due to illness or pregnancy, benefits shall accrue from the eighth (8th) day of lost work time specified by a Physician and verified by the Employer, if the Covered Participant first received medical attention by a Physician within one (1) day before or three (3) days after the date of disablement specified by the Physician as resulting from the illness or pregnancy. If the Covered Participant did not receive medical attention within these time frames, benefits shall accrue from the eighth (8th) day after the date medical attention is received from a Physician; and

      (2)    For loss of time due to Accidental Bodily Injury, benefits shall accrue from the first (1st) day of lost work time specified by the Physician and verified by the Employer, provided that the Covered Participant first received medical attention within one (1) day before or three (3) days after the date of disablement specified by the Physician as resulting from the injury. Benefits shall accrue from the date medical attention is received from the Physician, if this medical attention was received more than three (3) days after the occurrence of the injury. If a period of loss of time due to an injury begins more than two (2) weeks after the date of the occurrence of the injury, it shall be treated for purposes of this Sub-Section (1) as loss of time due to an illness.

  (c)    All periods of loss of time for which a Loss of Time Benefit is payable shall be deemed to occur during a single period of Disability except:

      (1)    Loss of time due to related illnesses, injuries or pregnancy shall be deemed to arise during separate periods of Disability, if, and only if, thirty (30) or more consecutive calendar days of active employment separate the dates on which the Covered Participant is absent from work; or

      (2)    Loss of time due to unrelated illnesses, injuries or pregnancy shall be deemed to arise during separate periods of Disability, if, and only if, one (1) day of active employment separates any periods of absence from work.

## 12.03 HOSPITAL EXPENSE BENEFIT

A Covered Individual may receive from the Plan a Hospital Expense Benefit as follows:

  (a)    Conditions—

      (1)    The Hospital Confinement must be the result of illness, injury, pregnancy or organ transplant donation; and

      (2)    The Covered Individual must be under the care of a Physician.

  (b)    Covered Expenses—

For the number of days and at the level of benefits specified under Section 20.01(b), the Plan shall pay for all covered charges incurred in a Hospital by Covered Individuals for services which are required for purposes of treatment. Coverage shall include, but not be limited to: room and board, general nursing care, operating room, administration of anesthesia, X-ray examinations, laboratory analyses, drugs and medicines, unreplaced blood, and

necessary disposable items. Standard hospital admission kits are also payable. A private room used for isolation purposes will only be covered if the Covered Individual is contagious to other patients.

(c)     Non-Covered Expenses—

    (1)     Telephone, television, radio, barber and beauty services, other personal items and replaced blood;

    (2)     Taxes, surcharges or interest charges;

    (3)     Any amount in excess of the Hospital's average Semi-Private Room rate, except as provided in Paragraph (b) above; and

    (4)     Private room charges for reverse isolation.

## 12.04 SURGICAL AND OBSTETRICAL EXPENSE BENEFIT

A Covered Individual may receive from the Plan a Surgical and Obstetrical Expense Benefit as follows:

(a)     Conditions—

    (1)     The surgery, except for sterilizations, must be necessitated by illness, injury, pregnancy or organ transplant donation; and

    (2)     The surgery must be performed by a Physician, podiatrist or Dentist provided they are so licensed to perform such surgery.

(b)     Covered Expenses—

The Plan shall pay the level of benefits specified under Section 20.01(c) for the covered Physician's charges. All payments shall be based upon the Reasonable and Customary charge as established by the Fund.

(c)     Non-Covered Expenses—

Charges for stand-by surgeons and any portion of the surgical expense which exceeds the Reasonable and Customary allowance.

## 12.05 OUTPATIENT DIAGNOSTIC X-RAY AND LABORATORY EXPENSE BENEFIT

A Covered Individual may receive from the Plan an Outpatient Diagnostic X-ray and Laboratory Expense Benefit as follows:

(a)     Conditions—

    (1)     The X-ray or laboratory examination must be necessitated by illness, injury, pregnancy or organ transplant donation; and

    (2)     X-ray and laboratory charges will be paid on the basis of Reasonable and Customary allowances and/or usage limitations.

(b)     Covered Expenses—

The Plan shall pay the level of benefits for out-patient X-ray and laboratory charges as a Major Medical Expense Benefit and as specified under Sections 20.01(d) and 20.01(p).

(c)   Non-Covered Expenses—

(1)   Diagnostic procedures rendered as part of a routine physical examination, except as specified in Section 12.15;

(2)   Any portion of the X-ray and laboratory charges that exceed Reasonable and Customary allowances and/or usage limitations; and

(3)   Dental X-rays or laboratory work.

## 12.06 OUTPATIENT ACCIDENTAL BODILY INJURY EXPENSE BENEFIT

A Covered Individual may receive from the Plan an Outpatient Accidental Bodily Injury Expense Benefit as follows:

(a)   Conditions—

(1)   The emergency care must be the result of an Accidental Bodily Injury;

(2)   The Covered Individual must not be confined to the Hospital as a resident patient; and

(3)   Treatment must be received within five (5) days of the occurrence of the injury.

(b)   Covered Expenses—

The Plan shall pay the level of benefits specified under Section 20.01(e) for all covered expenses incurred due to any Accidental Bodily Injury on the first (1st) day of treatment only.

(c)   Non-Covered Expenses—

No payment shall be made under this benefit for illness.

## 12.07 PRESCRIPTION DRUG BENEFIT

A Covered Individual may receive from the Plan a Prescription Drug Benefit as follows:

(a)   Conditions—

The Plan will pay the level of benefits specified under Section 20.01(f) for covered charges for these Prescription Drugs.

(b)   Covered Expenses—

The Plan will provide benefits only for those covered drugs prescribed by a Physician or Dentist, dispensed by a Pharmacist and not available over the counter (except insulin and insulin syringes), including:

(1)   Any medicinal substance which bears the legend: "Caution: Federal Law Prohibits Dispensing Without a Prescription";

(2)   Any medicinal substance which may be dispensed by prescription only according to state law;

(3)   Any medicinal substance which has at least one ingredient that is a federal or state restricted drug in a therapeutic amount; and

(4)   Insulin and syringes.

(c)    Non-Covered Expenses—

    (1)    Therapeutic devices or appliances, hypodermic needles, support garments and other non-medicinal substances;

    (2)    All contraceptive and prophylactic devices, even if prescribed for medical reasons;

    (3)    Medications supplied to Covered Individuals in a Hospital or other treatment facility (includes take home drugs);

    (4)    Drugs or medicines supplied to the Covered Individual by a prescribing Physician or Dentist;

    (5)    Cosmetic or beauty aids, dietary supplements, vitamins, medications prescribed for weight-loss;

    (6)    Immunizing agents, injectables, blood and blood plasma or medication prescribed for parenteral administration;

    (7)    Medication for which the cost is recoverable under any Worker's Compensation or Occupational Disease Law or any state or federal agency.   Any medication furnished by any other drug or medical service for which no charge is made to the Covered Individual;

    (8)    Any drug labeled:   "Caution:   Limited by Federal Law to Investigational Use", or any experimental drug;

    (9)    Any drug or medication available over the counter;

    (10)   Any drug or medication for enhancing sexual function, including but not limited to Viagra; and

    (11)   Any drug or medication primarily intended for cosmetic or lifestyle enhancement rather than treatment of an illness or injury.

## 12.08 PSYCHIATRIC, ALCOHOLISM AND DRUG ABUSE—INPATIENT TREATMENT BENEFIT

A Covered Individual may receive from the Plan a Psychiatric, Alcoholism and Drug Abuse—Inpatient Treatment Benefit as follows:

(a)    Covered Expenses—

The Plan will provide benefits for necessary care and treatment including, but not limited to:  room at semi-private rate, meals, nursing care, medical supplies and other services as regularly rendered by a qualified Hospital or a licensed Psychiatric Treatment Facility or Alcohol or Drug Abuse Treatment Facility, as approved by the Fund.

(b)    Amount Paid—

For the number of days at the level of benefits specified under Section 20.01(g), all covered charges up to the calendar year and/or lifetime maximum specified under Section 20.01(g) when incurred by a Covered Individual in a qualified Hospital or in a licensed Psychiatric Treatment Facility or Alcohol and Drug Abuse Treatment facility.

(c)    Non-Covered Expenses—

    (1)    Maintenance Care;

    (2)    Treatment not prescribed by a psychiatrist, Physician or clinical psychologist;

(3)     Half-way house type facilities;

(4)     Legal Services;

(5)     Recreational, vocational, financial, educational, family or marital counseling;

(6)     Services rendered by a federal, state or other facility for which the member is not legally required to pay;

(7)     Detoxification or drug withdrawal programs not rendered by a Hospital, a licensed Psychiatric Treatment Facility or Alcohol and Drug Abuse Treatment Facility;

(8)     Services rendered by a social worker or counselor who is not licensed or not registered in the state where services are performed; and

(9)     Telephone, television, radio, barber, beauty services and other personal comfort items.

## 12.09 PSYCHIATRIC, ALCOHOLISM AND DRUG ABUSE—OUTPATIENT TREATMENT BENEFIT

A Covered Individual may receive from the Plan a Psychiatric, Alcoholism and Drug Abuse—Outpatient Treatment Benefit as follows:

(a)     Covered Expenses—

All services rendered on an outpatient basis under the direction of a psychiatrist, Physician, Clinical Psychologist, or licensed Social Worker performed for maintenance of a psychiatric condition or chemical abuse program in affiliation with a Hospital, Psychiatric Treatment Facility or Alcohol or Drug Abuse Treatment Facility.

(b)     Amount Paid—

The Plan will pay the level of benefits specified under Section 20.01(h) for all covered outpatient expenses up to the calendar year maximum specified under Section 20.01(h) for each Covered Individual.

(c)     Non-Covered Expenses—

The Plan will not pay charges for:

(1)     Educational, vocational, financial, family or marital counseling;

(2)     Legal Services;

(3)     Recreational counseling;

(4)     Services rendered by a federal, state or other institution for which the member is not legally required to pay;

(5)     Dues or contributions to a supportive organization or facility; and

(6)     Services rendered by a Social Worker or Counselor who is not licensed or not registered in the state where services are performed.

## 12.10 ORGAN TRANSPLANT DONOR BENEFIT

A Covered Individual may receive from the Plan an Organ Transplant Donor Benefit as follows:

(a) This Plan will provide Coverage for the donor of an organ only in the absence of any other group or individual policy coverage for the donation of an organ, and only if such donation pertains to a procedure which has met the requirements for coverage as defined in Sections 4.02 and 4.17, except for the limitations on amounts in Section 4.17. The donor's medical expenses will be considered part of, and subject to, the provisions of the recipient's Plan. Donors shall be entitled to Basic Benefits, except for the Loss of Time Benefit. Major Medical Expense Benefits for donors are payable while the donor is confined in a Hospital for the actual donation of the organ and for ninety (90) days after the end of this Hospital confinement; and

(b) If both the recipient and the donor are covered under any Fund Plan, each shall be entitled to the maximum benefits provided and outlined under their respective Plans.

(c) Non-Covered Expenses--

(1) Surgical procedures considered not to be Standard Medical Care, Treatment, Services or Supplies; and

(2) Charges covered by any Other Plan.

## 12.11 HEARING AID BENEFIT

A Covered Individual may receive from the Plan a Hearing Aid Benefit as follows:

(a) Covered Expenses-

The Plan will provide benefits for all medically necessary services rendered by an audiologist or a certified hearing aid specialist, if recommended or prescribed by a Physician, including fitting, initial batteries and cost of approved hearing aid correction devices.

(b) Amount Paid-

The Plan will pay the level of benefits under the time frames specified in Section 20.01(j) for Reasonable and Customary covered charges, up to a maximum of $1,000 per hearing aid, per ear, incurred by each Covered Individual.

(c) Non-Covered Expenses-

(1) Replacement of lost, missing or stolen appliances;

(2) Repair or replacement of broken appliances;

(3) Replacement of batteries;

(4) Hearing aids purchased without prescription or recommendation by a Physician or without a Waiver approved by the Food and Drug Administration;

(5) Charges for care, treatment, services or supplies which are not uniformly and professionally endorsed by the general medical community as Standard Medical Care, Treatment, Services or Supplies; and

(6)     Services and supplies for which the Covered Individual is not legally required to pay.

## 12.12 OUTPATIENT CANCER TREATMENT BENEFIT

A Covered Individual may receive from the Plan an Outpatient Cancer Treatment Benefit as follows:

(a)     Covered Expenses—

The Plan will provide benefits for outpatient nuclear therapy, radiation therapy, chemotherapy, X-ray and laboratory procedures and Physician visits for the treatment of cancer.

(b)     Amount Paid—

The Plan will pay the level of benefits specified under Section 20.01(k) for all Reasonable and Customary covered charges incurred during the treatment period.

(c)     Non-Covered Expenses—

(1)     Charges for care, treatment, services or supplies which are not uniformly and professionally endorsed by the general medical community as Standard Medical Care, Treatment, Services or Supplies;

(2)     Services and supplies for which the Covered Individual is not legally required to pay; and

(3)     Services and supplies determined to be follow-up or screening services, occurring during a period when active treatment, such as chemotherapy or radiation therapy is not occurring.

## 12.13 AMBULANCE SERVICE BENEFIT

A Covered Individual may receive from the Plan an Ambulance Service Benefit as follows:

(a)     Covered Expenses—

(1)     The Plan will provide benefits for professional licensed ambulance service charges incurred solely for required medical treatment, including licensed Air Ambulance; and

(2)     The Fund will provide benefits for transportation by a Commercial Carrier when it is more economical than a private ambulance service.

(b)     Amount Paid—

The Plan will pay the level of benefits specified under Section 20.01(l) for all Reasonable and Customary covered charges for each Covered Individual.

(c)     Non-Covered Expenses—

(1)     Transportation in any privately owned vehicle;

(2)     Services and supplies for which the Covered Individual is not legally required to pay;

(3)     Transportation for reason other than receiving required medical treatment; and

(4)     Transportation to receive medical treatment which is available at point of origin.

## 12.14 CHIROPRACTIC EXPENSE BENEFIT

A Covered Individual may receive from the Plan a Chiropractic Expense Benefit as follows:

    (a)    Conditions and Covered Expenses—

        (1)    The services must be necessitated by illness or injury;

        (2)    The Covered Individual must be age 12 or older;

        (3)    The services can be performed on either an inpatient or an outpatient basis; and

        (4)    All services provided by a Chiropractor, or under his direction, including x-rays, laboratory, therapy, hospitalization and office visits, or any other covered services will be processed solely under this benefit.

    (b)    Amount Paid—

        (1)    The Plan shall pay the level of benefits specified under Section 20.01(m) for covered charges up to the calendar year maximum specified under Section 20.01(m). In no event shall payment exceed the scheduled benefit; and

        (2)    Each individual charge will be reviewed and only the portion of the charge deemed Reasonable and Customary will be considered for payment.

    (c)    Non-Covered Expenses—

        (1)    Any portion of the Chiropractic expense which exceeds the scheduled benefit;

        (2)    Any portion of the Chiropractic expense which exceeds the Reasonable and Customary allowance as established by the Fund;

        (3)    Any services not necessitated by illness or injury; and

        (4)    Any services performed on a Covered Individual under age twelve (12).

## 12.15 WOMEN'S HEALTH BENEFIT

A Covered Individual may receive from the Plan a Women's Health Benefit as follows:

    (a)    Covered Expenses-

        (1)    An annual office visit when done in conjunction with an annual Pap test for women 18 years of age or older;

        (2)    An annual Pap test for women eighteen (18) years of age or older; and

        (3)    An annual mammogram for women forty (40) years of age or older.

    (b)    Amount Paid-

The Plan will pay the level of benefits specified under Section 20.01(O) for all Reasonable and Customary covered charges for each Covered Individual.

(c)    Non-Covered Expenses-

    (1)    No payment shall be made for any routine laboratory procedures performed in conjunction with annual examination/pap test/mammogram;

    (2)    An annual office visit in conjunction with an annual pap test for women under 18 years of age; and

    (3)    An annual mammogram for women under forty (40) years of age.

## 12.16  MAYO CLINIC TREATMENT

The Plan will pay the level of benefits specified under Section 20.01(n). Covered Individuals shall not be entitled to payment for travel, lodging and other non-medical costs associated with obtaining medical services at Mayo Clinic.

## 12.17  WAIVER OF DEDUCTIBLE/COPAYMENT REQUIREMENT (OFFICE VISITS)

Deductibles shall not apply to the cost of covered physician office visits by Covered Individuals if the physician is participating in a TeamCare preferred provider organization network, except for a $20 per visit co-payment, which shall be required.

## 12.18  PAYMENT BASED ON PROPRIETY OF PROCEDURES

If multiple procedures and/or services are performed on the same day or in the same surgical setting or are inclusive with surgery or other services performed, benefits are allowed based on the propriety of the procedures according to accepted medical standards. Reimbursement is based on the Reasonable and Customary allowance for the appropriate procedure(s).

## 12.19  PAYMENT OF CERTAIN BASIC BENEFITS FOR TREATMENT CONTINUING AFTER TERMINATION OF COVERAGE UNDER THE PLAN

(a)    Conditions-

A Covered Individual whose Coverage under this Plan terminates for any reason other than Employer withdrawal, shall continue to be eligible for all Basic Benefits for a period of thirteen (13) weeks after the date the Individual's Coverage terminates, if:

    (1)    The illness, injury or pregnancy being treated exists on the date the Individual's Coverage under the Plan terminates;

    (2)    The Covered Individual incurs expenses compensable under the Plan on or prior to the date on which the Individual's Coverage under the Plan terminates; and

    (3)    The Covered Individual is, on the date his Coverage under the Plan is terminated, so incapacitated by the illness, injury or pregnancy that he is severely restricted from engaging in normal activities.

(b)    Covered Expenses-

Only those expenses directly related to the illness, injury or pregnancy being treated will be covered by the extension of Basic Benefits.

(c)    Non-Covered Expenses—

If, immediately upon termination of his Coverage under this Plan, a Covered Individual becomes eligible for benefits under the Retiree's Health and Welfare Plan sponsored by the Fund, he shall not be eligible for benefits under this Section.

## 12.20  TERMINATION OF THE BASIC BENEFIT EXTENSION

On the date the Covered Individual becomes eligible for insurance coverage under an Other Plan, all benefits provided under Section 12.19 shall cease.

## ARTICLE XIII.   MAJOR MEDICAL EXPENSE BENEFITS

### 13.01 OUTLINE OF MAJOR MEDICAL BENEFITS

A Covered Individual may receive Major Medical Expense Benefits from the Plan. The Sections of Article XIII describe policies and procedures applicable to all plans offering Major Medical Expense Benefits. However, levels of payment, if any, and/or program limitations specific to the Covered Individual's Plan are determined by referencing Section 20.01(p). Certain benefits, defined in Section 1.24 of this Plan as Eligible Major Medical Expenses, may be modified by the provisions of Article XX. Thus, in cases of conflict between provisions, Article XX shall control.

### 13.02 PAYMENT BASED ON PROPRIETY OF PROCEDURES

If multiple procedures and/or services are performed on the same day or in the same surgical setting or are inclusive with surgery or other services performed, benefits are allowed based on the propriety of the procedures according to accepted medical standards. Reimbursement is based on the Reasonable and Customary allowance for the appropriate procedure(s).

### 13.03 MAXIMUM MAJOR MEDICAL EXPENSE BENEFITS

The maximum Major Medical Expense Benefit payable for any Covered Individual shall be the calendar year maximum specified under Section 20.01(p).

### 13.04 EXTENSION OF THE MAJOR MEDICAL EXPENSE BENEFIT

The Major Medical Expense Benefit may be extended if, on the date his Coverage under the Plan terminates, a Covered Individual:

(a) Is suffering from a Disability; the treatment of which is compensable under the Plan;

(b) Is so incapacitated by that Disability that he is severely restricted from engaging in normal activities; and

(c) Becomes eligible for Major Medical Expense Benefits relating to that Disability.

The Covered Individual may establish further eligibility for Major Medical Expense Benefits related to that Disability for twenty-four (24) months from the last day of Basic Benefit Coverage (including Loss of Time Coverage and the Basic Benefit extension, if applicable), after deduction of the annual Plan Deductible amount specified in Section 20.07 to covered charges per calendar year incurred by the Covered Individual.

A Participant making Self-Payments subsequent to the end of his Active Coverage period, and who is applying for the Total and Permanent Disability Installment Benefit or the Waiver of Premium Disability Benefit and is subsequently approved for the Total and Permanent Disability Installment Benefit or the Waiver of Premium Disability Benefit, shall not be considered ineligible for the twenty-four (24) month extension.

Only those compensable expenses directly related to the Disability necessitating the Major Medical extension will be covered.

**13.05 TERMINATION OF THE MAJOR MEDICAL EXTENSION**

The eligibility of a Covered Individual for the extended Major Medical Benefits provided in Section 13.07 shall terminate if:

(a)   The Covered Individual's condition improves so that he is no longer incapacitated by his disability; or

(b)   The Covered Individual becomes eligible for coverage under an Other Plan.

(c)   Termination of the Major Medical Extension shall not be considered a COBRA event for purposes of self-payments (as described in Article III) to extend coverage.

## ARTICLE XIV.  LIFE INSURANCE BENEFITS

### 14.01 BENEFITS

The Fund may provide Covered Participants with a Life Insurance Benefit, Dependent Life Insurance Benefit, Total and Permanent Disability Installment Benefit, Waiver of Premium Disability Benefit and Accidental Death and Dismemberment Benefit. The following sections describe policies and procedures applicable to all plans offering the referenced Benefits. However, the levels of payment, if any, and/or program limitations specific to the Covered Individual's Plan are determined by referencing Section 20.04.

### 14.02 LIFE INSURANCE BENEFIT

The amount of the Life Insurance Benefit is specified in Section 20.04.

The Life Insurance Benefit shall not be provided to a beneficiary if such beneficiary is convicted by a court of competent jurisdiction of any willful act which caused or resulted in the death of the Covered Participant. Under such circumstances, the Life Insurance Benefit shall be provided to the next surviving class of beneficiaries as stated in the second paragraph of Section 14.09. In the event of a charge of wrongdoing against the beneficiary in connection with the death of the Covered Participant, the Fund retains the right to investigate the circumstances of such death and to withhold payment of any Benefit until termination of any investigation or prosecution involving the beneficiary.

### 14.03 DEPENDENT LIFE INSURANCE BENEFIT

The amount of the Life Insurance Benefit provided for the Spouse and Child of a Covered Participant is specified in Section 20.04.

Coverage of the Spouse and Child begins simultaneously with coverage of the Participant.

A Spouse's coverage ends at midnight on the Saturday of the week in which:  1) the Participant's coverage ends, 2) the Participant and Spouse are divorced, 3) the Spouse enters Service in the Uniformed Services, or 4) a Self-Payment is past due.

A Child's coverage ends at midnight on the Saturday of the week in which:  1) the Participant's coverage ends, 2) the Child reaches the age of nineteen (19) (regardless of student or handicapped status), 3) the Child marries or enters Service in the Uniformed Service, 4) the Child becomes a full-time Employee or a Plan Participant, 5) a Self-Payment is past due, or 6) is no longer considered an eligible dependant.

The Life Insurance Benefit shall not be provided to a beneficiary if such beneficiary is convicted by a court of competent jurisdiction of any willful act which caused or resulted in the death of the Covered Dependent. Under such circumstances, the Life Insurance Benefit shall be provided to the next surviving class of beneficiaries as stated in the second paragraph of Section 14.09. In the event of a charge of wrongdoing against the beneficiary in connection with the death of the Covered Dependent, the Fund retains the right to investigate the circumstances of such death and to withhold payment of any Benefit until termination of any investigation or prosecution involving the beneficiary.

### 14.04 TOTAL AND PERMANENT DISABILITY INSTALLMENT/WAIVER OF PREMIUM DISABILITY BENEFITS

The Fund provides a Total and Permanent Disability Installment Benefit for Covered Participants who became totally and permanently disabled as defined in Section 1.70 of this Document, prior to reaching age sixty (60).

If a Covered Participant becomes totally and permanently disabled, as defined in Section 1.70 of this Document, then:

    (a)    The Total and Permanent Disability Installment Benefit will be provided to the Covered Participant if he has not yet reached age fifty (50); or

    (b)    The Waiver of Premium Disability Benefit will be provided to the Covered Participant if he is between age fifty (50) and age fifty-nine (59), inclusive.

## 14.05 TOTAL AND PERMANENT DISABILITY INSTALLMENT BENEFIT

The Total and Permanent Disability Installment Benefit award specified in Section 20.04 shall consist of payment in lieu of any other benefits specified in Section 20.04. Payment shall be made in 60 equal monthly installments together with an interest allowance at two and one-half percent (2½%) per annum.

The first (1st) monthly installment shall be due and payable on whichever of the following is the latest date:

    (a)    Six (6) months after commencement of such Total and Permanent Disability, or

    (b)    In the month that a Social Security Award is dated (not the effective date), if the date is on or before the fifteenth (15th) of the month, or

    (c)    In the month following the month that a Social Security Award is dated (not the effective date), if the Award date is after the fifteenth (15th) of the month.

Subsequent monthly installments shall be paid on the corresponding day of each month thereafter. Any installments remaining unpaid at the death of the eligible recipient of this award shall be commuted into one (1) sum on the basis of two and one-half percent (2½%) per annum in accordance with Section 14.09.

It shall be the responsibility of the Covered Participant to furnish the Fund with an application for this benefit within three (3) years after the Participant's date of disability.

It shall further be the responsibility of the Covered Participant to furnish the Fund with proof sufficient to determine initial and continuing eligibility for this award.

A Social Security Award of Disability with a disability date on or prior to the Covered Participant's last date of Coverage will be considered as evidence and constitute proof sufficient of such Disability when application for this benefit is considered by the Fund.

## 14.06 WAIVER OF PREMIUM DISABILITY BENEFIT

The Waiver of Premium Disability Benefit provides an eligible Covered Participant with the Total and Permanent Disability Installment Benefit in the form of Life Insurance, without payment of further contributions on his behalf or by him. At the death of a Covered Participant who received a Waiver of Premium award, the proceeds of his Total and Permanent Disability Installment Benefit shall be paid according to Section 14.09.

It shall be the responsibility of the Covered Participant to furnish the Fund with an application for this benefit within three (3) years after the Participant's date of disability.

It shall further be the responsibility of the Covered Participant to furnish the Fund with proof sufficient to determine initial and continuing eligibility for this award.

A Social Security Award of Disability with a disability date on or prior to the Covered Participant's last date of Coverage will be considered as evidence and constitute proof sufficient of such Disability when application for this benefit is considered by the Fund.

### 14.07 ELIGIBILITY AND ADMINISTRATION

The Fund shall have the right at any time to require proof of the continuance of a Total and Permanent Disability. If the recipient fails to furnish satisfactory proof or if it appears at any time that the Total and Permanent Disability has terminated, no further payments shall be made and any Fund obligation with respect to the benefit on the life of such person shall cease, except that the remaining benefit on the life of such person, if eligible under this Plan, may be restored, subject to payment of contributions on behalf of the Covered Participant and to the limitation of the amount listed in Section 20.04.

If a Former Covered Participant receives all or part of the Total and Permanent Disability Installment Benefit, and subsequently becomes an Active Employee, that Employee shall again become eligible for the full Life Insurance Benefit after the completion of five (5) years as a Covered Participant.

For purposes of determining eligibility for the Total and Permanent Disability Installment Benefit or the Waiver of Premium Disability Benefit, the age of the Participant at the date of Disability shall control.

### 14.08 ACCIDENTAL DEATH AND DISMEMBERMENT BENEFIT

The Fund provides a Covered Participant with an Accidental Death and Dismemberment Benefit for loss, as provided below and not hereinafter excluded, sustained while covered under this Plan and occurring within one hundred-twenty (120) days after the date of the Accidental Bodily Injury resulting in the loss. For any one (1) of the losses listed below, the Fund will pay, subject to the provisions hereinafter contained, the portion set opposite such loss, of the Life Insurance Benefit in force on the date of the accident. Only one (1) of the amounts so specified, the largest, will be paid for all injuries resulting from any one (1) accident.

For Loss of:

| | |
|---|---|
| Life . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | The Principal Sum |
| Both Hands or Both Feet or Sight of Both Eyes . . . . . . . | The Principal Sum |
| One Hand and One Foot . . . . . . . . . . . . . . . . . | The Principal Sum |
| One Hand and Sight of One Eye . . . . . . . . . . . . . . | The Principal Sum |
| One Foot and Sight of One Eye . . . . . . . . . . . . . . | The Principal Sum |
| One Hand or One Foot . . . . . . . . . . . . . . . . . . . | ½ Principal Sum |
| Sight of One Eye . . . . . . . . . . . . . . . . . . . . . . | ½ Principal Sum |

"Loss" shall mean, with regard to hands and feet, dismemberment by severance through or above wrist or ankle joints; with regard to eyes, "loss" means entire and irrecoverable loss of sight.

     (a)    Exclusions—

The benefit shall not cover any of the following losses:

     (1)    Loss resulting from the contracting of disease;

     (2)    Loss caused, or contributed to, by bodily or mental infirmity, disease or medical or surgical treatment thereof, or infection (except pus-forming infection which occurs through an accidental cut or wound), even though the proximate and precipitating cause of the loss is Accidental Bodily Injury;

     (3)    Loss caused or contributed to by war or any act of war, whether war is declared or not, or by any act of international armed conflict,

## ARTICLE XV. DENTAL BENEFITS

### 15.01 PAYMENT FOR CERTAIN TREATMENT PERFORMED BY A DENTIST

A Covered Individual may receive from the Plan Dental Benefits to help defray the cost of covered dental procedures listed in Section 15.06. The remaining Sections of Article XV describe policies and procedures applicable to all plans offering the referenced Dental Benefit. However, levels of payment, if any, and/or program limitations specific to the Covered Individual's Plan are determined by referencing Section 20.02.

### 15.02 COVERED DENTAL PROCEDURES AND MAXIMUM AMOUNT PAYABLE

Payments of Dental Benefits are subject to the following:

(a)   The Plan shall pay the level of benefits specified in Section 20.02 for covered procedures (see Section 15.06) for a Covered Individual. All payments are subject to Reasonable and Customary charge limits as determined by the Fund;

(b)   The maximum amount payable for any Covered Individual in a calendar year (January 1st to December 31st) is specified in Section 20.02;

(c)   The maximum amount payable for orthodontic treatment for a Dependent Child up to the nineteenth (19th) birthday is specified in Section 20.02; and

(d)   If there are alternate treatment procedures available which render effective treatment, the Fund reserves the right to provide benefits for only the least costly of the procedures.

### 15.03 LIMITATIONS ON PAYMENT OF DENTAL BENEFITS

Dental Benefit payments shall not be made for charges incurred for:

(a)   Any amount over the Reasonable and Customary allowance established by the Fund;

(b)   Treatment by someone other than a Dentist or doctor, except for cleaning and scaling of teeth and application of fluoride treatment and/or sealants by a licensed dental hygienist when such services are rendered under the direct supervision and guidance of the Dentist;

(c)   Services and/or supplies for cosmetic purposes;

(d)   Orthodontic services and/or supplies for a Covered Participant, Spouse or Dependent Child past their nineteenth (19th) birthday, including orthodontia in conjunction with TMJ and/or other medical/dental conditions;

(e)   Services and/or supplies which do not satisfy Section 4.02 or which are not necessary according to those standards professionally endorsed by the general dental community;

(f)   Services and supplies for which the Covered Individual is not legally required to pay;

(g)   Precision attachments, specialized techniques and personalization or characterization of dental prostheses;

(h)  Procedures, restorations and appliances to increase vertical dimension (the distance between the nose and chin);

(i)  Educational programs, such as plaque control, oral hygiene instruction or nutritional counseling;

(j)  Sealants for Participants, Spouses or a Dependent Child past their fourteenth (14th) birthday;

(k)  Sealants more than once in any eighteen (18) month period for Dependents under their fourteenth (14th) birthday;

(l)  Implantology (except for subperiosteal, mandibular staple bone, osseointegrated biotes or mucosal implants to anchor full dentures only);

(m)  Replacement of lost, missing or stolen dental/orthodontic appliances;

(n)  Failure to keep a scheduled visit with a Dentist or hygienist;

(o)  Completion of any dental claim forms;

(p)  Local anesthesia, analgesia or nitrous oxide;

(q)  Prescriptions written by the Dentist;

(r)  Dental treatment for a Dependent Child past their nineteenth (19th) birthday;

(s)  Temporary restorations or sedative fillings on the same day as restorative dentistry;

(t)  In connection with restorative dentistry, bases;

(u)  In connection with inlays, crowns, bridgework, dentures or prosthetic devices:

   (1)  Expenses for replacement made less than three (3) years after a preceding placement or replacement which was covered by this Plan;

   (2)  Expenses for extension of bridges or prosthetic devices previously paid for by this Plan, except for expenses incurred for new extended areas, except as provided in 21(a); and

   (3)  Expenses for any prosthetic appliance unless the appliance is actually inserted.

(v)  Expenses for rebasing of dentures made less than three (3) years after the previous rebasing covered by the Plan;

(w)  Expenses for adjustments, tissue conditioning, relining and/or rebasing, less than 6 months after insertion of denture(s);

(x)  Expenses for laboratory relining made less than three (3) years after the previous laboratory relining covered by the Plan;

(y)  Expenses for labial veneers/laminate unless due to accident, fracture or birth defect, or within three (3) years of previous labial veneers covered by the Plan;

(z)  Full mouth X-rays more than once in any two (2) year period;

(aa)  Bite-wing X-ray(s) more than once in any six (6) month period;

(bb)  Fluoride application more than once in any six (6) month period;

(cc)  An oral examination more than once in any six (6) month period;

(dd)  Prophylaxis more than once in any six (6) month period;

(ee)  Periodontal prophylaxis more than once in any six (6) month period;

(ff)  Fluoride application performed on a Participant or Spouse;

(gg)  Periodontal scaling and/or root planing more than once in any one (1) year period;

(hh)  Crowns without sufficient breakdown or sufficient decay;

(ii)  Crowns and/or bridgework without sufficient bone support;

(jj)  Crowns and/or bridgework supported by implants;

(kk)  Expenses for multiple periodontal procedures performed on the same day;

(ll)  Expenses for periodontal procedures performed on Dependent Children (will be individually reviewed for possible payment);

(mm)  Expenses for space maintainer for Participant or Spouse;

(nn)  Expenses for home medicaments;

(oo)  Any procedure not completed;

(pp)  Permanent crowns and/or bridgework on deciduous (baby) teeth;

(qq)  Root canal therapy, apicoectomy, root resection and hemisection more than once in a lifetime per tooth (root); and

(rr)  General Anesthesia; unless administered in conjunction with oral surgery (impacted or surgical extractions), periodontal surgery, fracture, dislocations, apicoectomies, or three(3) or more simple extractions rendered on the same date of service.

## 15.04 ORTHODONTIA BENEFIT—DEPENDENT CHILDREN ONLY

A Covered Dependent Child shall receive from the Plan an Orthodontia Benefit as follows:

(a)  Covered Expenses—

The Plan will provide benefits, as specified in Section 20.02, for orthodontic services rendered by a Dentist or orthodontist, providing the Participant is covered, to correct the following dental problems:

(1)  The existence of extreme bucco-lingual version of the teeth, either unilateral or bilateral;

(2)  A protrusion of the maxillary teeth of four (4) or more millimeters;

(3)  An open bite of four (4) or more millimeters;

(4)  A protrusive or retrusive relation of the maxillary or mandibular arch of at least one (1) cusp; or

(5)  An arch-length discrepancy of four (4) or more millimeters.

(b)    Amount Paid—

The Plan will pay the level of benefits specified in Section 20.02 for covered charges up to the maximum Orthodontic Benefit per person, per lifetime as specified in Section 20.02.

(c)    Non-Covered Expenses—

(1)    Orthodontic appliances and/or related services rendered on Dependent Children past their nineteenth (19th) birthday;

(2)    Services and/or supplies for orthodontia on any Participant or Spouse;

(3)    Any covered charges in excess of the lifetime maximum benefit;

(4)    Any protrusion, retrusion or open-bite which does not meet the requirements outlined in (a) above; and

(5)    Expenses for incomplete procedures or appliances that are not inserted and/or related services.

## 15.05 EXTENSION OF DENTAL BENEFITS

If, on the date his Coverage under the Plan terminates, a Covered Individual has undergone any of the following dental procedures which require extended treatment, Dental Benefits will be extended to provide coverage for these procedures, providing the work is completed within one (1) year:

(a)    Dentures, full or partial, if the impression was taken while a Covered Individual;

(b)    Fixed bridgework, gold restorations and crowns, if tooth or teeth were prepared while a Covered Individual; and

(c)    Root canal therapy, if the tooth or teeth were opened for treatment while a Covered Individual.

## 15.06 LISTING OF COVERED DENTAL PROCEDURES

The following are American Dental Association procedure codes which will be considered for payment under the Covered Individual's Plan according to the provisions of Article XV and Section 20.02. ADA codes are listed in ascending order with notations as to special considerations, if applicable. Any ADA code listed with the notation "Medical" indicates that the procedure will be considered for payment only under the Covered Individual's Basic and/or Major Medical Benefits (refer to Articles XII, XIII and Section 20.01).

ADA                         SPECIAL
CODE                     CONSIDERATIONS

## CLINICAL ORAL EXAMS

| Code | Description | |
|------|-------------|---|
| 0110 | INITIAL ORAL EXAMINATION | |
| 0120 | PERIODIC ORAL EXAMINATION | |
| 0140 | LIMITED ORAL EXAMINATION | |
| 0150 | COMPREHENSIVE ORAL EXAMINATION | |
| 0160 | DETAILED AND EXTENSIVE ORAL EXAMINATION | |

## RADIOGRAPHS/DIAGNOSTIC IMAGING

| Code | Description | |
|------|-------------|---|
| 0210 | INTRAORAL - COMPLETE SERIES (INCLUDES BITE-WINGS) | |
| 0220 | INTRAORAL-PERIAPICAL-1ST FILM | |
| 0230 | INTRAORAL-PERIAPICAL-EACH ADDITIONAL FILM | |
| 0240 | INTRAORAL-OCCLUSAL FILM | |
| 0250 | EXTRAORAL-1ST FILM | |
| 0260 | EXTRAORAL-EACH ADDITIONAL FILM | |
| 0270 | BITEWING-SINGLE FILM | |
| 0272 | BITEWING-2 FILMS | |
| 0273 | BITEWING-3 FILMS | |
| 0274 | BITEWING-4 FILMS | |
| 0290 | POSTERIOR-ANTERIOR OR LATERAL SKULL AND FACIAL BONE SURVEY FILE | |
| 0310 | SIALOGRAPHY | |
| 0320 | TEMPOROMANDIBULAR JOINT ARTHROGRAM, INCLUDING INJECTION | MEDICAL |
| 0321 | OTHER TEMPOROMANDIBULAR FILMS | MEDICAL |
| 0322 | TOMOGRAPHIC SURVEY | MEDICAL |
| 0330 | PANORAMIC FILM | |
| 0340 | CEPHALOMETRIC FILM | |
| 0415 | BACTERIOLOGIC STUDIES | |
| 0460 | PULP VITALITY TESTS | |
| 0470 | DIAGNOSTIC CASTS | ORTHO ONLY |
| 0471 | DIAGNOSTIC PHOTOS | ORTHO ONLY |
| 0501 | HISTOPATHOLOGIC EXAMINATION | |
| 0502 | OTHER ORAL PATHOLOGY PROCEDURE | |

## PREVENTIVE

| Code | Description |
|------|-------------|
| 1110 | ADULT PROPHYLAXIS |
| 1120 | CHILD PROPHYLAXIS |
| 1203 | TOPICAL APPLICATION OF FLUORIDE—CHILD |
| 1204 | TOPICAL APPLICATION OF FLUORIDE—ADULT |
| 1351 | SEALANT PER TOOTH* |
| | * DEPENDENT CHILDREN ONLY—UNDER AGE 14 |
| 1510 | FIXED UNILATERAL SPACE MAINTAINER |
| 1515 | FIXED BILATERAL SPACE MAINTAINER |
| 1520 | REMOVABLE UNILATERAL SPACE MAINTAINER |
| 1525 | REMOVABLE BILATERAL SPACE MAINTAINER |
| 1550 | RECEMENT SPACE MAINTAINER |

## RESTORATIVE

| Code | Description |
|------|-------------|
| 2110 | AMALGAM 1 SURFACE PRIMARY |
| 2120 | AMALGAM 2 SURFACES PRIMARY |
| 2130 | AMALGAM 3 SURFACES PRIMARY |
| 2131 | AMALGAM 4 OR MORE SURFACES PRIMARY |
| 2140 | AMALGAM 1 SURFACE PERMANENT |
| 2150 | AMALGAM 2 SURFACES PERMANENT |
| 2160 | AMALGAM 3 SURFACES PERMANENT |
| 2161 | AMALGAM 4 OR MORE SURFACES PERMANENT |
| 2330 | RESIN 1 SURFACE, ANTERIOR |
| 2331 | RESIN 2 SURFACES, ANTERIOR |
| 2332 | RESIN 3 SURFACES, ANTERIOR |

| ADA CODE | | SPECIAL CONSIDERATIONS |
|---|---|---|

| 2335 | RESIN 4 OR MORE SURFACES OR INVOLVING INCISAL ANGLE (ANTERIOR) |
|---|---|
| 2336 | COMPOSITE RESIN CROWN, ANTERIOR-PRIMARY |
| 2380 | RESIN 1 SURFACE, POSTERIOR-PRIMARY |
| 2381 | RESIN 2 SURFACES, POSTERIOR-PRIMARY |
| 2382 | RESIN 3 OR MORE SURFACES, POSTERIOR-PRIMARY |
| 2385 | RESIN 1 SURFACE, POSTERIOR-PERMANENT |
| 2386 | RESIN 2 SURFACES, POSTERIOR-PERMANENT |
| 2387 | RESIN 3 OR MORE SURFACES, POSTERIOR-PERMANENT |
| 2510 | INLAY METALLIC 1 SURFACE |
| 2520 | INLAY METALLIC 2 SURFACES |
| 2530 | INLAY METALLIC 3 OR MORE SURFACES |
| 2543 | ONLAY METALLIC 3 SURFACES |
| 2544 | ONLAY METALLIC 4 OR MORE SURFACES |
| 2610 | INLAY PORCELAIN/CERAMIC 1 SURFACE |
| 2620 | INLAY PORCELAIN/CERAMIC 2 SURFACES |
| 2630 | INLAY PORCELAIN/CERAMIC 3 OR MORE SURFACES |
| 2642 | ONLAY PORCELAIN/CERAMIC 2 SURFACES |
| 2643 | ONLAY PORCELAIN/CERAMIC 3 SURFACES |
| 2644 | ONLAY PORCELAIN/CERAMIC 4 OR MORE SURFACES |
| 2650 | INLAY COMPOSITE/RESIN 1 SURFACE |
| 2651 | INLAY COMPOSITE/RESIN 2 SURFACES |
| 2652 | INLAY COMPOSITE/RESIN 3 OR MORE SURFACES |
| 2662 | ONLAY COMPOSITE/RESIN 2 SURFACES |
| 2663 | ONLAY COMPOSITE/RESIN 3 SURFACES |
| 2664 | ONLAY COMPOSITE/RESIN 4 OR MORE SURFACES |
| 2710 | CROWN RESIN (LABORATORY) |
| 2720 | CROWN RESIN WITH HIGH NOBLE METAL |
| 2721 | CROWN RESIN WITH PREDOMINANTLY BASE METAL |
| 2722 | CROWN RESIN WITH NOBLE METAL |
| 2740 | CROWN PORCELAIN/CERAMIC |
| 2750 | CROWN PORCELAIN WITH HIGH NOBLE METAL |
| 2751 | CROWN PORCELAIN WITH PREDOMINANTLY BASE METAL |
| 2752 | CROWN PORCELAIN WITH NOBLE METAL |
| 2790 | CROWN FULL CAST HIGH NOBLE METAL |
| 2791 | CROWN FULL CAST PREDOMINANTLY BASE METAL |
| 2792 | CROWN FULL CAST NOBLE METAL |
| 2810 | CROWN METALLIC 3/4 CAST |
| 2910 | RECEMENT INLAY |
| 2920 | RECEMENT CROWN |
| 2930 | CROWN STAINLESS STEEL (PRIMARY) |
| 2931 | CROWN STAINLESS STEEL (PERMANENT) |
| 2932 | CROWN PREFABRICATED RESIN |
| 2933 | CROWN STAINLESS STEEL WITH RESIN WINDOW |
| 2940 | SEDATIVE FILLING |
| 2950 | CORE BUILD-UP (INCLUDING PINS) |
| 2951 | PIN RETENTION: PER TOOTH, IN ADDITION TO RESTORATION |
| 2952 | CAST POST/CORE IN ADDITION TO CRN/ABUT |
| 2954 | PREFAB/POST/CORE IN ADDITION TO CRN/ABUT |
| 2960 | LABIAL VENEER (LAMINATE) |
| 2961 | LABIAL VENEER (RESIN LAMINATE) |
| 2962 | LABIAL VENEER (PORCELAIN LAMINATE) |
| 2970 | CROWN: TEMPORARY (FRACTURED TOOTH) |
| 2980 | CROWN REPAIR |

## ENDODONTICS

| 3110 | PULP CAP DIRECT |
|---|---|
| 3120 | PULP CAP INDIRECT |

ADA                                                                    SPECIAL
CODE                                                           CONSIDERATIONS


3220    THERAPEUTIC PULPOTOMY
3230    PULPAL THERAPY ANTERIOR-PRIMARY
3240    PULPAL THERAPY POSTERIOR-PRIMARY
3310    ROOT CANAL ANTERIOR
3320    ROOT CANAL BICUSPID
3330    ROOT CANAL MOLAR
3346    RETREATMENT OF PREVIOUS ROOT CANAL-ANTERIOR
3347    RETREATMENT OF PREVIOUS ROOT CANAL-BICUSPID
3348    RETREATMENT OF PREVIOUS ROOT CANAL-MOLAR
3351    APEXIFICATION-INITIAL VISIT
3352    APEXIFICATION-INTERIM MEDICATION REPLACEMENT
3353    APEXIFICATION-FINAL VISIT
3410    APICOECTOMY-ANTERIOR
3421    APICOECTOMY-BICUSPID
3425    APICOECTOMY-MOLAR
3426    APICOECTOMY-EACH ADDITIONAL ROOT
3430    RETROGRADE FILLING
3450    ROOT AMPUTATION
3920    HEMISECTION
3950    CANAL PREPARATION/FIT DOWEL
        Must be performed in conjunction with root canal therapy.

## PERIODONTICS

4210    GINGIVECTOMY/PLASTY/PER QUADRANT
4211    GINGIVECTOMY/PLASTY/PER TOOTH
4220    GINGIVAL CURETTAGE/PER QUADRANT
4240    GINGIVAL FLAP PROCEDURE/INCLUDING ROOT PLANNING/PER QUADRANT
4249    CLINICAL CROWN LENGTHENING-HARD TISSUE
4250    MUCOGINGIVAL SURGERY PER QUADRANT
4260    OSSEOUS SURGERY PER QUADRANT
4263    BONE REPLACEMENT GRAFT 1ST SITE/PER QUADRANT
4264    BONE REPLACEMENT GRAFT EACH ADDITIONAL SITE/PER QUADRANT
4266    GUIDED TISSUE REGENERATION PER SITE PER TOOTH/RESORBABLE
4267    GUIDED TISSUE REGENERATION PER SITE PER TOOTH/NON-RESORBABLE
4270    PEDICLE SOFT TISSUE GRAFTS
4271    FREE SOFT TISSUE GRAFTS
4273    CONNECTIVE TISSUE GRAFT PROCEDURE
4274    DISTAL OR PROXIMAL WEDGE PROCEDURE
4320    SPLINT/INTRACORONAL
4321    SPLINT/EXTRACORONAL
4341    PERIODONTAL SCALING/ROOT PLANNING PER QUADRANT
4355    FULL MOUTH DEBRIDEMENT
4381    LOCALIZED DELIVERY OF CHEMOTHERAPEUTIC AGENTS PER TOOTH
4910    PERIODONTAL MAINTENANCE PROCEDURES
4920    UNSCHEDULED DRESSING CHANGE

## PROSTHODONTICS, REMOVABLE

5110    COMPLETE DENTURE-MAXILLARY
5120    COMPLETE DENTURE-MANDIBULAR
5130    IMMEDIATE DENTURE-MAXILLARY
5140    IMMEDIATE DENTURE-MANDIBULAR
5211    MAXILLARY PARTIAL DENTURE-RESIN BASE
5212    MANDIBULAR PARTIAL DENTURE-RESIN BASE
5213    MAXILLARY PARTIAL DENTURE CAST METAL WITH RESIN BASE
5214    MANDIBULAR PARTIAL DENTURE CAST METAL WITH RESIN BASE
5281    REMOVABLE UNILATERAL PARTIAL DENTURE

| ADA CODE | | SPECIAL CONSIDERATIONS |
|---|---|---|

| | | |
|---|---|---|
| 5410 | ADJUST COMPLETE DENTURE-MAXILLARY | |
| 5411 | ADJUST COMPLETE DENTURE-MANDIBULAR | |
| 5421 | ADJUST PARTIAL DENTURE-MAXILLARY | |
| 5422 | ADJUST PARTIAL DENTURE-MANDIBULAR | |
| 5510 | REPAIR BROKEN COMPLETE DENTURE BASE | |
| 5520 | REPLACE MISSING OR BROKEN TEETH: COMPLETE DENTURE | |
| 5610 | REPAIR RESIN DENTURE BASE | |
| 5620 | REPAIR CAST FRAMEWORK | |
| 5630 | REPAIR OR REPLACE BROKEN CLASP | |
| 5640 | REPLACE BROKEN TEETH: PARTIAL DENTURE | |
| 5650 | ADD TOOTH TO EXISTING PARTIAL DENTURE | |
| 5660 | ADD CLASP TO EXISTING PARTIAL DENTURE | |
| 5710 | REBASE COMPLETE MAXILLARY DENTURE | |
| 5711 | REBASE COMPLETE MANDIBULAR DENTURE | |
| 5720 | REBASE MAXILLARY PARTIAL DENTURE | |
| 5721 | REBASE MANDIBULAR PARTIAL DENTURE | |
| 5730 | RELINE COMPLETE MAXILLARY DENTURE/OFFICE | |
| 5731 | RELINE COMPLETE MANDIBULAR DENTURE/OFFICE | |
| 5740 | RELINE MAXILLARY PARTIAL/OFFICE | |
| 5741 | RELINE MANDIBULAR PARTIAL/OFFICE | |
| 5750 | RELINE COMPLETE MAXILLARY DENTURE/LABORATORY | |
| 5751 | RELINE COMPLETE MANDIBULAR DENTURE/LABORATORY | |
| 5760 | RELINE MAXILLARY PARTIAL/LABORATORY | |
| 5761 | RELINE MANDIBULAR PARTIAL/LABORATORY | |
| 5810 | TEMPORARY DENTURE COMPLETE MAXILLARY | |
| 5811 | TEMPORARY DENTURE COMPLETE MANDIBULAR | |
| 5820 | TEMPORARY DENTURE PARTIAL MAXILLARY | |
| 5821 | TEMPORARY DENTURE PARTIAL MANDIBULAR | |
| 5850 | TISSUE CONDITIONING/MAXILLARY | |
| 5851 | TISSUE CONDITIONING/MANDIBULAR | |
| 5860 | OVERDENTURE/COMPLETE MAXILLARY | |
| 5861 | OVERDENTURE/PARTIAL MAXILLARY | |
| 5863 | OVERDENTURE/PARTIAL MANDIBULAR | |
| 5864 | OVERDENTURE/COMPLETE MANDIBULAR | |

## PROSTHODONTICS, FIXED (BRIDGEWORK)

| | | |
|---|---|---|
| 6055 | IMPLANT CONNECTING BAR (WITH FULL DENTURE ONLY) | |
| 6210 | PONTIC - CAST HIGH NOBLE METAL | |
| 6211 | PONTIC - CAST PREDOMINANTLY BASE METAL | |
| 6212 | PONTIC - CAST NOBLE METAL | |
| 6240 | PONTIC - PORCELAIN FUSED TO HIGH NOBLE METAL | |
| 6241 | PONTIC - PORCELAIN FUSED TO PREDOMINANTLY BASE METAL | |
| 6242 | PONTIC - PORCELAIN FUSED TO NOBLE METAL | |
| 6250 | PONTIC - RESIN WITH HIGH NOBLE METAL | |
| 6251 | PONTIC - RESIN WITH PREDOMINANTLY BASE METAL | |
| 6252 | PONTIC - RESIN WITH NOBLE METAL | |
| 6520 | INLAY METALLIC 2 SURFACE | |
| 6530 | INLAY METALLIC 3 OR MORE SURFACES | |
| 6543 | ONLAY METALLIC 3 SURFACES | |
| 6544 | ONLAY METALLIC 4 OR MORE SURFACES | |
| 6545 | MARYLAND BRIDGE—WING | |
| 6720 | CROWN - RESIN WITH HIGH NOBLE METAL | |
| 6721 | CROWN - RESIN WITH PREDOMINANTLY BASE METAL | |
| 6722 | CROWN - RESIN WITH NOBLE METAL | |
| 6750 | CROWN - PORCELAIN FUSED TO HIGH NOBLE METAL | |
| 6751 | CROWN - PORCELAIN FUSED TO PREDOMINANTLY BASE METAL | |
| 6752 | CROWN - PORCELAIN FUSED TO NOBLE METAL | |

| ADA CODE | | SPECIAL CONSIDERATIONS |
|---|---|---|
| 6780 | CROWN - 3/4 CAST HIGH NOBLE METAL | |
| 6790 | CROWN - FULL CAST HIGH NOBLE METAL | |
| 6791 | CROWN - FULL CAST PREDOMINANTLY BASE MENTAL | |
| 6792 | CROWN - FULL CAST NOBLE METAL | |
| 6930 | RECEMENT BRIDGE | |
| 6940 | STRESS BREAKER | |
| | *Only payable when partial or fixed bridge is payable. Charges are combined with appliance. | |
| 6965 | TEMPORARY BRIDGE/PER UNIT | |
| 6970 | CAST POST AND CORE IN ADDITION TO BRIDGE RETAINER | |
| 6971 | CAST POST AS PART OF BRIDGE RETAINER | |
| 6972 | PREFABRICATED POST AND CORE IN ADDITION TO BRIDGE RETAINER | |
| 6973 | CORE BUILD UP FOR RETAINER, INCLUDING PINS | |
| 6980 | BRIDGE REPAIR | |

## EXTRACTIONS AND ORAL SURGERY

| | | |
|---|---|---|
| 7110 | EXTRACTION/SINGLE TOOTH | |
| 7120 | EXTRACTION/EACH ADDITIONAL TOOTH | |
| 7130 | ROOT REMOVAL - EXPOSED ROOTS | |
| 7210 | SURGICAL EXTRACTION/ERUPTED TOOTH | |
| 7220 | EXTRACTION/INCISION SOFT TISSUE | |
| 7230 | EXTRACTION OF TOOTH, PARTIAL BONY IMPACTION | |
| 7240 | EXTRACTION OF TOOTH, COMPLETE BONY IMPACTION | |
| 7241 | EXTRACTION OF TOOTH—COMPLETE BONY IMPACTION WITH UNUSUAL DIFFICULTIES OR CIRCUMSTANCES | |
| 7250 | REMOVAL OF RESIDUAL ROOT | |
| 7260 | ORAL/ANTRAL FISTULA CLOSURE | |
| 7270 | TOOTH REIMPLANTATION | |
| 7280 | SURGICAL EXPOSURE FOR ORTHO-(FOR DEPENDENT CHILD, ONLY) | |
| 7281 | SURGICAL EXPOSURE TO AID ERUPTION | |
| 7285 | BIOPSY/ORAL TISSUE/HARD | MEDICAL |
| 7286 | BIOPSY/ORAL TISSUE/SOFT | MEDICAL |
| 7290 | SURGICAL REPOSITIONING/TEETH | ORTHO ONLY |
| 7291 | TRANSSEPTAL FIBEROTOMY | MEDICAL |
| 7310 | ALVEOPLASTY/PER QUADRANT/WITH EXTRACTIONS | |
| 7320 | ALVEOPLASTY/PER QUADRANT/NO EXTRACTIONS | |
| 7340 | VESTIBULOPLASTY/ARCH/UNCOMPLICATED | MEDICAL |
| 7350 | VESTIBULOPLASTY/ARCH/COMPLICATED | MEDICAL |
| 7410 | RADICAL EXCISION—LESION DIAMETER UP TO 1.25 CM | MEDICAL |
| 7420 | RADICAL EXCISION—LESION DIAMETER OVER 1.25 CM | MEDICAL |
| 7425 | EXCISION PERICORONAL GINGIVA | |
| 7430 | EXCISE BENIGN TUMOR/LESION—UP TO 1.25 CM | MEDICAL |
| 7431 | EXCISE BENIGN TUMOR/LESION—OVER 1.25 CM | MEDICAL |
| 7440 | EXCISE MALIGNANT TUMOR/LESION—UP TO 1.25 CM | MEDICAL |
| 7441 | EXCISE MALIGNANT TUMOR/LESION—OVER 1.25 CM | MEDICAL |
| 7450 | EXCISE ODONTOGENIC CYST/TUMOR—UP TO 1.25 CM | MEDICAL |
| 7451 | EXCISE ODONTOGENIC CYST/TUMOR—OVER 1.25 CM | MEDICAL |
| 7460 | EXCISE NONODONTOGENIC CYST/TUMOR—UP TO 1.25 CM | MEDICAL |
| 7461 | EXCISE NONODONTOGENIC CYST/TUMOR—OVER 1.25 CM | MEDICAL |
| 7465 | DESTROY LESION BY PHYSICAL METHOD | MEDICAL |
| 7470 | REMOVAL EXOSTOSIS/MANDIBLE/MAXILLA | MEDICAL |
| 7480 | PARTIAL OSTECTOMY | MEDICAL |
| 7490 | RADICAL RESECTION/MANDIBLE WITH BONE GRAFT | MEDICAL |
| 7510 | INCISION & DRAINAGE OF ABSCESS—INTRAORAL | |
| 7520 | INCISION & DRAINAGE OF ABSCESS—EXTRAORAL | MEDICAL |
| 7530 | REMOVAL OF FOREIGN BODY, SKIN/TISSUE | |
| 7540 | REMOVAL OF FOREIGN BODY, MUSCULOSKELETAL | |

| ADA CODE | | SPECIAL CONSIDERATIONS |
|---|---|---|
| 7550 | SEQUESTRECTOMY FOR OSTEOMYELITIS | MEDICAL |
| 7560 | MAXILLARY SINUSOTOMY FOR REMOVAL OF TOOTH | MEDICAL |
| 7610 | FRACTURE MAXILLA/SIMPLE/OPEN REDUCTION | MEDICAL |
| 7620 | FRACTURE MAXILLA/SIMPLE/CLOSED REDUCTION | MEDICAL |
| 7630 | FRACTURE MANDIBLE/SIMPLE/OPEN REDUCTION | MEDICAL |
| 7640 | FRACTURE MANDIBLE/SIMPLE/CLOSED REDUCTION | MEDICAL |
| 7650 | FRACTURE MALAR AND/OR ZYGOMATIC ARCH/SIMPLE/OPEN REDUCTION | MEDICAL |
| 7660 | FRACTURE MALAR AND/OR ZYGOMATIC ARCH/SIMPLE/CLOSED REDUCTION | MEDICAL |
| 7670 | FRACTURE ALVEOLUS/SIMPLE/OPEN REDUCTION/SPLINT | MEDICAL |
| 7680 | FRACTURE FACIAL BONES/SIMPLE/COMPLICATED REDUCTION/SURGICAL APPROACHES | MEDICAL |
| 7710 | FRACTURE MAXILLA/COMPOUND/OPEN REDUCTION | MEDICAL |
| 7720 | FRACTURE MAXILLA/COMPOUND/CLOSED REDUCTION | MEDICAL |
| 7730 | FRACTURE MANDIBLE/COMPOUND/OPEN REDUCTION | MEDICAL |
| 7740 | FRACTURE MANDIBLE/COMPOUND/CLOSED REDUCTION | MEDICAL |
| 7750 | FRACTURE MALAR AND/OR ZYGOMATIC ARCH/COMPOUND/OPEN REDUCTION | MEDICAL |
| 7760 | FRACTURE MALAR AND/OR ZYGOMATIC ARCH/COMPOUND/CLOSED REDUCTION | MEDICAL |
| 7770 | FRACTURE ALVEOLUS/COMPOUND/OPEN REDUCTION/SPLINT | MEDICAL |
| 7780 | FRACTURE FACIAL BONES/COMPOUND/COMPLICATED REDUCTION/FIXATION | MEDICAL |
| 7810 | OPEN REDUCTION OF DISLOCATION | MEDICAL |
| 7820 | CLOSED REDUCTION OF DISLOCATION | MEDICAL |
| 7830 | MANIPULATION UNDER ANESTHESIA | MEDICAL |
| 7840 | CONDYLECTOMY | MEDICAL |
| 7850 | SURGICAL DISCECTOMY | MEDICAL |
| 7860 | ARTHROTOMY | MEDICAL |
| 7870 | ARTHROCENTESIS | MEDICAL |
| 7880 | OCCLUSAL ORTHOTIC DEVICE | MEDICAL |
| 7910 | SUTURE SMALL WOUND UP TO 5 CM | MEDICAL |
| 7911 | COMPLICATED SUTURING UP TO 5 CM | MEDICAL |
| 7912 | COMPLICATED SUTURING OVER 5 CM | MEDICAL |
| 7920 | SKIN GRAFT | MEDICAL |
| 7940 | OSTEOPLASTY FOR ORTHOGNATHIC DEFORMITIES | MEDICAL |
| 7950 | OSSEOUS GRAFT/MANDIBLE/FACIAL BONES | MEDICAL |
| 7955 | REPAIR MAXILLOFACIAL/SOFT AND HARD TISSUE DEFECTS | MEDICAL |
| 7960 | FRENULECTOMY/FRENECTOMY/FRENOTOMY | MEDICAL |
| 7970 | EXCISION OF HYPERPLASTIC TISSUE/PER ARCH | |
| 7971 | EXCISION OF PERICORONAL GINGIVA | |
| 7980 | SIALOLITHOTOMY | MEDICAL |
| 7981 | EXCISION OF SALIVARY GLAND | MEDICAL |
| 7982 | SIALODOCHOPLASTY | MEDICAL |
| 7983 | CLOSURE OF SALIVARY FISTULA | MEDICAL |
| 7990 | EMERGENCY TRACHEOTOMY | MEDICAL |
| 7993 | ALLOPLASTIC IMPLANT—PER TOOTH | |
| 7995 | ALLOPLASTIC IMPLANT—PER QUADRANT | |
| 7996 | ALLOPLASTIC IMPLANT—MATERIAL | |
| 7999 | UNSPECIFIED ORAL SURGERY, BY REPORT | MEDICAL |

## ORTHODONTICS

| | | |
|---|---|---|
| 8210 | REMOVABLE APPLIANCE/THUMB SUCKING/TONGUE THRUSTING | |
| 8220 | FIXED APPLIANCE/THUMB SUCKING/TONGUE THRUSTING | |
| 8800 | INSERTION ACTIVE APPLIANCE | ORTHO ONLY |
| 8810 | DIAGNOSTIC RECORDS | ORTHO ONLY |
| 8820 | MAINTENANCE/ADJUSTMENTS | ORTHO ONLY |
| 8830 | RETAINER/RETENTION | ORTHO ONLY |
| 8840 | ORTHO/REPAIR | ORTHO ONLY |
| 8850 | MISC. ORTHO PROCEDURE | ORTHO ONLY |

ADA                     **SPECIAL**
**CODE**                 **CONSIDERATIONS**

## MISCELLANEOUS PROCEDURES

| | |
|---|---|
| 9110 | PALLIATIVE/EMERGENCY TREATMENT/MINOR |
| 9220 | ANESTHESIA/GENERAL/OFFICE/1ST 30 MINUTES |
| | *Payable for surgical procedures, or for three or more extractions only. |
| 9221 | ANESTHESIA/GENERAL/EACH ADDITIONAL 15 MINUTES |
| 9240 | INTRAVENOUS SEDATION: OFFICE |
| 9310 | CONSULTATION SESSION/DIAGNOSTIC SERVICES |
| 9410 | HOUSE CALLS |
| 9420 | HOSPITAL CALLS |
| 9430 | OFFICE VISIT/REGULAR HOURS |
| 9440 | OFFICE VISIT/AFTER REGULAR HOURS |
| 9610 | INJECTION/THERAPEUTIC DRUG |
| 9630 | OTHER DRUGS/MEDICAMENTS |
| 9910 | APPLICATION/DESENSITIZING MEDICAMENT |
| 9930 | UNUSUAL POST-SURGERY COMPLICATIONS |
| 9940 | OCCLUSAL GUARDS |
| 9951 | OCCLUSAL ADJUSTMENT - LIMITED |
| 9952 | OCCLUSAL ADJUSTMENT - COMPLETE |

## ARTICLE XVI.  VISION BENEFITS

**16.01 COVERED VISION EXPENSES**

    (a)    The Plan may provide payments to help defray the cost of eye examinations and materials for Covered Individuals.  The Sections of Article XVI describe policies and procedures applicable to all Plans offering Vision Benefits.  However, levels of payment, if any, and/or program limitations specific to the Covered Individual's Plan are determined by referencing Section 20.03.  Finally, from time to time in order to enhance benefits, the Fund enters into agreements with providers who agree to special arrangements for Fund participants who patronize them, and these agreements are separately published.  These agreements are, however, subject to change without prior notice.

    (b)    Only procedures intended to improve the otherwise healthy eye by glasses shall be covered under Vision Benefits.  However, eye procedures requiring hospitalization, surgery, X-ray or laboratory work may be covered under Basic Benefits and/or Major Medical Expense Benefits.

    (c)    Only vision procedures performed by an optician, optometrist or ophthalmologist shall be covered.

**16.02 COVERED VISION PROCEDURES AND MAXIMUM AMOUNT PAYABLE**

    The Plan shall pay covered expenses incurred up to the amount listed for the covered procedure or item under Section 20.03.

**16.03 LIMITATION ON PAYMENT FOR VISION BENEFITS**

    (a)    No Vision Benefit payment shall be made in any one twelve (12) month period for more than:

        (1)    One (1) complete examination;

        (2)    One (1) pair of lenses;

        (3)    One (1) set of frames, or repair of frames;

        (4)    One (1) pair of contact lenses; or

        (5)    Either one (1) pair of lenses and frames or one (1) pair of contact lenses.

    (b)    No Vision Benefit payment shall be made for:

        (1)    Vision care services or supplies received from a medical department maintained by the Participant's Employer, a mutual benefit association, a labor union, trustee or similar group;

        (2)    Vision care services or supplies furnished by, or at the direction of, the United States government or any agency thereof;

        (3)    Medical or surgical treatment of the eye;

        (4)    Sunglasses, plain or prescription, or safety glasses;

        (5)    Orthoptics, vision training or aniseikonia; and

        (6)    Replacement due to loss or theft.

## ARTICLE XVII.   OUT-OF-POCKET EXPENSE LIMIT

17.01 THE TERM OUT-OF-POCKET EXPENSE IS DEFINED AS THE PORTION OF ELIGIBLE EXPENSES INCURRED THAT ARE THE PARTICIPANT'S RESPONSIBILITY AFTER THE PLAN HAS PAID ITS REQUIRED BENEFITS.   THE FUND MAY PROVIDE COVERED INDIVIDUALS WITH AN OUT-OF-POCKET EXPENSE LIMIT TO BE ADMINISTERED AS SET FORTH IN THIS ARTICLE.   HOWEVER, THE LIMIT LEVELS, IF ANY, AND/OR PROGRAM LIMITATIONS SPECIFIC TO THE COVERED INDIVIDUAL'S PLAN ARE DETERMINED BY REFERENCING SECTION 20.05.

(a) Expenses that may be applied to the Out-of-Pocket Expense Limit include:

(1) The balance of eligible Hospital Expenses after the Plan pays its required benefit; and

(2) The balance of eligible Major Medical Expenses after the Plan pays its required benefit.

(b) Expenses not applied to the Out-of-Pocket Expense Limit include:

(1) All deductibles and disallowed charges;

(2) Any amount that exceeds the Reasonable and Customary allowance established by the Fund;

(3) The balance on any chiropractic charges after the Plan pays its required benefit;

(4) Any non-covered expenses;

(5) The balance of any dental expenses after the Fund has paid its required Dental Benefits;

(6) The balance of any Vision expenses after the Fund has paid its required Vision Benefits;

(7) Any charge which would exceed the stated maximums as set forth in Article XX of the Plan; and

(8) The balance of any psychiatric expenses after the Fund has paid its required Psychiatric Benefits.

## ARTICLE XVIII.   PLAN BENEFIT LIMIT

18.01   THE TERM PLAN BENEFIT LIMIT IS DEFINED AS THE MAXIMUM PAYABLE BY THE PLAN IN A GIVEN CALENDAR YEAR UNDER ANY OR ALL APPLICABLE PLAN BENEFITS.   THE PLAN MAY INCLUDE SUCH PLAN BENEFIT LIMIT AS DESCRIBED.   THE AMOUNT OF THE PLAN BENEFIT LIMIT, IF ANY, IS DETERMINED BY REFERENCING SECTION 20.06.

18.02   IN ADDITION TO ALL OTHER LIMITATIONS, THERE IS A SEPARATE COVERAGE LIMIT OF $1,000,000 PER COVERED INDIVIDUAL PER CALENDAR YEAR: PAYMENTS BY THE FUND, UPON ALL COVERAGE CLAIMS INCURRED BY ANY COVERED INDIVIDUAL IN ANY CALENDAR YEAR (2001 OR LATER), SHALL NOT EXCEED $1,000,000.   THIS COVERAGE LIMIT IS TO BE CALCULATED AND APPLIED SEPARATELY, WITHOUT ANY REGARD FOR ANY OTHER LIMIT THAT MAY ALSO BE APPLICABLE.

## ARTICLE XIX.   EFFECTIVE DATE OF PLAN SPECIFIC PROVISIONS (PLAN C-6)

19.01 ALL PLAN SPECIFIC PROVISIONS OF THIS PLAN DOCUMENT ARE AFFECTIVE AND APPLICABLE TO PLAN C-6 WITH RESPECT TO EVERY LOSS OR OTHER BASIS OF COVERAGE THAT OCCURS ON OR AFTER NOVEMBER 17, 1999, SUBJECT THEREAFTER TO DULY ENACTED PLAN REVISIONS.

## ARTICLE XX.   SCHEDULE OF BENEFITS (PLAN C-6)

### 20.01 BASIC BENEFITS AND MAJOR MEDICAL EXPENSE BENEFITS

Subject to TeamCare limitations in Section 4.20, the Plan provides accident and health benefits, in the form of Basic Benefits, as set forth in detail in Article XII, and Major Medical Expense Benefits, as set forth in detail in Article XIII, so as to provide comprehensive benefits for Covered Individuals for illness, injury or pregnancy.  Actual benefits provided under this plan may be different then shown based upon the specific plan of benefits selected by the Employer.  A Schedule of the Basic and Major Medical Benefits for Plan C-6 follows:

| Benefit Type | Schedule of Benefits |
|---|---|
| (a)  Loss of Time Benefit (Participant Only) | $300/week (or $42.86 per day) for the first 10 weeks and $350/week (or $50 per day) for the remaining 16 weeks for maximum of 26 weeks.  Includes Loss of Time Disability Coverage for Covered Participants and Covered Dependents as long as Covered Participant is eligible for Loss of Time Benefit. |
| (b)  Hospital Expense Benefit | After Plan Deductible, 100% of covered charges for an unlimited number of days at average semi-private room rate (coronary care unit, intensive care unit, burn unit or isolation room if medically required).  If the Hospital does not have an average semi-private room rate, the amount payable will be the average rate charged by Hospitals in the area for semi-private rooms, as determined by the Fund. |
| (c)  Surgical and Obstetrical Expense Benefit | After Plan Deductible, 100% of Reasonable and Customary covered charges. |
| (d)  Outpatient Diagnostic X-ray and Laboratory Expense Benefit | See Section 20.01(p). |
| (e)  Outpatient Accidental Bodily Injury Expense Benefit | After Plan Deductible, 100% of Reasonable and Customary covered charges—1st day of treatment only if treatment is performed within 5 days of accident and subject to TeamCare co-pay requirements. |
| (f)  Prescription Drug Benefit | 75% of covered charges. For each prescription drug purchased through the TeamCare RX program, a Covered Individual pays a 25% co-payment at the time of any purchase from a TeamCare RX retail pharmacy or a 20% co-payment for any purchase through |

| Benefit Type | Schedule of Benefits |
|---|---|
| | the TeamCare RX mail order program, provided that the maximum co-payment is $200 for each filled prescription purchased through the TeamCare RX program. If a generic drug equivalent is available to fill a prescription, the Covered Individual must choose the generic drug or pay (in addition to the co-payment) the difference in cost between the generic drug and the brand name drug (if the brand name drug is chosen rather than the generic drug, the above-stated $200 maximum is inapplicable and does not limit the amount payable by the Covered Individual). |
| (g) Psychiatric, Alcoholism and Drug Abuse-Inpatient Treatment Benefit | After Plan Deductible, 80% of covered charges for up to 21 days maximum per person, per calendar year. Life-time maximum of 42 days. |
| (h) Psychiatric, Alcoholism and Drug Abuse-Outpatient Treatment Benefit | After Plan Deductible, 80% of covered charges up to 30 sessions/visits per person, per calendar year. |
| (i) Organ Transplant Donor Benefit | After Plan Deductible, The Basic and Major Medical Expense Benefits as outlined in Section 12.10 and 1.24. |
| (j) Hearing Aid Benefit | After Plan Deductible, 100% of Reasonable and Customary covered charges once in every 36 month period. |
| (k) Outpatient Cancer Treatment Benefit | After Plan Deductible, 100% of Reasonable and Customary covered charges during the active treatment period and subject to TeamCare co-pay requirements. |
| (l) Ambulance Service Benefit | After Plan Deductible, 100% of Reasonable and Customary covered charges. |
| (m) Chiropractic Expense Benefit | After Plan Deductible, 80% of Reasonable and Customary covered charges up to $1,000 per person, per calendar year for Covered Individuals age 12 and older. |
| (n) Mayo Clinic Treatment | After Plan Deductible, applicable Basic Benefits and/or Major Medical Expense Benefits. Office visit is subject to TeamCare co-pay requirements. |

| | | |
|---|---|---|
| (o) | Women's Health Benefit | After Plan Deductible, applicable Basic Benefits and/or Major Medical Expense Benefits. Office visit is subject to TeamCare co-pay requirements. |
| (p) | Major Medical Expense Benefit | After Plan Deductible, 80% of the Eligible Major Medical Expenses as defined in Section 1.24 of this document up to a maximum of $250,000 per person, per calendar year. |

## 20.02 DENTAL BENEFITS

The Plan provides Dental Benefits, as set forth in Article XV, for Covered Individuals so as to defray the cost of certain dental procedures. A schedule of Dental Benefits for Plan C-6 follows:

| Benefit Type | | Schedule of Benefits |
|---|---|---|
| (a) | Orthodontic | 100% of the Reasonable and Customary charges for the following* procedures incurred by a Dependent Child up to the 19th birthday up to a $1,500 lifetime maximum.<br>*ADA Codes 0470, 0471, 7290, 8800-8850 as listed under Section 15.06. |
| (b) | Crowns and Bridgework | 80% of the Reasonable and Customary charges for the following* procedures subject to a maximum benefit per person per calendar year of $1,500 consisting of any combination of payments for covered services as defined in Section 20.02(b) and (c).<br>*ADA Codes 2510-2810, 2932, 2952-2970, 6210-6545, 6720-6792, 6970-6972 as listed under Section 15.06. |
| (c) | All other ADA Codes (excluding those listed as "Medical") referenced under Section 15.06 | 100% of the Reasonable and Customary charges subject to a maximum benefit per person per calendar year of $1,500 consisting of any combination of payments under Section 15.06 for covered services as defined in Section 20.02(b) and (c). |

## 20.03 VISION BENEFITS

The Plan provides Vision Benefits, as set forth in Article XVI, so as to defray the cost of eye examinations and materials for Covered Individuals. A schedule of Vision Benefits for Plan C-6 follows:

| Procedure/Item | Schedule of Benefits |
|---|---|
| EXAMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . | $25.00 |
| FRAMES . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $30.00 |
| LENSES (PER PAIR) | |
| SINGLE VISION . . . . . . . . . . . . . . . . . . . . . | $30.00 |
| BI-FOCAL . . . . . . . . . . . . . . . . . . . . . . . | $40.00 |

```
TRI-FOCAL . . . . . . . . . . . . . . . . . . . . . . . $50.00
LENTICULAR . . . . . . . . . . . . . . . . . . . . . . $60.00
CONTACTS . . . . . . . . . . . . . . . . . . . . . . . $60.00
```

**20.04 LIFE INSURANCE BENEFIT, ACCIDENTAL DEATH AND DISMEMBERMENT BENEFIT, TOTAL AND PERMANENT DISABILITY INSTALLMENT BENEFIT AND THE WAIVER OF PREMIUM DISABILITY BENEFIT**

The Plan provides:

    (a)    Life Insurance Benefits for Covered Participants and Covered Dependents;

    (b)    Accidental Death and Dismemberment Benefit for Covered Participants; and

    (c)    Total and Permanent Disability Installment Benefit or Waiver of Premium Disability Benefit for Covered Participants.

Details of the administration of these benefits are set forth in Article XIV. A schedule of these benefits for Plan C-6 follows:

| Benefit Type | Schedule of Benefits |
|---|---|
| PARTICIPANT LIFE | $40,000.00 |
| PARTICIPANT ACCIDENTAL DEATH | $40,000.00 |
| PARTICIPANT ACCIDENTAL DISMEMBERMENT | $40,000.00 maximum (See Schedule in Section 14.08) |
| PARTICIPANT TOTAL AND PERMANENT DISABILITY INSTALLMENT BENEFIT | $16,000.00 |
| SPOUSE LIFE INSURANCE | $ 4,000.00 |
| DEPENDENT LIFE INSURANCE | $ 2,000.00 |

**20.05 OUT OF POCKET EXPENSE LIMIT**

This is not applicable to Plan C-6.

**20.06 PLAN BENEFIT LIMIT**

$1,000,000 per Covered Individual per calendar year.

**20.07 PLAN DEDUCTIBLE**

$200 per Covered Individual per calendar year, limited to a maximum $400 per calendar year in covered charges incurred by a group consisting of one Covered Participant and all related Covered Dependants.

**ARTICLE XIX.    EFFECTIVE DATE OF PLAN SPECIFIC PROVISIONS (Plan C-5)**

19.01 ALL PLAN SPECIFIC PROVISIONS OF THIS PLAN DOCUMENT ARE AFFECTIVE AND APPLICABLE TO PLAN C-5 WITH RESPECT TO EVERY LOSS OR OTHER EASIS OF COVERAGE THAT OCCURS ON OR AFTER NOVEMBER 17, 1999, SUBJECT THEREAFTER TO DULY ENACTED PLAN REVISIONS.

## ARTICLE XX.  SCHEDULE OF BENEFITS (PLAN C-5)

### 20.01 BASIC BENEFITS AND MAJOR MEDICAL EXPENSE BENEFITS

Subject to TeamCare limitations in Section 4.20, the Plan provides accident and health benefits, in the form of Basic Benefits, as set forth in detail in Article XII, and Major Medical Expense Benefits, as set forth in detail in Article XIII, so as to provide comprehensive benefits for Covered Individuals for illness, injury or pregnancy.  Actual benefits provided under this plan may be different then shown based upon the specific plan of benefits selected by the Employer.  A Schedule of the Basic and Major Medical Benefits for Plan C-5 follows:

| Benefit Type | Schedule of Benefits |
|---|---|
| (a)  Loss of Time Benefit (Participant Only) | $175/week (or $25.00 per day) for maximum of 26 weeks.  Includes Loss of Time Disability Coverage for Covered Participants and Covered Dependents as long as Covered Participant is eligible for Loss of Time Benefit. |
| (b)  Hospital Expense Benefit | After Plan Deductible, 100% of covered charges for an unlimited number of days at average semi-private room rate (coronary care unit, intensive care unit, burn unit or isolation room if medically required).  If the Hospital does not have an average semi-private room rate, the amount payable will be the average rate charged by Hospitals in the area for semi-private rooms as determined by the Fund. |
| (c)  Surgical and Obstetrical Expense Benefit | After Plan Deductible, 100% of Reasonable and Customary covered charges. |
| (d)  Outpatient Diagnostic X-ray and Laboratory Expense Benefit | See Section 20.01(p). |
| (e)  Outpatient Accidental Bodily Injury Expense Benefit | After Plan Deductible, 100% of Reasonable and Customary covered charges—1st day of treatment only if treatment is performed within 5 days of accident and subject to TeamCare co-pay requirements. |
| (f)  Prescription Drug Benefit | 75% of covered charges. For each prescription drug purchased through the TeamCare RX program, a Covered Individual pays a 25% co-payment at the time of any purchase from a TeamCare RX retail pharmacy or a 20% co-payment for any purchase through the TeamCare RX mail order program, |

| Benefit Type | Schedule of Benefits |
|---|---|
| | provided that the maximum co-payment is $200 for each filled prescription purchased through the TeamCare RX program. If a generic drug equivalent is available to fill a prescription, the Covered Individual must choose the generic drug or pay (in addition to the co-payment) the difference in cost between the generic drug and the brand name drug (if the brand name drug is chosen rather than the generic drug, the above-stated $200 maximum is inapplicable and does not limit the amount payable by the Covered Individual). |
| (g)  Psychiatric, Alcoholism and Drug Abuse-Inpatient Treatment Benefit | After Plan Deductible, 80% of covered charges for up to 21 days maximum per person, per calendar year. Life-time maximum of 42 days. |
| (h)  Psychiatric, Alcoholism and Drug Abuse-Outpatient Treatment Benefit | After Plan Deductible, 80% of covered charges up to 30 session/visits per person, per calendar year. |
| (i)  Organ Transplant Donor Benefit | After Plan Deductible, The Basic and Major Medical Expense Benefits as outlined in Section 12.10 and 1.24. |
| (j)  Hearing Aid Benefit | After Plan Deductible, 100% of Reasonable and Customary covered charges once in every 36 month period. |
| (k)  Outpatient Cancer Treatment Benefit | After Plan Deductible, 100% of Reasonable and Customary covered charges during the active treatment period and subject to TeamCare co-pay requirements. |
| (l)  Ambulance Service Benefit | After Plan Deductible, 100% of Reasonable and Customary covered charges. |
| (m)  Chiropractic Expense Benefit | After Plan Deductible, 80% of Reasonable and Customary covered charges up to $1,000 per person, per calendar year for Covered Individuals age 12 and older. |
| (n)  Mayo Clinic Treatment | After Plan Deductible, applicable Basic Benefits and/or Major Medical Expense Benefits. Office visit is subject to TeamCare co-pay requirements. |

| | | |
|---|---|---|
| (o) | Women's Health Benefit | After Plan Deductible, applicable Basic Benefits and/or Major Medical Expense Benefits. Office visit is subject to TeamCare co-pay requirements. |
| (p) | Major Medical Expense Benefit | After Plan Deductible, 80% of the Eligible Major Medical Expenses as defined in Section 1.24 of this document up to a maximum of $250,000 per person, per calendar year. |

## 20.02 DENTAL BENEFITS

The Plan provides Dental Benefits, as set forth in Article XV, for Covered Individuals so as to defray the cost of certain dental procedures. A schedule of Dental Benefits for Plan C-5 follows:

| Benefit Type | Schedule of Benefits |
|---|---|
| (a) Orthodontic | 100% of the Reasonable and Customary charges for the following* procedures incurred by a Dependent Child up to the 19th birthday up to a $1,500 lifetime maximum.<br>*ADA Codes 0470, 0471, 7290, 8800-8850 as listed under Section 15.06. |
| (b) Crowns and Bridgework | 80% of the Reasonable and Customary charges for the following* procedures subject to a maximum benefit per person per calendar year of $1,500 consisting of any combination of payments for covered services as defined in Section 20.02(b) and (c).<br>*ADA Codes 2510-2810, 2932, 2952-2970, 6210-6545, 6720-6792, 6960-6972 as listed under Section 15.06. |
| (c) All other ADA Codes (excluding those listed as "Medical") referenced under Section 15.06) | 100% of the Reasonable and Customary charges subject to a maximum benefit per person per calendar year of $1,500 consisting of any combination of payments under Section 15.06 for covered services as defined in Section 20.02(b) and (c). |

## 20.03 VISION BENEFITS

The Plan provides Vision Benefits, as set forth in Article XVI, so as to defray the cost of eye examinations and materials for Covered Individuals. A schedule of Vision Benefits for Plan C-5 follows:

| Procedure/Item | Schedule of Benefits |
|---|---|
| EXAMINATION | $25.00 |
| FRAMES | $30.00 |
| LENSES (PER PAIR) | |
| SINGLE VISION | $30.00 |
| BI-FOCAL | $40.00 |

```
TRI-FOCAL . . . . . . . . . . . . . . . . . . . . . . . $50.00
LENTICULAR . . . . . . . . . . . . . . . . . . . . . . $60.00
CONTACTS . . . . . . . . . . . . . . . . . . . . . . . $60.00
```

**20.04 LIFE INSURANCE BENEFIT, ACCIDENTAL DEATH AND DISMEMBERMENT BENEFIT, TOTAL AND PERMANENT DISABILITY INSTALLMENT BENEFIT AND THE WAIVER OF PREMIUM DISABILITY BENEFIT**

The Plan provides:

    (a)    Life Insurance Benefits for Covered Participants and Covered Dependents;

    (b)    Accidental Death and Dismemberment Benefit for Covered Participants; and

    (c)    Total and Permanent Disability Installment Benefit or Waiver of Premium Disability Benefit for Covered Participants.

Details of the administration of these benefits are set forth in Article XIV. A schedule of these benefits for Plan C-5 follows:

| Benefit Type | Schedule of Benefits |
|---|---|
| PARTICIPANT LIFE | $30,000.00 |
| PARTICIPANT ACCIDENTAL DEATH | $30,000.00 |
| PARTICIPANT ACCIDENTAL DISMEMBERMENT | $30,000.00 maximum (See Schedule in Section 14.08) |
| PARTICIPANT TOTAL AND PERMANENT DISABILITY INSTALLMENT BENEFIT | $16,000.00 |
| SPOUSE LIFE INSURANCE | $ 3,000.00 |
| DEPENDENT LIFE INSURANCE | $ 1,500.00 |

**20.05 OUT OF POCKET EXPENSE LIMIT**

This is not applicable to Plan C-5.

**20.06 PLAN BENEFIT LIMIT**

$1,000,000 per Covered Individual per calendar year.

**20.07 PLAN DEDUCTIBLE**

$200 per Covered Individual per calendar year, limited to a maximum $400 per calendar year in covered charges incurred by a group consisting of one Covered Participant and all related Covered Dependants.

## ARTICLE XIX.    EFFECTIVE DATE OF PLAN SPECIFIC PROVISIONS    (Plan C-4)

19.01 ALL PLAN SPECIFIC PROVISIONS OF THIS PLAN DOCUMENT ARE AFFECTIVE AND APPLICABLE TO PLAN C-4 WITH RESPECT TO EVERY LOSS OR OTHER BASIS OF COVERAGE THAT OCCURS ON OR AFTER NOVEMBER 17, 1999, SUBJECT THEREAFTER TO DULY ENACTED PLAN REVISIONS.

## ARTICLE XX.   SCHEDULE OF BENEFITS (PLAN C-4)

### 20.01 BASIC BENEFITS AND MAJOR MEDICAL EXPENSE BENEFITS

Subject to TeamCare limitations in Section 4.40, the Plan provides accident and health benefits, in the form of Basic Benefits, as set forth in detail in Article XII, and Major Medical Expense Benefits, as set forth in detail in Article XIII, so as to provide comprehensive benefits for Covered Individuals for illness, injury or pregnancy.  Actual benefits provided under this plan may be different then shown based upon the specific plan of benefits selected by the Employer.  A Schedule of the Basic and Major Medical Benefits for Plan C-4 follows:

| Benefit Type | Schedule of Benefits |
|---|---|
| (a)   Loss of Time Benefit (Participant Only) | $150/week (or $21.42 per day) for maximum of 26 weeks.  No Loss of Time Disability Coverage.  Therefore, no continuation of family coverage while collecting Loss of Time Benefits, unless Employer Contributions continue or Self-Payments are made. |
| (b)   Hospital Expense Benefit | After Plan Deductible, 100% of covered charges for an unlimited number of days at average semi-private room rate (coronary care unit, intensive care unit, burn unit or isolation room if medically required).  If the Hospital does not have an average semi-private room rate, the amount payable will be the average rate charged by Hospitals in the area for semi-private rooms, as determined by the Fund. |
| (c)   Surgical and Obstetrical Expense Benefit | After Plan Deductible, 90% of Reasonable and Customary covered charges. |
| (d)   Outpatient Diagnostic X-ray and Laboratory Expense Benefit | See Section 20.01(p). |
| (e)   Outpatient Accidental Bodily Injury Expense Benefit | After Plan Deductible, 100% of covered charges—1st day of treatment only, if treatment is performed within 5 days of accident and subject to TeamCare co-pay requirement. |
| (f)   Prescription Drug Benefit | 75% of covered charges. For each prescription drug purchased through the TeamCare RX program, a Covered Individual pays a 25% co-payment at the time of any purchase from a TeamCare RX retail pharmacy or a 20% co-payment for any purchase through the TeamCare RX mail order program, provided that the maximum co-payment |

| Benefit Type | Schedule of Benefits |
|---|---|
| | is $200 for each filled prescription purchased through the TeamCare RX program. If a generic drug equivalent is available to fill a prescription, the Covered Individual must choose the generic drug or pay (in addition to the co-payment) the difference in cost between the generic drug and the brand name drug (if the brand name drug is chosen rather than the generic drug, the above-stated $200 maximum is inapplicable and does not limit the amount payable by the Covered Individual). |
| (g) Psychiatric, Alcoholism and Drug Abuse-Inpatient Treatment Benefit | After Plan Deductible, 80% of covered charges for up to 17 days per person, per calendar year. Life-time maximum of 34 days. |
| (h) Psychiatric, Alcoholism and Drug Abuse-Outpatient Treatment Benefit | After Plan Deductible, 80% of covered charges up to 30 sessions/visits per person, per calendar year. |
| (i) Organ Transplant Donor Benefit | After Plan Deductible, The Basic and Major Medical Expense Benefits as outlined in Section 12.10 and 1.24. |
| (j) Hearing Aid Benefit | Not applicable to Plan C-4. |
| (k) Outpatient Cancer Treatment Benefit | After Plan Deductible, Applicable Basic and/or Major Medical Expense Benefits. |
| (l) Ambulance Service Benefit | After Plan Deductible, Applicable Basic and/or Major Medical Expense Benefits. |
| (m) Chiropractic Expense | After Plan Deductible, 70% of Reasonable and Customary covered charges up to maximum of $800 per person, per calendar year for Covered Individuals age 12 and older. |
| (n) Mayo Clinic Treatment | After Plan Deductible, applicable Basic Benefits and/or Major Medical Expense Benefits. Office visit is subject to TeamCare co-pay requirements. |
| (o) Women's Health Benefit | After Plan Deductible, applicable Basic Benefits and/or Major Medical Expense Benefits. Office visit is subject to TeamCare co-pay requirements. |

(p)    Major Medical Expense Benefit

After Plan Deductible, 80% of the Eligible Major Medical Expenses as defined in Section 1.24 of this document up to a maximum of $250,000 per person, per calendar year.

**20.02 DENTAL BENEFITS**

The Plan provides Dental Benefits, as set forth in Article XV, for Covered Individuals so as to defray the cost of certain dental procedures. A schedule of Dental Benefits for Plan C-4 follows:

| Benefit Type | Schedule of Benefits |
|---|---|

(a)    Orthodontic

50% of the Reasonable and Customary charges for the following* procedures incurred by a Dependent Child up to the 19th birthday up to a $1,000 lifetime maximum.
*ADA Codes 0470, 0471, 7290, 8800-8850 as listed under Section 15.06.

(b)    Crowns, Bridgework and Dentures

70% of the Reasonable and Customary charges for the following* procedures subject to a maximum benefit per person per calendar year of $1,500 consisting of any combination of payments for covered services as defined in Section 20.02(b), (c), and (d).
*ADA Codes 2510-2810, 2932, 2952-2970, 5110-5281, 5810-5821, 5860-6545, 6720-6792, 6970-6972 as listed under Section 15.06.

(c)    Preventive Services

100% of the Reasonable and Customary charges subject to a maximum benefit per person per calendar year of $1,500 consisting of any combination of payments for covered services as defined in Section 20.02(b), (c), and (d).
*ADA Codes 0110-0160, 1110-1550, 9110 as listed under Section 15.06.

(d)    All other ADA Codes (excluding those listed as "Medical") referenced under Section 16.06

85% of the Reasonable and Customary charges subject to a maximum benefit per person per calendar year of $1,500 consisting of any combination of payments under Section 15.06 for covered services as defined in Section 20.02(b), (c), and (d).

**20.03 VISION BENEFITS**

The Plan provides Vision Benefits, as set forth in Article XVI, so as to defray the cost of eye examinations and materials for Covered Individuals. A schedule of Vision Benefits for Plan C-4 follows:

| Procedure/Item | Schedule of Benefits |
|---|---|
| EXAMINATION | $25.00 |
| FRAMES | $30.00 |
| LENSES (PER PAIR) | |
| SINGLE VISION | $30.00 |
| BI-FOCAL | $40.00 |
| TRI-FOCAL | $50.00 |
| LENTICULAR | $60.00 |
| CONTACTS | $60.00 |

**20.04 LIFE INSURANCE BENEFIT, ACCIDENTAL DEATH AND DISMEMBERMENT BENEFIT, TOTAL AND PERMANENT DISABILITY INSTALLMENT BENEFIT AND THE WAIVER OF PREMIUM DISABILITY BENEFIT**

The Plan provides:

    (a)    Life Insurance Benefits for Covered Participants and Covered Dependents;

    (b)    Accidental Death and Dismemberment Benefit for Covered Participants; and

    (c)    Total and Permanent Disability Installment Benefit or Waiver of Premium Disability Benefit for Covered Participants.

Details of the administration of these benefits are set forth in Article XIV. A schedule of these benefits for Plan C-4 follows:

| Benefit Type | Schedule of Benefits |
|---|---|
| PARTICIPANT LIFE | $25,000.00 |
| PARTICIPANT ACCIDENTAL DEATH | $25,000.00 |
| PARTICIPANT ACCIDENTAL DISMEMBERMENT | $25,000.00 maximum (See Schedule in Section 14.08) |
| PARTICIPANT TOTAL AND PERMANENT DISABILITY INSTALLMENT BENEFIT | $16,000.00 |
| SPOUSE LIFE INSURANCE | $ 3,000.00 |
| DEPENDENT LIFE INSURANCE | $ 1,500.00 |

**20.05 OUT OF POCKET EXPENSE LIMIT**

This is not applicable to the C-4 Plan.

**20.06 PLAN BENEFIT LIMIT**

$1,000,000 per Covered Individual per calendar year.

**20.07 PLAN DEDUCTIBLE**

$200 per Covered Individual per calendar year, limited to a maximum $400 per calendar year in covered charges incurred by a group consisting of one Covered Participant and all related Covered Dependants.

**ARTICLE XIX.   EFFECTIVE DATE OF PLAN SPECIFIC PROVISIONS   (PLAN MODIFIED C-4)**

19.01 ALL PLAN SPECIFIC PROVISIONS OF THIS PLAN DOCUMENT ARE AFFECTIVE AND APPLICABLE TO PLAN MODIFIED C-4 WITH RESPECT TO EVERY LOSS OR OTHER BASIS OF COVERAGE THAT OCCURS ON OR AFTER NOVEMBER 17, 1999, SUBJECT THEREAFTER TO DULY ENACTED PLAN REVISIONS.

ARTICLE XX. SCHEDULE OF BENEFITS (PLAN MODIFIED C-4)

**20.01 BASIC BENEFITS AND MAJOR MEDICAL EXPENSE BENEFITS**

Subject to TeamCare limitations in Section 4.40, the Plan provides accident and health benefits, in the form of Basic Benefits, as set forth in detail in Article XII, and Major Medical Expense Benefits, as set forth in detail in Article XIII, so as to provide comprehensive benefits for Covered Individuals for illness, injury or pregnancy. Actual benefits provided under this plan may be different then shown based upon the specific plan of benefits selected by the Employer. A Schedule of the Basic and Major Medical Benefits for Plan Modified C-4 follows:

| Benefit Type | Schedule of Benefits |
|---|---|
| (a) Loss of Time Benefit (Participant Only) | $150/week (or $21.42 per day) for maximum of 26 weeks. No Loss of Time Disability Coverage. Therefore, no continuation of family coverage while collecting Loss of Time Benefits, unless Employer Contributions continue or Self-Payments are made. |
| (b) Hospital Expense Benefit | After Plan Deductible, After Plan Deductible, 90% of covered charges for an unlimited number of days at average semi-private room rate (coronary care unit, intensive care unit, burn unit or isolation room if medically required). If the Hospital does not have an average semi-private room rate, the amount payable will be the average rate charged by Hospitals in the area for semi-private rooms, as determined by the Fund. 100% after Out of Pocket Expense Limit is met. |
| (c) Surgical and Obstetrical Expense Benefit | After Plan Deductible, 90% of Reasonable and Customary covered charges. 100% after Out of Pocket Expense Limit is met. |
| (d) Outpatient Diagnostic X-ray and Laboratory Expense Benefit | See Section 20.01(p). |
| (e) Outpatient Accidental Bodily Injury Expense Benefit | After Plan Deductible, After Plan Deductible, 90% of covered charges—1st day of treatment only, if treatment is performed within 5 days of accident and subject to TeamCare co-pay requirement. 100% after Out of Pocket Expense Limit is met. |
| (f) Prescription Drug Benefit | 75% of covered charges. For each prescription drug purchased through the TeamCare RX program, a Covered Individual pays a 25% co-payment at |

**Benefit Type**                                    **Schedule of Benefits**

the time of any purchase from a TeamCare RX retail pharmacy or a 20% co-payment for any purchase through the TeamCare RX mail order program, provided that the maximum co-payment is $200 for each filled prescription purchased through the TeamCare RX program. If a generic drug equivalent is available to fill a prescription, the Covered Individual must choose the generic drug or pay (in addition to the co-payment) the difference in cost between the generic drug and the brand name drug (if the brand name drug is chosen rather than the generic drug, the above-stated $200 maximum is inapplicable and does not limit the amount payable by the Covered Individual).

(g)  Psychiatric, Alcoholism and Drug Abuse-Inpatient Treatment Benefit

After Plan Deductible, After Plan Deductible, 80% of covered charges for up to 17 days per person, per calendar year. Life-time maximum of 34 days.

(h)  Psychiatric, Alcoholism and Drug Abuse-Outpatient Treatment Benefit

After Plan Deductible, 80% of covered charges up to 30 sessions/visits per person, per calendar year.

(i)  Organ Transplant Donor Benefit

After Plan Deductible, The Basic and Major Medical Expense Benefits as outlined in Section 12.10 and 1.24.

(j)  Hearing Aid Benefit

Not applicable to Plan Modified C-4.

(k)  Outpatient Cancer Treatment Benefit

After Plan Deductible, Applicable Basic and/or Major Medical Expense Benefits.

(l)  Ambulance Service Benefit

After Plan Deductible, Applicable Basic and/or Major Medical Expense Benefits.

(m)  Chiropractic Expense

After Plan Deductible, 70% of Reasonable and Customary covered charges up to maximum of $800 per person, per calendar year for Covered Individuals age 12 and older.

(n)  Mayo Clinic Treatment

After Plan Deductible, applicable Basic Benefits and/or Major Medical Expense Benefits. Office visit is subject to TeamCare co-pay requirements.

| | | |
|---|---|---|
| (o) | Women's Health Benefit | After Plan Deductible, applicable Basic Benefits and/or Major Medical Expense Benefits. Office visit is subject to TeamCare co-pay requirements. |
| (p) | Major Medical Expense Benefit | After Plan Deductible, 90% of the Eligible Major Medical Expenses as defined in Section 1.24 of this document. |

**20.02 DENTAL BENEFITS**

The Plan provides Dental Benefits, as set forth in Article XV, for Covered Individuals so as to defray the cost of certain dental procedures. A schedule of Dental Benefits for Plan Modified O-4 follows:

| Benefit Type | | Schedule of Benefits |
|---|---|---|
| (a) | Orthodontic | 50% of the Reasonable and Customary charges for the following* procedures incurred by a Dependent Child up to the 19th birthday up to a $1,000 lifetime maximum.<br>*ADA Codes 0470, 0471, 7290, 8800-8850 as listed under Section 15.06. |
| (b) | Crowns, Bridgework and Dentures | 70% of the Reasonable and Customary charges for the following* procedures subject to a maximum benefit per person per calendar year of $1,500 consisting of any combination of payments for covered services as defined in Section 20.02(b), (c), and (d).<br>*ADA Codes 2510-2810, 2932, 2952-2970, 5110-5281, 5810-5821, 5860-6545, 6720-6792, 6970-6972 as listed under Section 15.06. |
| (c) | Preventive Services | 100% of the Reasonable and Customary charges subject to a maximum benefit per person per calendar year of $1,500 consisting of any combination of payments for covered services as defined in Section 20.02(b), (c), and (d).<br>*ADA Codes 0110-0160, 1110-1550, 9110 as listed under Section 15.06. |
| (d) | All other ADA Codes (excluding those listed as "Medical") referenced under Section 16.06 | 85% of the Reasonable and Customary charges subject to a maximum benefit per person per calendar year of $1,500 consisting of any combination of payments under Section 15.06 for covered services as defined in Section 20.02(b), (c), and (d). |

## 20.03 VISION BENEFITS

The Plan provides Vision Benefits, as set forth in Article XVI, so as to defray the cost of eye examinations and materials for Covered Individuals. A schedule of Vision Benefits for Plan Modified C-4 follows:

| Procedure/Item | Schedule of Benefits |
|---|---|
| EXAMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $25.00 |
| FRAMES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $30.00 |
| LENSES (PER PAIR) | |
| SINGLE VISION . . . . . . . . . . . . . . . . . . . . . . . . | $30.00 |
| BI-FOCAL . . . . . . . . . . . . . . . . . . . . . . . . . . | $40.00 |
| TRI-FOCAL . . . . . . . . . . . . . . . . . . . . . . . . . . | $50.00 |
| LENTICULAR . . . . . . . . . . . . . . . . . . . . . . . . . | $60.00 |
| CONTACTS . . . . . . . . . . . . . . . . . . . . . . . . . . | $60.00 |

## 20.04 LIFE INSURANCE BENEFIT, ACCIDENTAL DEATH AND DISMEMBERMENT BENEFIT, TOTAL AND PERMANENT DISABILITY INSTALLMENT BENEFIT AND THE WAIVER OF PREMIUM DISABILITY BENEFIT

The Plan provides:

    (a)    Life Insurance Benefits for Covered Participants and Covered Dependents;

    (b)    Accidental Death and Dismemberment Benefit for Covered Participants; and

    (c)    Total and Permanent Disability Installment Benefit or Waiver of Premium Disability Benefit for Covered Participants.

Details of the administration of these benefits are set forth in Article XIV. A schedule of these benefits for Plan C-4 follows:

| Benefit Type | Schedule of Benefits |
|---|---|
| PARTICIPANT LIFE . . . . . . . . . . . . . . . . . . . | $25,000.00 |
| PARTICIPANT ACCIDENTAL DEATH . . . . . . . . . . . . . . | $25,000.00 |
| PARTICIPANT ACCIDENTAL DISMEMBERMENT . . . . . . . . . . | $25,000.00 |
| | maximum (See Schedule in Section 14.08) |
| PARTICIPANT TOTAL AND PERMANENT DISABILITY INSTALLMENT BENEFIT . . . . . . . . . . . . . | $16,000.00 |
| SPOUSE LIFE INSURANCE . . . . . . . . . . . . . . . . . | $ 3,000.00 |
| DEPENDENT LIFE INSURANCE . . . . . . . . . . . . . . . . | $ 1,500.00 |

## 20.05 OUT OF POCKET EXPENSE LIMIT

Out of Pocket Expense Limit excluding Plan Deductible is $1,000 per Covered Individual per Calendar Year or $2,000 per family per calendar year. Charges relating to non-covered services, dental, chiropractic and vision services, psychiatric, drug and alcoholism treatment, and prescription drugs do not apply towards the Out of Pocket Expense Limit.

## 20.06 PLAN BENEFIT LIMIT

$500,000 per Covered Individual per calendar year.

## 20.07 PLAN DEDUCTIBLE

$250 per Covered Individual or $500 per Family each calendar year.

## ARTICLE XIX.  EFFECTIVE DATE OF PLAN SPECIFIC PROVISIONS (Plan A)

19.01 ALL PLAN SPECIFIC PROVISIONS OF THIS PLAN DOCUMENT ARE AFFECTIVE AND APPLICABLE TO PLAN A WITH RESPECT TO EVERY LOSS OR OTHER BASIS OF COVERAGE THAT OCCURS ON OR AFTER NOVEMBER 17, 1999, SUBJECT THEREAFTER TO DULY ENACTED PLAN REVISIONS.

## ARTICLE XX.  SCHEDULE OF BENEFITS (PLAN A)

### 20.01 BASIC BENEFITS AND MAJOR MEDICAL EXPENSE BENEFITS

Subject to TeamCare limitations in Section 4.20, the Plan provides accident and health benefits, in the form of Basic Benefits, as set forth in detail in Article XII, and Major Medical Expense Benefits, as set forth in detail in Article XIII, so as to provide comprehensive benefits for Covered Individuals for illness, injury or pregnancy.  Actual benefits provided under this plan may be different then shown based upon the specific plan of benefits selected by the Employer.  A Schedule of the Basic and Major Medical Benefits for Plan A follows:

| Benefit Type | Schedule of Benefits |
|---|---|
| (a)  Loss of Time Benefit (Participant Only) | $100/week (or $14.29 per day) for maximum of 20 weeks.  No Loss of Time Disability Coverage.  Therefore, no continuation of family coverage while collecting Loss of Time Benefit unless Employer Contributions continue or Self-Payments are made. |
| (b)  Hospital Expense Benefit | After Plan Deductible, 100% of covered charges for 1st 14 days; 80% thereafter.  No maximum day limit. Average semi-private room rate applies (coronary care unit, intensive care unit, burn unit or isolation room if medically required).  If the Hospital does not have an average semi-private room rate, the amount payable will be based on the average rate charged by Hospitals in the area for semi-private rooms as determined by the Fund. |
| (c)  Surgical and Obstetrical Expense Benefit | After Plan Deductible, 80% of Reasonable and Customary covered charges. |
| (d)  Outpatient Diagnostic X-ray and Laboratory Expense Benefit | See Section 20.01(p). |
| (e)  Outpatient Accidental Bodily Injury Expense Benefit | After Plan Deductible, 100% of Reasonable and Customary covered charges for 1st day of treatment only if treatment is performed within 5 days of accident, up to $500 maximum; balance under Major Medical.  Subject to TeamCare co-pay requirements. |
| (f)  Prescription Drug Benefit | 75% of covered charges.  For each prescription drug purchased through the TeamCare RX program, a Covered Individual pays a 25% co-payment at the time of any purchase from a |

**Benefit Type**                                        **Schedule of Benefits**

TeamCare RX retail pharmacy or a 20% co-payment for any purchase through the TeamCare RX mail order program, provided that the maximum co-payment is $200 for each filled prescription purchased through the TeamCare RX program. If a generic drug equivalent is available to fill a prescription, the Covered Individual must choose the generic drug or pay (in addition to the co-payment) the difference in cost between the generic drug and the brand name drug (if the brand name drug is chosen rather than the generic drug, the above-stated $200 maximum is inapplicable and does not limit the amount payable by the Covered Individual).

(g)   Psychiatric, Alcoholism and Drug Abuse-Inpatient Treatment Benefit

After Plan Deductible, 80% of covered charges for up to 15 days maximum per person, per calendar year. Life-time maximum of 30 days.

(h)   Psychiatric, Alcoholism and Drug Abuse-Outpatient Treatment Benefit

After Plan Deductible, 80% of covered charges up to 30 sessions/visits, per person, per calendar year.

(i)   Organ Transplant Donor Benefit

After Plan Deductible, The Basic and Major Medical Expense Benefits as outlined in Section 12.10 and 1.24.

(j)   Hearing Aid Benefit

Not applicable to Plan A.

(k)   Outpatient Cancer Treatment Benefit

After Plan Deductible, Applicable Basic and/or Major Medical Expense Benefits.

(l)   Ambulance Service Benefit

After Plan Deductible, Applicable Basic and/or Major Medical Expense Benefits.

(m)   Chiropractic Expense Benefit

After Plan Deductible, 60% of Reasonable and Customary covered charges up to maximum of $600 per person, per calendar year for Covered Individuals age 12 and older.

(n)   Mayo Clinic Treatment

After Plan Deductible, applicable Basic Benefits and/or Major Medical Expense Benefits. Office visit is subject to TeamCare co-pay requirements.

(o)   Women's Health Benefit

After Plan Deductible, applicable Basic Benefits and/or Major Medical Expense Benefits. Office visit is

| Benefit Type | Schedule of Benefits |
|---|---|
| | subject to TeamCare co-pay requirements. |
| (p) Major Medical Expense Benefit | After Plan Deductible, 80% of the Eligible Major Medical Expenses as defined in Section 1.24 of this document up to a maximum of $100,000 per person, per calendar year. |

## 20.02 DENTAL BENEFITS

The Plan provides Dental Benefits, as set forth in Article XV, for Covered Individuals so as to defray the cost of certain dental procedures. A schedule of Dental Benefits for Plan A follows:

| Benefit Type | Schedule of Benefits |
|---|---|
| (a) Preventive Care | 75% of the Reasonable and Customary charges for the following* procedures subject to a maximum benefit per person per calendar year of $750 consisting of any combination of payments for covered services as defined in Section 20.02(a) and (b). *ADA Codes 0110-0160, 1110-1550, 9110 as listed under Section 15.06. |
| (b) All other ADA Codes (excluding those listed as "Medical") referenced under Section 15.06 | 50% of the Reasonable and Customary charges subject to a maximum benefit per person per calendar year of $750 consisting of any combination of payments under Section 15.06 for covered services as defined in Section 20.02(a) and (b). |

## 20.03 VISION BENEFITS

The Plan provides Vision Benefits, as set forth in Article XVI, so as to defray the cost of eye examinations and materials for Covered Individuals. A schedule of Vision Benefits for Plan A follows:

| Procedure/Item | Schedule of Benefits |
|---|---|
| EXAMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . | $15.00 |
| FRAMES . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $10.00 |
| LENSES (PER PAIR) | |
| SINGLE VISION . . . . . . . . . . . . . . . . . . . . . . | $10.00 |
| BI-FOCAL . . . . . . . . . . . . . . . . . . . . . . . . | $14.00 |
| TRI-FOCAL . . . . . . . . . . . . . . . . . . . . . . . . | $16.50 |
| LENTICULAR . . . . . . . . . . . . . . . . . . . . . . . | $30.00 |
| CONTACTS . . . . . . . . . . . . . . . . . . . . . . . . | $20.00 |

**20.04 LIFE INSURANCE BENEFIT, ACCIDENTAL DEATH AND DISMEMBERMENT BENEFIT, TOTAL AND PERMANENT DISABILITY INSTALLMENT BENEFIT AND THE WAIVER OF PREMIUM DISABILITY BENEFIT**

The Plan provides:

(a)    Life Insurance Benefits for Covered Participants and Covered Dependents;

(b)    Accidental Death and Dismemberment Benefit for Covered Participants; and

(c)    Total and Permanent Disability Installment Benefit or Waiver of Premium Disability Benefit for Covered Participants.

Details of the administration of these benefits are set forth in Article XIV. A schedule of these benefits for Plan A follows:

| Benefit Type | Schedule of Benefits |
|---|---|
| PARTICIPANT LIFE . . . . . . . . . . . . . . . . . . . . . | $20,000.00 |
| PARTICIPANT ACCIDENTAL DEATH . . . . . . . . . . . . . . | $20,000.00 |
| PARTICIPANT ACCIDENTAL DISMEMBERMENT . . . . . . . . . . | $20,000.00 maximum (See Schedule in Section 14.08) |
| PARTICIPANT TOTAL AND PERMANENT DISABILITY INSTALLMENT BENEFIT . . . . . . . . . . . . . | $12,000.00 |
| SPOUSE LIFE INSURANCE . . . . . . . . . . . . . . . . | $ 2,500.00 |
| DEPENDENT LIFE INSURANCE . . . . . . . . . . . . . . . . | $ 1,000.00 |

**20.05 OUT OF POCKET EXPENSE LIMIT**

This is not applicable to Plan A.

**20.06 PLAN BENEFIT LIMIT**

$1,000,000 per Covered Individual per calendar year.

**20.07 PLAN DEDUCTIBLE**

$200 per Covered Individual per calendar year, limited to a maximum $400 per calendar year in covered charges incurred by a group consisting of one Covered Participant and all related Covered Dependants.

## ARTICLE XIX.   EFFECTIVE DATE OF PLAN SPECIFIC PROVISIONS (Plan B)

19.01 ALL PLAN SPECIFIC PROVISIONS OF THIS PLAN DOCUMENT ARE AFFECTIVE AND APPLICABLE TO PLAN B WITH RESPECT TO EVERY LOSS OR OTHER BASIS OF COVERAGE THAT OCCURS ON OR AFTER NOVEMBER 17, 1999, SUBJECT THEREAFTER TO DULY ENACTED PLAN REVISIONS.

## ARTICLE XX. SCHEDULE OF BENEFITS (PLAN B)

### 20.01 BASIC BENEFITS AND MAJOR MEDICAL EXPENSE BENEFITS

Subject to TeamCare limitations in Section 4.20, the Plan provides accident and health benefits, in the form of Basic Benefits, as set forth in detail in Article XII, and Major Medical Expense Benefits, as set forth in detail in Article XIII, so as to provide comprehensive benefits for Covered Individuals for illness, injury or pregnancy. Actual benefits provided under this plan may be different then shown based upon the specific plan of benefits selected by the Employer. A Schedule of the Basic and Major Medical Benefits for Plan B follows:

| Benefit Type | Schedule of Benefits |
|---|---|
| (a)  Loss of Time Benefit (Participant Only) | $100/week (or $14.29 per day) for maximum of 20 weeks. No Loss of Time Disability Coverage. Therefore, no continuation of family coverage while collecting Loss of Time Benefit unless Employer Contributions continue, or Self-Payments are made. |
| (b)  Hospital Expense Benefit | After Plan Deductible, 80% of covered charges for an unlimited number of days (room and board charges based on average semi-private room rate; coronary care unit, intensive care unit, burn unit or isolation room if medically required). If the Hospital does not have an average semi-private room rate, the amount payable will be based on the average rate charged by Hospitals in the area for semi-private rooms, as determined by the Fund. |
| (c)  Surgical and Obstetrical Expense Benefit | After Plan Deductible, 80% of Reasonable and Customary covered charges. |
| (d)  Outpatient Diagnostic X-ray and Laboratory Expense Benefit | See Section 20.01(p). |
| (e)  Outpatient Accidental Bodily Injury Expense Benefit | After Plan Deductible, 100% of Reasonable and Customary covered charges for 1st day of treatment only if treatment is performed within 5 days of accident up to $500 maximum; balance under Major Medical. Subject to TeamCare co-pay requirement. |
| (f)  Prescription Drug Benefit | 75% of covered charges. For each prescription drug purchased through the TeamCare RX program, a Covered Individual pays a 25% co-payment at the time of any purchase from a TeamCare RX retail pharmacy or a 20% |

**Benefit Type**                                          **Schedule of Benefits**

co-payment for any purchase through the TeamCare RX mail order program, provided that the maximum co-payment is $200 for each filled prescription purchased through the TeamCare RX program. If a generic drug equivalent is available to fill a prescription, the Covered Individual must choose the generic drug or pay (in addition to the co-payment) the difference in cost between the generic drug and the brand name drug (if the brand name drug is chosen rather than the generic drug, the above-stated $200 maximum is inapplicable and does not limit the amount payable by the Covered Individual).

(g)   Psychiatric, Alcoholism and Drug
Abuse-Inpatient Treatment Benefit          After Plan Deductible, 80% of covered charges for up to 13 days maximum per person, per calendar year. Lifetime maximum of 26 days.

(h)   Psychiatric, Alcoholism and Drug
Abuse-Outpatient Treatment Benefit          After Plan Deductible, 80% of covered charges up to 30 sessions/visits per person, per calendar year.

(i)   Organ Transplant Donor Benefit          After Plan Deductible, The Basic and Major Medical Expense Benefits as outlined in Section 12.10 and 1.24.

(j)   Hearing Aid Benefit          Not applicable to Plan B.

(k)   Outpatient Cancer Treatment Benefit After Plan Deductible, Applicable Basic and/or Major Medical Expense Benefits.

(l)   Ambulance Service Benefit          After Plan Deductible, Applicable Basic and/or Major Medical Expense Benefits.

(m)   Chiropractic Expense Benefit          After Plan Deductible, 60% of Reasonable and Customary covered charges up to maximum of $500 per person, per calendar year for Covered Individuals age 12 and older.

(n)   Mayo Clinic Treatment          After Plan Deductible, applicable Basic Benefits and/or Major Medical Expense Benefits. Office visit is subject to TeamCare co-pay requirements.

(o)   Women's Health Benefit          After Plan Deductible, applicable Basic Benefits and/or Major Medical Expense Benefits. Office visit is

|     |     |     |
| --- | --- | --- |
| | | subject to TeamCare co-pay requirements. |
| (p) | Major Medical Expense Benefit | After Plan Deductible, 80% of the Eligible Major Medical Expenses as defined in Section 1.24 of this document up to a maximum of $50,000 per person, per calendar year. |

## 20.02 DENTAL BENEFITS

The Plan provides Dental Benefits, as set forth in Article XV, for Covered Individuals so as to defray the cost of certain dental procedures. A schedule of Dental Benefits for Plan B follows:

| Benefit Type | Schedule of Benefits |
| --- | --- |
| (a) Preventive Care | 75% of the Reasonable and Customary charges for the following* procedures subject to a maximum benefit per person per calendar year of $500 consisting of any combination of payments for covered services as defined in Section 20.02(a) and (b). *ADA Codes 0110-0160, 1110-1550, 9110 as listed under Section 15.06 |
| (b) All other ADA Codes (excluding those listed as "Medical") referenced under Section 15.06 | 50% of the Reasonable and Customary charges subject to a maximum benefit per person per calendar year of $500 consisting of any combination of payments under Section 15.06 for covered services as defined in Section 20.02(a) and (b). |

## 20.03 VISION BENEFITS

The Plan provides Vision Benefits, as set forth in Article XVI, so as to defray the cost of eye examinations and materials for Covered Individuals. A schedule of Vision Benefits for Plan B follows:

| Procedure/Item | Schedule of Benefits |
| --- | --- |
| EXAMINATION | $15.00 |
| FRAMES | $10.00 |
| LENSES (PER PAIR) | |
| SINGLE VISION | $10.00 |
| BI-FOCAL | $14.00 |
| TRI-FOCAL | $16.50 |
| LENTICULAR | $30.00 |
| CONTACTS | $20.00 |

**20.04** **LIFE INSURANCE BENEFIT, ACCIDENTAL DEATH AND DISMEMBERMENT BENEFIT, TOTAL AND PERMANENT DISABILITY INSTALLMENT BENEFIT AND THE WAIVER OF PREMIUM DISABILITY BENEFIT**

The Plan provides:

(a) Life Insurance Benefits for Covered Participants and Covered Dependents;

(b) Accidental Death and Dismemberment Benefit for Covered Participants; and

(c) Total and Permanent Disability Installment Benefit or Waiver of Premium Disability Benefit for Covered Participants.

Details of the administration of these benefits are set forth in Article XIV. A schedule of these benefits for Plan B follows:

| Benefit Type | Schedule of Benefits |
|---|---|
| PARTICIPANT LIFE | $20,000.00 |
| PARTICIPANT ACCIDENTAL DEATH | $20,000.00 |
| PARTICIPANT ACCIDENTAL DISMEMBERMENT | $20,000.00 maximum (See Schedule in Section 14.08) |
| PARTICIPANT TOTAL AND PERMANENT DISABILITY INSTALLMENT BENEFIT | $11,000.00 |
| SPOUSE LIFE INSURANCE | $ 2,000.00 |
| DEPENDENT LIFE INSURANCE | $ 750.00 |

**20.05** **OUT OF POCKET EXPENSE LIMIT**

This is not applicable to Plan B.

**20.06** **PLAN BENEFIT LIMIT**

$1,000,000 per Covered Individual per calendar year.

**20.07** **PLAN DEDUCTIBLE**

$200 per Covered Individual per calendar year, limited to a maximum $400 per calendar year in covered charges incurred by a group consisting of one Covered Participant and all related Covered Dependants.

## ARTICLE XIX.   EFFECTIVE DATE OF PLAN SPECIFIC PROVISIONS (Plan S)

19.01 ALL PLAN SPECIFIC PROVISIONS OF THIS PLAN DOCUMENT ARE AFFECTIVE AND APPLICABLE TO PLAN S WITH RESPECT TO EVERY LOSS OR OTHER BASIS OF COVERAGE THAT OCCURS ON OR AFTER NOVEMBER 17, 1999, SUBJECT THEREAFTER TO DULY ENACTED PLAN REVISIONS.

## ARTICLE XX.    SCHEDULE OF BENEFITS (PLAN S)

### 20.01 BASIC BENEFITS AND MAJOR MEDICAL EXPENSE BENEFITS

Subject to TeamCare limitations in Section 4.20, the Plan provides accident and health benefits, in the form of Basic Benefits, as set forth in detail in Article XII, and Major Medical Expense Benefits, as set forth in detail in Article XIII, so as to provide comprehensive benefits for Covered Individuals for illness, injury or pregnancy. Actual benefits provided under this plan may be different then shown based upon the specific plan of benefits selected by the Employer. A Schedule of the Basic and Major Medical Benefits for Plan S follows:

| Benefit Type | Schedule of Benefits |
|---|---|
| (a)   Loss of Time Benefit (Participant Only) | Not applicable to Plan S. |
| (b)   Hospital Expense Benefit | 80% of covered charges (room and board charges based on average semi-private room rate; coronary care unit, intensive care unit, burn unit or isolation room if medically required) for the length of the Confinement. The 20% balance remaining is not eligible for payment by the Major Medical Expense Benefit of Plan S, but it will be applied to the Out of Pocket Expense Limit. If the $1,000 Out of Pocket Expense Limit is satisfied, the Plan will pay 100% of remaining covered charges, up to the Plan Benefit Limit, in combination with other Basic and/or Major Medical Expense Benefits, of $100,000 per person, per calendar year.<br><br>Note: If the Hospital does not have an average semi-private room rate, the amount payable will be based on the average rate charged by Hospitals in the area for semi-private rooms as determined by the Fund. |
| (c)   Surgical and Obstetrical Expense Benefit | Major Medical only. |
| (d)   Outpatient Diagnostic X-ray and Laboratory Expense Benefit | Major Medical only. |
| (e)   Outpatient Accidental Bodily Injury Expense Benefit | Major Medical only. |
| (f)   Prescription Drug Benefit | 75% of covered charges. For each prescription drug purchased through the TeamCare RX program, a Covered Individual pays a 25% co-payment at the time of any purchase from a TeamCare RX retail pharmacy or a 20% |

**Benefit Type**                                                    **Schedule of Benefits**

co-payment for any purchase through
the TeamCare RX mail order program,
provided that the maximum co-payment
is $200 for each filled prescription
purchased through the TeamCare RX
program. If a generic drug
equivalent is available to fill a
prescription, the Covered Individual
must choose the generic drug or pay
(in addition to the co-payment) the
difference in cost between the
generic drug and the brand name drug
(if the brand name drug is chosen
rather than the generic drug, the
above-stated $200 maximum is
inapplicable and does not limit the
amount payable by the Covered
Individual).

(g)   Psychiatric, Alcoholism and Drug
Abuse-Inpatient Treatment Benefit          Not applicable to Plan S.

(h)   Psychiatric, Alcoholism and Drug
Abuse-Outpatient Treatment Benefit         Not applicable to Plan S.

(i)   Organ Transplant Donor Benefit       The Basic and Major Medical Expense
                                            Benefits as outlined in Section 12.10
                                            and 1.24.

(j)   Hearing Aid Benefit                  Not applicable to Plan S.

(k)   Outpatient Cancer Treatment Benefit  Major Medical only.

(l)   Ambulance Service Benefit            Major Medical only.

(m)   Chiropractic Expense Benefit         50% of Reasonable and Customary
                                            covered charges up to maximum of $400
                                            per person, per calendar year for
                                            Covered Individuals age 12 and older.

(n)   Mayo Clinic Treatment               After Plan Deductible, applicable
                                            Basic Benefits and/or Major Medical
                                            Expense Benefits. Office visit is
                                            subject to TeamCare co-pay
                                            requirements.

(o)   Women's Health Benefit              After Plan Deductible, applicable
                                            Basic Benefits and/or Major Medical
                                            Expense Benefits. Office visit is
                                            subject to TeamCare co-pay
                                            requirements.

(p)   Major Medical Expense Benefit       80% of non-deductible Eligible Major
                                            Medical Expenses as defined in
                                            Section 1.24 of this document. The
                                            20% balance remaining will be applied
                                            to the Out of Pocket Expense Limit.
                                            If the $1,000 Out of Pocket Expense
                                            Limit is satisfied, the Plan will pay
                                            100% of non-deductible Eligible

Expenses up to the Plan Benefit Limit, in combination with Basic Benefits, of $100,000 per person, per calendar year. Deductible amounts are $500 per person or $1,500 per family ($500 maximum per Covered Individual toward this "family deductible").

**20.02 DENTAL BENEFITS**

Not applicable to Plan S.

**20.03 VISION BENEFITS**

Not applicable to Plan S.

**20.04 LIFE INSURANCE BENEFIT, ACCIDENTAL DEATH AND DISMEMBERMENT BENEFIT, TOTAL AND PERMANENT DISABILITY INSTALLMENT BENEFIT AND THE WAIVER OF PREMIUM DISABILITY BENEFIT**

Not applicable to Plan S.

**20.05 OUT OF POCKET EXPENSE LIMIT**

Maximum of $1,000 in Eligible Expenses per person, per calendar year, after the Plan pays its required Basic and/or Major Medical Expense Benefits, up to the Plan Benefit Limit.

**20.06 PLAN BENEFIT LIMIT**

Maximum of $100,000 payable per person, per calendar year under any combination of Basic and/or Major Medical Expense Benefits.

**ARTICLE XIX.   EFFECTIVE DATE OF PLAN SPECIFIC PROVISIONS (Plan MM-100)**

19.01 **ALL PLAN SPECIFIC PROVISIONS OF THIS PLAN DOCUMENT ARE AFFECTIVE AND APPLICABLE TO PLAN MM-100 WITH RESPECT TO EVERY LOSS OR OTHER BASIS OF COVERAGE THAT OCCURS ON OR AFTER NOVEMBER 17, 1999, SUBJECT THEREAFTER TO DULY ENACTED PLAN REVISIONS.**

## ARTICLE XX.   SCHEDULE OF BENEFITS (PLAN MM-100)

### 20.01 BASIC BENEFITS AND MAJOR MEDICAL EXPENSE BENEFITS

Subject to TeamCare limitations in Section 4.40, the Plan provides accident and health benefits, in the form of Basic Benefits, as set forth in detail in Article XII, and Major Medical Expense Benefits, as set forth in detail in Article XIII, so as to provide comprehensive benefits for Covered Individuals for illness, injury or pregnancy. Actual benefits provided under this plan may be different then shown based upon the specific plan of benefits selected by the Employer. A Schedule of the Basic and Major Medical Benefits for Plan MM-100 follows:

| Benefit Type | Schedule of Benefits |
|---|---|
| (a)   Loss of Time Benefit (Participant Only) | $100/week (or $14.28 per day) for maximum of 26 weeks. No Loss of Time Disability Coverage. Therefore, no continuation of family coverage while collecting Loss of Time Benefits, unless Employer Contributions continue or Self-Payments are made. |
| (b)   Hospital Expense Benefit | After Plan Deductible, 80% of covered charges for an unlimited number of days at average semi-private room rate (coronary care unit, intensive care unit, burn unit or isolation room if medically required). If the Hospital does not have an average semi-private room rate, the amount payable will be the average rate charged by Hospitals in the area for semi-private rooms, as determined by the Fund. 100% after Out of Pocket Expense Limit is met. |
| (c)   Surgical and Obstetrical Expense Benefit | After Plan Deductible, 80% of Reasonable and Customary covered charges. 100% after Out of Pocket Expense Limit is met. |
| (d)   Outpatient Diagnostic X-ray and Laboratory Expense Benefit | After Plan Deductible, 80% of Reasonable and Customary and covered charges. 100% after Out of Pocket Expense Limit is met. |
| (e)   Outpatient Accidental Bodily Injury Expense Benefit | After Plan Deductible, 80% of covered charges—1st day of treatment only, if treatment is performed within 5 days of accident and subject to TeamCare co-pay requirement. 100% after Out of Pocket Expense Limit is met. |
| (f)   Prescription Drug Benefit | 75% of covered charges. For each prescription drug purchased through the TeamCare RX program, a Covered |

| Benefit Type | Schedule of Benefits |
|---|---|

Individual pays a 25% co-payment at the time of any purchase from a TeamCare RX retail pharmacy or a 20% co-payment for any purchase through the TeamCare RX mail order program, provided that the maximum co-payment is $200 for each filled prescription purchased through the TeamCare RX program. If a generic drug equivalent is available to fill a prescription, the Covered Individual must choose the generic drug or pay (in addition to the co-payment) the difference in cost between the generic drug and the brand name drug (if the brand name drug is chosen rather than the generic drug, the above-stated $200 maximum is inapplicable and does not limit the amount payable by the Covered Individual).

**(g)   Psychiatric, Alcoholism and Drug Abuse-Inpatient Treatment Benefit**

After Plan Deductible, 80% of covered charges for up to 13 days per person, per calendar year.  Life-time maximum of 26 days.

**(h)   Psychiatric, Alcoholism and Drug Abuse-Outpatient Treatment Benefit**

After Plan Deductible, 80% of covered charges up to 30 sessions/visits per person, per calendar year.

**(i)   Organ Transplant Donor Benefit**

The Basic and Major Medical Expense Benefits as outlined in Section 12.10 and 1.24.

**(j)   Hearing Aid Benefit**

Not applicable to Plan MM-100.

**(k)   Outpatient Cancer Treatment Benefit**

Applicable Basic and/or Major Medical Expense Benefits.

**(l)   Ambulance Service Benefit**

Applicable Basic and/or Major Medical Expense Benefits.

**(m)   Chiropractic Expense**

50% of Reasonable and Customary covered charges up to maximum of $500 per person, per calendar year for Covered Individuals age 12 and older.

**(n)   Mayo Clinic Treatment**

After Plan Deductible, applicable Basic Benefits and/or Major Medical Expense Benefits.  Office visit is subject to TeamCare co-pay requirements.

**(o)   Women's Health Benefit**

After Plan Deductible, applicable Basic Benefits and/or Major Medical Expense Benefits.  Office visit is

|  |  | subject to TeamCare co-pay requirements. |
|---|---|---|
| (p) | Major Medical Expense Benefit | 80% of the non-deductible Eligible Major Medical Expenses as defined in Section 1.24 of this document. |

## 20.02 DENTAL BENEFITS

The Plan provides Dental Benefits, as set forth in Article XV, for Covered Individuals so as to defray the cost of certain dental procedures. A schedule of Dental Benefits for Plan MM-100 follows:

| Benefit Type | | Schedule of Benefits |
|---|---|---|
| (a) | Orthodontic | 50% of the Reasonable and Customary charges for the following* procedures incurred by a Dependent Child up to the 19th birthday up to a $1,000 lifetime maximum.<br>*ADA Codes 0470, 0471, 7290, 8800-8850 as listed under Section 15.06. |
| (b) | Crowns, Bridgework and Dentures | 70% of the Reasonable and Customary charges for the following* procedures subject to a maximum benefit per person per calendar year of $1,500 consisting of any combination of payments for covered services as defined in Section 20.02(b), (c), and (d).<br>*ADA Codes 2510-2810, 2932, 2952-2970, 5110-5281, 5810-5821, 5860-6545, 6720-6792, 6970-6972 as listed under Section 15.06. |
| (c) | Preventive Services | 100% of the Reasonable and Customary charges subject to a maximum benefit per person per calendar year of $1,500 consisting of any combination of payments for covered services as defined in Section 20.02(b), (c), and (d).<br>*ADA Codes 0110-0160, 1110-1550, 9110 as listed under Section 15.06. |
| (d) | All other ADA Codes (excluding those listed as "Medical") referenced under Section 16.06 | 85% of the Reasonable and Customary charges subject to a maximum benefit per person per calendar year of $1,500 consisting of any combination of payments under Section 15.06 for covered services as defined in Section 20.02(b), (c), and (d). |

## 20.03 VISION BENEFITS

The Plan provides Vision Benefits, as set forth in Article XVI, so as to defray the cost of eye examinations and materials for Covered Individuals. A schedule of Vision Benefits for Plan MM-100 follows:

| Procedure/Item | Schedule of Benefits |
|---|---|
| EXAMINATION | $25.00 |
| FRAMES | $30.00 |
| LENSES (PER PAIR) | |
| SINGLE VISION | $30.00 |
| BI-FOCAL | $40.00 |
| TRI-FOCAL | $50.00 |
| LENTICULAR | $60.00 |
| CONTACTS | $60.00 |

## 20.04 LIFE INSURANCE BENEFIT, ACCIDENTAL DEATH AND DISMEMBERMENT BENEFIT, TOTAL AND PERMANENT DISABILITY INSTALLMENT BENEFIT AND THE WAIVER OF PREMIUM DISABILITY BENEFIT

The Plan provides:

(a)    Life Insurance Benefits for Covered Participants and Covered Dependents;

(b)    Accidental Death and Dismemberment Benefit for Covered Participants; and

(c)    Total and Permanent Disability Installment Benefit or Waiver of Premium Disability Benefit for Covered Participants.

Details of the administration of these benefits are set forth in Article XIV. A schedule of these benefits for Plan C-4 follows:

| Benefit Type | Schedule of Benefits |
|---|---|
| PARTICIPANT LIFE | $20,000.00 |
| PARTICIPANT ACCIDENTAL DEATH | $20,000.00 |
| PARTICIPANT ACCIDENTAL DISMEMBERMENT | $20,000.00 maximum (See Schedule in Section 14.08) |
| PARTICIPANT TOTAL AND PERMANENT DISABILITY INSTALLMENT BENEFIT | $11,000.00 |
| SPOUSE LIFE INSURANCE | $ 2,000.00 |
| DEPENDENT LIFE INSURANCE | $  750.00 |

## 20.05 OUT OF POCKET EXPENSE LIMIT

Out of Pocket Expense Limit excluding Plan Deductible is $1,500 per Covered Individual or $3,000 per family per calendar year. Charges relating to non-covered services, dental, chiropractic and vision services, psychiatric, drug and alcoholism treatment and prescription drugs do not apply towards the Out of Pocket Expense Limit.

## 20.06 PLAN BENEFIT LIMIT

$250,000 per Covered Individual per calendar year.

## 20.07 PLAN DEDUCTIBLE

$100 per Covered Individual or $300 per family per calendar year.

**ARTICLE XIX. EFFECTIVE DATE OF PLAN SPECIFIC PROVISIONS (Plan MM-200)**

19.01 ALL PLAN SPECIFIC PROVISIONS OF THIS PLAN DOCUMENT ARE AFFECTIVE AND APPLICABLE TO PLAN MM-200 WITH RESPECT TO EVERY LOSS OR OTHER BASIS OF COVERAGE THAT OCCURS ON OR AFTER NOVEMBER 17, 1999, SUBJECT THEREAFTER TO DULY ENACTED PLAN REVISIONS.

## ARTICLE XX.   SCHEDULE OF BENEFITS (PLAN MM-200)

### 20.01 BASIC BENEFITS AND MAJOR MEDICAL EXPENSE BENEFITS

Subject to TeamCare limitations in Section 4.40, the Plan provides accident and health benefits, in the form of Basic Benefits, as set forth in detail in Article XII, and Major Medical Expense Benefits, as set forth in detail in Article XIII, so as to provide comprehensive benefits for Covered Individuals for illness, injury or pregnancy. Actual benefits provided under this plan may be different then shown based upon the specific plan of benefits selected by the Employer. A Schedule of the Basic and Major Medical Benefits for Plan MM-200 follows:

| Benefit Type | Schedule of Benefits |
|---|---|
| (a)   Loss of Time Benefit (Participant Only) | $100/week (or $14.28 per day) for maximum of 26 weeks. No Loss of Time Disability Coverage. Therefore, no continuation of family coverage while collecting Loss of Time Benefits, unless Employer Contributions continue or Self-Payments are made. |
| (b)   Hospital Expense Benefit | After Plan Deductible, 80% of covered charges for an unlimited number of days at average semi-private room rate (coronary care unit, intensive care unit, burn unit or isolation room if medically required). If the Hospital does not have an average semi-private room rate, the amount payable will be the average rate charged by Hospitals in the area for semi-private rooms, as determined by the Fund. 100% after Out of Pocket Expense Limit is met. |
| (c)   Surgical and Obstetrical Expense Benefit | After Plan Deductible, 80% of Reasonable and Customary covered charges. 100% after Out of Pocket Expense Limit is met. |
| (d)   Outpatient Diagnostic X-ray and Laboratory Expense Benefit | After Plan Deductible, 80% of Reasonable and Customary and covered charges. 100% after Out of Pocket Expense Limit is met. |
| (e)   Outpatient Accidental Bodily Injury Expense Benefit | After Plan Deductible, 80% of covered charges—1st day of treatment only, if treatment is performed within 5 days of accident and subject to TeamCare co-pay requirement. 100% after Out of Pocket Expense Limit is met. |
| (f)   Prescription Drug Benefit | 75% of covered charges. For each prescription drug purchased through the TeamCare RX program, a Covered |

**Benefit Type**                                          **Schedule of Benefits**

Individual pays a 25% co-payment at
the time of any purchase from a
TeamCare RX retail pharmacy or a 20%
co-payment for any purchase through
the TeamCare RX mail order program,
provided that the maximum co-payment
is $200 for each filled prescription
purchased through the TeamCare RX
program.     If   a   generic   drug
equivalent is available to fill a
prescription, the Covered Individual
must choose the generic drug or pay
(in addition to the co-payment) the
difference   in   cost   between   the
generic drug and the brand name drug
(if the brand name drug is chosen
rather than the generic drug, the
above-stated   $200   maximum   is
inapplicable and does not limit the
amount   payable   by   the   Covered
Individual).

(g)   Psychiatric, Alcoholism and Drug
Abuse-Inpatient Treatment Benefit           After Plan Deductible, 80% of covered
                                            charges for up to 13 days per person,
                                            per calendar year.  Life-time maximum
                                            of 26 days.

(h)   Psychiatric, Alcoholism and Drug
Abuse-Outpatient Treatment Benefit          After Plan Deductible, 80% of covered
                                            charges up to 30 sessions/visits per
                                            person, per calendar year.

(i)   Organ Transplant Donor Benefit        The Basic and Major Medical Expense
                                            Benefits as outlined in Section 12.10
                                            and 1.24.

(j)   Hearing Aid Benefit                   Not applicable to Plan MM-200.

(k)   Outpatient Cancer Treatment Benefit   Applicable Basic and/or Major Medical
                                            Expense Benefits.

(l)   Ambulance Service Benefit             Applicable Basic and/or Major Medical
                                            Expense Benefits.

(m)   Chiropractic Expense                  50%   of   Reasonable and Customary
                                            covered charges up to maximum of $500
                                            per person, per calendar year for
                                            Covered Individuals age 12 and older.

(n)   Mayo Clinic Treatment                 After   Plan Deductible, applicable
                                            Basic Benefits and/or Major Medical
                                            Expense Benefits.   Office visit is
                                            subject   to   TeamCare   co-pay
                                            requirements.

(o)   Women's Health Benefit                After   Plan Deductible, applicable
                                            Basic Benefits and/or Major Medical
                                            Expense Benefits.   Office visit is

subject to TeamCare co-pay
requirements.

(p)    Major Medical Expense Benefit        80% of the non-deductible Eligible
                                            Major Medical Expenses as defined in
                                            Section 1.24 of this document.

## 20.02 DENTAL BENEFITS

The Plan provides Dental Benefits, as set forth in Article XV, for Covered Individuals so as to defray the cost of certain dental procedures. A schedule of Dental Benefits for Plan MM-200 follows:

Benefit Type                                Schedule of Benefits

(a)    Orthodontic                          50% of the Reasonable and
                                            Customary charges for the
                                            following* procedures incurred
                                            by a Dependent Child up to the
                                            19th birthday up to a $1,000
                                            lifetime maximum.
                                            *ADA Codes 0470, 0471, 7290, 8800-
                                            8850 as listed under Section 15.06.

(b)    Crowns, Bridgework and Dentures      70% of the Reasonable and Customary
                                            charges for the following* procedures
                                            subject to a maximum benefit per
                                            person per calendar year of $1,500
                                            consisting of any combination of
                                            payments for covered services as
                                            defined in Section 20.02(b), (c), and
                                            (d).
                                            *ADA Codes 2510-2810, 2932, 2952-
                                            2970, 5110-5281, 5810-5821, 5860-
                                            6545, 6720-6792, 6970-6972 as listed
                                            under Section 15.06.

(c)    Preventive Services                  100% of the Reasonable and Customary
                                            charges subject to a maximum benefit
                                            per person per calendar year of
                                            $1,500 consisting of any combination
                                            of payments for covered services as
                                            defined in Section 20.02(b), (c), and
                                            (d).
                                            *ADA Codes 0110-0160, 1110-1550, 9110
                                            as listed under Section 15.06.

(d)    All other ADA Codes (excluding
those listed as "Medical") referenced
under Section 16.06                         85% of the Reasonable and Customary
                                            charges subject to a maximum benefit
                                            per person per calendar year of
                                            $1,500 consisting of any combination
                                            of payments under Section 15.06 for
                                            covered services as defined in
                                            Section 20.02(b), (c), and (d).

## 20.03 VISION BENEFITS

The Plan provides Vision Benefits, as set forth in Article XVI, so as to defray the cost of eye examinations and materials for Covered Individuals. A schedule of Vision Benefits for Plan MM-200 follows:

| Procedure/Item | Schedule of Benefits |
|---|---|
| EXAMINATION | $25.00 |
| FRAMES | $30.00 |
| LENSES (PER PAIR) | |
| SINGLE VISION | $30.00 |
| BI-FOCAL | $40.00 |
| TRI-FOCAL | $50.00 |
| LENTICULAR | $60.00 |
| CONTACTS | $60.00 |

## 20.04 LIFE INSURANCE BENEFIT, ACCIDENTAL DEATH AND DISMEMBERMENT BENEFIT, TOTAL AND PERMANENT DISABILITY INSTALLMENT BENEFIT AND THE WAIVER OF PREMIUM DISABILITY BENEFIT

The Plan provides:

(a)   Life Insurance Benefits for Covered Participants and Covered Dependents;

(b)   Accidental Death and Dismemberment Benefit for Covered Participants; and

(c)   Total and Permanent Disability Installment Benefit or Waiver of Premium Disability Benefit for Covered Participants.

Details of the administration of these benefits are set forth in Article XIV. A schedule of these benefits for Plan C-4 follows:

| Benefit Type | Schedule of Benefits |
|---|---|
| PARTICIPANT LIFE | $20,000.00 |
| PARTICIPANT ACCIDENTAL DEATH | $20,000.00 |
| PARTICIPANT ACCIDENTAL DISMEMBERMENT | $20,000.00 maximum (See Schedule in Section 14.08) |
| PARTICIPANT TOTAL AND PERMANENT DISABILITY INSTALLMENT BENEFIT | $11,000.00 |
| SPOUSE LIFE INSURANCE | $ 2,000.00 |
| DEPENDENT LIFE INSURANCE | $   750.00 |

## 20.05 OUT OF POCKET EXPENSE LIMIT

Out of Pocket Expense Limit excluding Plan Deductible is $2,500 per Covered Individual or $5,000 per family per calendar year. Charges relating to non-covered services, dental, chiropractic and vision services, psychiatric, drug and alcoholism treatment and prescription drugs do not apply towards the Out of Pocket Expense Limit.

## 20.06 PLAN BENEFIT LIMIT

$250,000 per Covered Individual per calendar year.

## 20.07 PLAN DEDUCTIBLE

$200 per Covered Individual or $500 per family per calendar year.

Ex.#2

REQUEST FOR CHANGE OF BENEFICIARY CARD

CENTRAL STATES
SOUTHEAST AND
SOUTHWEST AREAS
HEALTH AND WELFARE FUND

PARTICIPANT INFORMATION - Please print or type

| LEGAL LAST NAME | LEGAL FIRST NAME | MI |
|---|---|---|
| Bonner JR | Clarence L. | |

Life Insurance Beneficiary (if desired, list primary and contingent beneficiaries.)

BENEFICIARY LAST NAME | BENEFICIARY FIRST NAME | MI

| Bonner & Moore | Darnella Gabour | |

Below is an example of naming primary and contingent beneficiaries of Life Insurance in The Health and Welfare Plan.
Example: Mary Jane Doe, wife, if living, otherwise to the one who survives.
Use a separate piece of paper when naming primary and contingent beneficiaries. State this information fully, sign, date and attach to the Request for Change of Beneficiary Card.

BY SIGNING BELOW, I, A PARTICIPANT IN THE HEALTH AND WELFARE PLAN, REVOKE ANY PREVIOUS DESIGNATION. I ALSO RESERVE THE RIGHT TO CHANGE THE DESIGNATED BENEFICIARY.

SIGNATURE

RELATIONSHIP TO PARTICIPANT

DATE SIGNED 9-30-93

LOCAL UNION NO. 991

TO VALIDATE THIS CARD YOUR SIGNATURE AND DATE SIGNED IS NECESSARY.

---

REQUEST FOR CHANGE OF BENEFICIARY CARD

CENTRAL STATES
SOUTHEAST AND
SOUTHWEST AREAS
HEALTH AND WELFARE FUND

PARTICIPANT INFORMATION - Please print or type

| LEGAL LAST NAME | LEGAL FIRST NAME | MI |
|---|---|---|
| Bonner JR | Clarence | L |

Life Insurance Beneficiary (if desired, list primary and contingent beneficiaries.)

BENEFICIARY LAST NAME | BENEFICIARY FIRST NAME | MI

| Bonner | Marenia | |

Below is an example of naming primary and contingent beneficiaries of Life Insurance in The Health and Welfare Plan.
Example: Mary Jane Doe, wife, if living, otherwise to the one who survives.
Use a separate piece of paper when naming primary and contingent beneficiaries. State this information fully, sign, date and attach to the Request for Change of Beneficiary Card.

BY SIGNING BELOW, I, A PARTICIPANT IN THE HEALTH AND WELFARE PLAN, REVOKE ANY PREVIOUS DESIGNATION. I ALSO RESERVE THE RIGHT TO CHANGE THE DESIGNATED BENEFICIARY.

SIGNATURE

SOCIAL SECURITY NO. 472682862

RELATIONSHIP TO PARTICIPANT Daughter

DATE SIGNED 10-13-93

LOCAL UNION NO. 991

Ex. #4

## CENTRAL STATES SOUTHEAST AND SOUTHWEST AREAS HEALTH AND WELFARE FUND
### NOTICE OF CLAIM

FROM: LOCAL NO. 991     2116     DATE Feb. 9, 2004

In order to report a claim for DEATH, ACCIDENTAL DEATH, DISMEMBERMENT, TOTAL & PERMANENT DISABILITY / WAIVER OF PREMIUM, please complete this form in detail and follow the instructions set forth below.

(Please type or print)

| 1 | Member's Name (Last) (First) (MI) | | Date of Birth | |
|---|---|---|---|---|
| | Bonner,Jr   Clarence     L. | | Aug. 28, 1947 | |
| | Member's Address (No. Street, City, State, Zip Code) | | Member's Phone | Occupation |
| | 2355 Crestwood Circle   Mobile, Al 36617 | | (251) 452 0714 | driver |

| 2 | Name and Address of Employer | Date Last Worked |
|---|---|---|
| | Yellow Freight Systems    Mobile, AL 36602 | 12/11/2003 |

| 3 | Are you on Medicare? ☐ Yes ☒ No   If yes, send us a copy of your Medicare Card. |
|---|---|

| 4 | Type of Claim (Check One) | ☒ Member Death | ☐ Member Accidental Dismemberment |
|---|---|---|---|
| | | ☐ Member Accidental Death | ☐ Member Total & Permanent Disability (under age 50) |
| | | ☐ Dependent Spouse Death | |
| | | ☐ Dependent Child Death | ☐ Member Total & Permanent Disability (ages 50 thru 59) |

| 5 | Name and Address of Applicant for Member Death Benefits | Telephone No. | Relationship to member |
|---|---|---|---|
| | Rosemary M. Bonner | (251) 452 0714 | spouse |
| | 2355 Crestwood Circle | | |
| | Mobile, AL 36617 | | Social Security No. |

| 6 | | | |
|---|---|---|---|
| Please Attach the Indicated Documents to this Notice of Claim | **FOR MEMBER DEATH OR ACCIDENTAL DEATH** | ☒ Date of Death 12/ 19/2003 |
| | | ☐ Member had Waiver of Premium |
| | | ☐ Member was on TPD   Claim No. |
| | **FOR MEMBER ACCIDENTAL DISMEMBERMENT** | ☐ Date of Accident |
| | | ☐ Date Member Became Dismembered |
| | **FOR DEPENDENT SPOUSE DEATH** | ☐ Date of Death |
| | | ☐ Certified Copy of Marriage Certificate |
| ALL DEATH CLAIMS MUST HAVE CERTIFIED DEATH CERTIFICATE | Name: | |
| | **FOR DEPENDENT CHILD DEATH** | ☐ Date of Death |
| | | ☐ Certified Copy of Birth Certificate |
| | Name: | |
| | **FOR MEMBER TOTAL & PERMANENT DISABILITY** | ☐ Copy of Social Security Award |
| | | ☐ Certified Copy of Birth Certificate |
| | | ☐ Completed and Signed Health and Welfare Beneficiary Card |
| | Date of Disability | |

RECEIVED LIFE INSURANCE FEB 16 2004

| 7 | Name and Address of Local Union |
|---|---|
| | Teamsters Local Union 991 |
| | 112 S. Broad Street |
| | Mobile, AL 36602 |

x _Judy M Chapa_     Signature of Union Official       x _Rosemary M. Bonner_   Signature of Applicant

Mail this completed Notice of Claim, with the Documents requested in Item 6 above, to:
Central States, Southeast and Southwest Areas
Health and Welfare Fund
Life Insurance Department
PO Box 5107    Des Plaines IL   60017-5107

FOR CENTRAL STATES OFFICE USE ONLY

HW8-1 REV. 2/90

Ex. #4

**CENTRAL STATES SOUTHEAST AND SOUTHWEST AREAS HEALTH AND WELFARE FUND**

**NOTICE OF CLAIM**

FROM: LOCAL NO. __991__          DATE __Dec. 29, 2003__

In order to report a claim for DEATH, ACCIDENTAL DEATH, DISMEMBERMENT, TOTAL & PERMANENT DISABILITY / WAIVER OF PREMIUM, please complete this form in detail and follow the instructions set forth below.

*(Please type or print)*

| 1 | Member's Name (Last) Bonner (First) Clarence (MI) | Date of Birth 8/28/1947 |
|---|---|---|
| | Member's Address (No. Street, City, State, Zip Code) 2355 Crestwood Circle Mobile, AL 36617 | Member's Phone | Occupation driver |

| 2 | Name and Address of Employer Yellow Freight System | Date Last Worked mid Dec. 2003 |
|---|---|---|

| 3 | Are you on Medicare?  ☐ Yes  ☒ No     If yes, send us a copy of your Medicare Card. |
|---|---|

| 4 | Type of Claim (Check One) | ☒ Member Death | ☐ Member Accidental Dismemberment |
|---|---|---|---|
| | | ☐ Member Accidental Death | ☐ Member Total & Permanent Disability (under age 50) |
| | | ☐ Dependent Spouse Death | |
| | | ☐ Dependent Child Death | ☐ Member Total & Permanent Disability (ages 50 thru 59) |

| 5 | Name and Address of Applicant for Member Death Benefits Sandra Faye Bonner (mother of dependant child:) Clarencia J. Bonner 907 Whistler Street. Prichard AL 36610 | Telephone No. (251) 456 6497   Social Security No. | Sandra Bonner Clarencia B |
|---|---|---|---|

| 6 | Please Attach the Indicated Documents to this Notice of Claim ALL DEATH CLAIMS MUST HAVE CERTIFIED DEATH CERTIFICATE | FOR MEMBER DEATH OR ACCIDENTAL DEATH | ☒ Date of Death ____Dec. 19, 2003____ |
|---|---|---|---|
| | | | ☐ Member had Waiver of Premium ____ |
| | | | ☐ Member was on TPD     Claim No. ____ |
| | | FOR MEMBER ACCIDENTAL DISMEMBERMENT | ☐ Date of Accident ____ |
| | | | ☐ Date Member Became Dismembered ____ |
| | | FOR DEPENDENT SPOUSE DEATH | ☐ Date of Death ____ |
| | | Name: ____ | ☐ Certified Copy of Marriage Certificate |
| | | FOR DEPENDENT CHILD DEATH | ☐ Date of Death ____ |
| | | Name: ____ | ☐ Certified Copy of Birth Certificate |
| | | FOR MEMBER TOTAL & PERMANENT DISABILITY | ☐ Copy of Social Security Award |
| | | | ☐ Certified Copy of Birth Certificate |
| | | Date of Disability ____ | ☐ Completed and Signed Health and Welfare Beneficiary Card |

RECEIVED
LIFE INSURANCE
FEB 1 9 2004

| 7 | Name and Address of Local Union Teamsters Local 991 112 S. Broad Street Mobile, AL 36602 ____ Judy M Chapa (Signature of Union Official) | Sandra Faye Bonner - mother Clarencia Bonner (child) (Signature of Applicant) |
|---|---|---|

Mail this completed Notice of Claim, with the Documents requested in Item 6 above, to:

Central States, Southeast and Southwest Areas
Health and Welfare Fund
Life Insurance Department
PO Box 5107     Des Plaines IL  60017-5107

**FOR CENTRAL STATES OFFICE USE ONLY**

HW8-1 REV. 2/88

Ex.#5

THE STATE OF ALABAMA, MOBILE COUNTY

| | | |
|---|---|---|
| IN RE:  THE MARRIAGE OF | ) | |
| SANDRA BONNER | ) | CIRCUIT COURT |
| Plaintiff | ) | AT MOBILE, ALABAMA |
| NO. DR92 502152-K | ) | |
| CLARENCE LEE BONNER, JR. | ) | Entered on _____ |
| Defendant | ) | Min. Book No.____Entry_____ |

## JUDGMENT OF DIVORCE

This cause is submitted for judgment on the pleadings and the testimony as heard in open Court, and on consideration, it is ORDERED, ADJUDGED and DECREED by the Court that the bonds of matrimony heretofore existing between the Plaintiff and the Defendant be and the same are henceforth dissolved.

It is further ORDERED, ADJUDGED and DECREED that Plaintiff and Defendant be, and hereby are permitted to again contract marriage, subject to such provision of the law as regulate appeals and the marriage of divorced persons, and in no event before the expiration of sixty days after the rendition of this judgment.

It is also further ORDERED, ADJUDGED and DECREED by the Court as follows:

1. That the custody of the minor child born of the marriage, namely, Clarencia Bonner, be and hereby is awarded to the Plaintiff, subject to all reasonable rights of visitation on the part of the Defendant, to include but not be limited, to the right to have the minor child visit with him on alternate weekends from 6:00 P. M. on Friday until 6:00 P. M. on Sunday and for a period of four weeks during the summer months of each year and from December 26 until January 2 of each year during the Christmas season.

2. That the Defendant shall pay to the Plaintiff as child support the sum of $400.00 per month and that said payments shall be made through the Office of the Accounts Clerk, Domestic Relations Division of this Court, and he shall pay the commission due thereon as required by law, and said child support is in compliance with Rule 32 ARJA Child Support Guidelines.

3. That the Defendant shall maintain in full force and effect hospitalization insurance on the minor child and he shall be responsible for all major medical expenses incurred in behalf of the minor child.

4. That the Defendant shall maintain in full force and effect his present life insurance program and he shall maintain the minor child born of this marriage as beneficiary of at least one-half of said life insurance during the child's minority, and further the Defendant shall furnish proof to the Plaintiff within thirty days from the date of this decree as to same.

5. That the Court awards the homeplace owned by the Defendant prior to the marriage to the Defendant and the Plaintiff shall convey all of her right, title and interest in and to said property within thirty days of the signing of the Judgment of Divorce and in consideration therefor, the Defendant shall pay to the Plaintiff the sum of $500.00 representing her equity in the homeplace, and that said conveyance shall be made within thirty days from the date of this decree and in the event the Plaintiff fails, refuses or neglects to do so within said thirty days, then the Circuit Clerk be and hereby is authorized and empowered to make such conveyance on behalf of the Plaintiff to the Defendant upon submission by counsel of the deed to the Circuit Clerk and proof of the payment of the $500.00 consideration.

6. That the furniture shall be equally divided between the parties.

7. That the Court awards to the Plaintiff the Cadillac automobile and she shall be responsible for the indebtedness due thereon and she shall hold the Defendant harmless therefrom and the Defendant shall execute title to such vehicle to the Plaintiff.

8. That the Court awards the truck to the Defendant and he shall be responsible for any indebtedness due thereon and he shall hold the Plaintiff harmless therefrom and the Plaintiff shall execute title to such vehicle to the Defendant.

9. That the Court awards to the Attorney of Record for the Plaintiff a judgment against the Defendant in the amount of $500.00 toward a reasonable Attorney's fee for representing the Plaintiff herein.

The Court retains jurisdiction to enter an order pursuant to the Wage Withholding Act. (See Act No. 84-445, Regular Session, 1984)

Jurisdiction be and hereby is retained in this cause as to any further or future orders or decrees as to the care, custody and maintenance of said minor child as to the Court may seem proper and as changed conditions may require.

The costs of this cause having been prepaid, no further order is made as to same.

Dated, DECEMBER 10, 1992

S/CAIN J. KENNEDY

CAIN J. KENNEDY, CIRCUIT JUDGE

Ex. #6

**CENTRAL STATES SOUTHEAST AND SOUTHWEST AREAS HEALTH AND WELFARE FUND**

**NOTICE OF CLAIM**

FROM: LOCAL NO. _991_          3 | |          DATE_____

In order to report a claim for DEATH, ACCIDENTAL DEATH, DISMEMBERMENT, TOTAL & PERMANENT DISABILITY / WAIVE OF PREMIUM, please complete this form in detail and follow the instructions set forth below.

(Please type or print)

**1**   Member's Name (Last)  _Bonner_  (First) _Clarence_  (M.I.) _W. Jr._  Date of Birth _8/28/47_

Member's Address (No. Street, City, State, Zip Code) _2355 Crestwood cir. mobile Ala 36617_   Member's Phone ____   Occupation _Truck driver_

**2**   Name and Address of Employer _Yellow Freight Systems Inc 1111 Virginia st mobile_   Date Last Worked _8/04_

**3**   Are you on Medicare?  ☐ Yes  ☑ No   If yes, send us a copy of your Medicare Card.

**4**   Type of Claim (Check One)

☑ Member Death
☐ Member Accidental Death
☐ Dependent Spouse Death
☐ Dependent Child Death

☐ Member Accidental Dismemberment
☐ Member Total & Permanent Disability (under age 50)
☐ Member Total & Permanent Disability (ages 50 thru 59)

**5**   Name and Address of Applicant for Member Death Benefits _Darrell A. Bonner 2056 N. McVay Dr. mobile AL 36605_   Telephone No. ____   Relationship to member ____   Social Security No. _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_

**6**   Please Attach the Indicated Documents to this Notice of Claim

ALL DEATH CLAIMS MUST HAVE CERTIFIED DEATH CERTIFICATE

**FOR MEMBER DEATH OR ACCIDENTAL DEATH**
☑ Date of Death _Dec. 19th, 2003_
☐ Member had Waiver of Premium
☐ Member was on TPD     Claim No. __

**FOR MEMBER ACCIDENTAL DISMEMBERMENT**
☐ Date of Accident ____
☐ Date Member Became Dismembered ____

**FOR DEPENDENT SPOUSE DEATH**
Name: ____
☐ Date of Death ____
☐ Certified Copy of Marriage Certificate

RECEIVED
LIFE INSURANCE
MAR 0 1 2004

**FOR DEPENDENT CHILD DEATH**
Name: ____
☐ Date of Death ____
☐ Certified Copy of Birth Certificate

**FOR MEMBER TOTAL & PERMANENT DISABILITY**
Date of Disability ____
☐ Copy of Social Security Award
☐ Certified Copy of Birth Certificate
☐ Completed and Signed Health and Welfare Beneficiary Card

**7**   Name and Address of Local Union  _Teamsters Local 991_

Signature of Union Official ____

x _Darrell G. Bonner_  Signature of Applicant

Mail this completed Notice of Claim, with the Documents requested in Item 6 above, to:
Central States, Southeast and Southwest Areas
Health and Welfare Fund
Life Insurance Department
PO Box 5107   Des Plaines IL  60017-5107

**FOR CENTRAL STATES OFFICE USE ONLY**

HW6-1 REV 2/90

Ex. #7

**CENTRAL STATES SOUTHEAST AND SOUTHWEST AREAS HEALTH AND WELFARE FUND**
**NOTICE OF CLAIM**

FROM: LOCAL NO. 991                    DATE 2/17/04

In order to report a claim for DEATH, ACCIDENTAL DEATH, DISMEMBERMENT, TOTAL & PERMANENT DISABILITY / WAIVER
OF PREMIUM, please complete this form in detail and follow the instructions set forth below.

(Please type or print)

| | |
|---|---|
| **1** Member's Name (Last) (First) (MI) Date of Birth | |
| BONNER, Clarence L 8/28/47 | |
| Member's Address (No. Street, City, State, Zip Code) Member's Phone | Occupation |
| 2355 Crestwood Cir. Mobile, AL 36617 | Truck Driver |

**2** Name and Address of Employer  Yellow Freight Systems Inc. 1111 Virginia St. Mobile AL 36604   Date Last Worked 12/12/03

**3** Are you on Medicare?  ☐ Yes  ☒ No   If yes, send us a copy of your Medicare Card.

**4** Type of Claim (Check One)

☒ Member Death
☐ Member Accidental Death
☐ Dependent Spouse Death
☐ Dependent Child Death

☐ Member Accidental Dismemberment
☐ Member Total & Permanent Disability (under age 50)
☐ Member Total & Permanent Disability (ages 50 thru 59)

**5** Name and Address of Applicant for Member Death Benefits  Gabonette N. Bonner   Telephone No. 817 281 8875   Relationship to member Wife
5133 Senator Dr. Keller, TX 76248   Social Security No

**6**

Please Attach the Indicated Documents to this Notice of Claim

ALL DEATH CLAIMS MUST HAVE CERTIFIED DEATH CERTIFICATE

**FOR MEMBER DEATH OR ACCIDENTAL DEATH**

☒ Date of Death 12/19/03
☐ Member had Waiver of Premium
☐ Member was on TPD    Claim No.

**FOR MEMBER ACCIDENTAL DISMEMBERMENT**

☐ Date of Accident
☐ Date Member Became Dismembered

**FOR DEPENDENT SPOUSE DEATH**

Name:

☐ Date of Death
☐ Certified Copy of Marriage Certificate

RECEIVED
LIFE INSURANCE
MAR 0 1 2004

**FOR DEPENDENT CHILD DEATH**

Name:

☐ Date of Death
☐ Certified Copy of Birth Certificate

**FOR MEMBER TOTAL & PERMANENT DISABILITY**

Date of Disability

☐ Copy of Social Security Award
☐ Certified Copy of Birth Certificate
☐ Completed and Signed Health and Welfare Beneficiary Card

**7** Name and Address of Local Union  Teamsters Local 991

Signature of Union Official

Gabrielle N. Bonner
Signature of Applicant

FOR CENTRAL STATES OFFICE USE ONLY

Mail this completed Notice of Claim, with the Documents requested in Item 6 above, to:
Central States, Southeast and Southwest Areas
Health and Welfare Fund
Life Insurance Department
PO Box 5107   Des Plaines IL  60017-5107

HW8-1 REV 2/90

Ex. #8

**CENTRAL STATES SOUTHEAST AND SOUTHWEST AREAS HEALTH AND WELFARE FUND**

**NOTICE OF CLAIM**

FROM: LOCAL NO. _991_ DATE_____

In order to report a claim for DEATH, ACCIDENTAL DEATH, DISMEMBERMENT, TOTAL & PERMANENT DISABILITY / W
OF PREMIUM, please complete this form in detail and follow the instructions set forth below.

(Please type or print)

| 1 | Member's Name (Last) (First) (M) Date of Birth |
|---|---|
| | BONNER, Clarence L. JR. 8/28/47 |
| | Member's Address (No. Street, City, State, Zip Code) Member's Phone Occupation |
| | 2355 Crestwood Circle Mobile, AL 36617 Truck Dri |

| 2 | Name and Address of Employer Date Last Worked |
|---|---|
| | Yellow Freight Systems, Inc. 1111 Virginia St. Mobile 36604 |

**3** Are you on Medicare? ☐ Yes ☑ No If yes, send us a copy of your Medicare Card.

| 4 | Type of Claim (Check One) | ☑ Member Death | ☐ Member Accidental Dismemberment |
|---|---|---|---|
| | | ☐ Member Accidental Death | ☐ Member Total & Permanent Disability (under age 50) |
| | | ☐ Dependent Spouse Death | |
| | | ☐ Dependent Child Death | ☐ Member Total & Permanent Disability (ages 50 thru 59) |

| 5 | Name and Address of Applicant for Member Death Benefits Telephone No. Relationship to member |
|---|---|
| | Giselle E. Bonner, 5733 Senator St. 817 281 8575 Daughter |
| | Social Security No. |

| 6 | | FOR MEMBER DEATH OR ACCIDENTAL DEATH | ☐ Date of Death _____ |
|---|---|---|---|
| | | | ☐ Member had Waiver of Premium _____ |
| | | | ☐ Member was on TPD Claim No. _____ |
| Please Attach the Indicated Documents to this Notice of Claim | | FOR MEMBER ACCIDENTAL DISMEMBERMENT | ☐ Date of Accident _____ |
| | | | ☐ Date Member Became Dismembered _____ |
| | | FOR DEPENDENT SPOUSE DEATH | ☐ Date of Death _____ |
| | | Name: _____ | ☐ Certified Copy of Marriage Certificate |
| ALL DEATH CLAIMS MUST HAVE CERTIFIED DEATH CERTIFICATE | | FOR DEPENDENT CHILD DEATH | ☐ Date of Death _____ |
| | | Name: _____ | ☐ Certified Copy of Birth Certificate |
| | | FOR MEMBER TOTAL & PERMANENT DISABILITY | ☐ Copy of Social Security Award |
| | | | ☐ Certified Copy of Birth Certificate |
| | | Date of Disability _____ | ☐ Completed and Signed Health and Welfare Beneficiary Card |

| 7 | Name and Address of Local Union |
|---|---|
| | Teamsters Local 991 |
| | (Signature of Union Official) X ___Giselle E. B___ (Signature of Applicant) |

Mail this completed Notice of Claim, with the
Documents requested in Item 6 above, to:
Central States, Southeast and Southwest Areas
Health and Welfare Fund
Life Insurance Department
PO Box 5107 Des Plaines IL 60017-5107

FOR CENTRAL STATES OFFICE USE ONLY

Ex. #9

RECYCLED

ALL-STATE® LEGAL  800-222-0510  6D11



**CENTRAL STA..ES
SOUTHEAST AND
SOUTHWEST AREAS
HEALTH AND WELFARE AND PENSION FUNDS**

EMPLOYEE TRUSTEES
FRED GEGARE
JERRY YOUNGER
GEORGE J. WESTLEY
CHARLES A. WHOBREY
PHILIP E. YOUNG

EMPLOYER TRUSTEES
HOWARD McDOUGALL
ARTHUR H. BUNTE, JR.
TOM J. VENTURA
DANIEL J. BRUTTO
GARY F. CALDWELL

EXECUTIVE DIRECTOR
THOMAS C. NYHAN

March 24, 2004

Darrell Bonner
2056 N McVay Dr
Mobile AL 36605

RE:  Clarence Bonner
     SSN: :
     Claim Number: MD003012
     Date of Loss: December 19, 2003

Dear Mr. Bonner:

We have received your claim for the Life Insurance Benefit on your Father, Clarence
Bonner.  Please accept our condolences.

We are sorry, but we must deny this claim.

According the Plan Document, Article XIV, Section 14.09:

**BENEFICIARY AND MODE OF SETTLEMENT**

*It is the responsibility of each Covered Participant to supply the Fund with properly
executed enrollment forms as required by the Fund, designating the beneficiary of any
benefit described in this Article.  If a Covered Participant desires to change the
designated beneficiary who had been previously designated on the enrollment card, then,
it is his responsibility to provide the Fund with a properly executed Request for Change
of Beneficiary Card.*

According to the beneficiary card we have on file dated 10/13/93, Clarencia Bonner is the
named beneficiary.

If you are dissatisfied with this decision, please complete the enclosed Appeals Committee Review Procedure Form and return it to the Fund. The appeal procedures are written on the back of the enclosed appeal form.

If you are not going to pursue this matter any further, please complete the enclosed *Disclaimer Statement*, have it **notarized**, and return it in the enclosed envelope as soon as possible, so we may release payment on this claim.

We are sorry we could not be of service to you.

Sincerely,

Tom Martino, Supervisor
Life Insurance Department
Health and Welfare Group

Enclosures

State of _____

County of _____

## DISCLAIMER STATEMENT

I hereby waive all my rights, title and interest in and to the sum of $40,000.00 of the death claim proceeds for the Life Insurance Benefit on the life of Clarence Bonner, Social Security Number 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 issued by the Central States Southeast and Southwest Health and Welfare Fund in connection with the Group Life Policy of the Central States Fund.

_____
Signature of Applicant

_____
Address

_____
City          State          Zip

Subscribed and sworn to before me,
a Notary Public, this _____
day of _____, 2001.

_____
Signature of Notary Public



**CENTRAL STA. .ES**
**SOUTHEAST AND**
**SOUTHWEST AREAS**
**HEALTH AND WELFARE AND PENSION FUNDS**

EMPLOYER TRUSTEES
FRED GEGARE
JERRY YOUNGER
GEORGE J. WESTLEY
CHARLES A. WHOBREY
PHILIP E. YOUNG

EMPLOYEE TRUSTEES
HOWARD McDOUGALL
ARTHUR H. BUNTE, JR.
TOM J. VENTURA
DANIEL J. BRUTTO
GARY F. CALDWELL

EXECUTIVE DIRECTOR
THOMAS C. NYHAN

March 24, 2004

Gabrielle Bonner
5133 Senator Dr
Keller TX 76248

RE:     Clarer
        SSN: 
        Claim Number: MD005012
        Date of Loss: December 19, 2003

Dear Ms. Bonner:

We have received your claim for the Life Insurance Benefit on your Father, Clarence Bonner. Please accept our condolences.

We are sorry, but we must deny this claim.

According the Plan Document, Article XIV, Section 14.09:

**BENEFICIARY AND MODE OF SETTLEMENT**

*It is the responsibility of each Covered Participant to supply the Fund with properly executed enrollment forms as required by the Fund, designating the beneficiary of any benefit described in this Article. If a Covered Participant desires to change the designated beneficiary who had been previously designated on the enrollment card, then, it is his responsibility to provide the Fund with a properly executed Request for Change of Beneficiary Card.*

According to the beneficiary card we have on file dated 10/13/93, Clarencia Bonner is the named beneficiary.

If you are dissatisfied with this decision, please complete the enclosed Appeals Committee Review Procedure Form and return it to the Fund. The appeal procedures are written on the back of the enclosed appeal form.

If you are not going to pursue this matter any further, please complete the enclosed *Disclaimer Statement*, have it <u>notarized</u>, and return it in the enclosed envelope as soon as possible, so we may release payment on this claim.

We are sorry we could not be of service to you.

Sincerely,


Tom Martino, Supervisor
Life Insurance Department
Health and Welfare Group


Enclosures

State of _____

County of _____

## DISCLAIMER STATEMENT

I hereby waive all my rights, title and interest in and to the sum of $40,000.00 of the death claim proceeds for the Life Insurance Benefit on the life of Clarence Bonner, Social Security Number 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 issued by the Central States Southeast and Southwest Health and Welfare Fund in connection with the Group Life Policy of the Central States Fund.

_____
Signature of Applicant

_____
Address

_____
City          State          Zip

Subscribed and sworn to before me,
a Notary Public, this _____
day of _____, 2001.

_____
Signature of Notary Public



**CENTRAL STA. .ES
SOUTHEAST AND
SOUTHWEST AREAS
HEALTH AND WELFARE AND PENSION FUNDS**

EMPLOYEE TRUSTEES
FRED GEGARE
JERRY YOUNGER
GEORGE J. WESTLEY
CHARLES A. WHORREY
PHILIP E. YOUNG

EMPLOYER TRUSTEES
HOWARD McDOUGALL
ARTHUR H. BUNTE, JR.
TOM J. VENTURA
DANIEL J. BRUTTO
GARY F. CALDWELL

EXECUTIVE DIRECTOR
THOMAS C. NYHAN

March 24, 2004

Giselle Bonner
5133 Senator Dr
Keller TX 76248

RE:   Clare:
      SSN:
      Claim Number: MD005012
      Date of Loss: December 19, 2003

Dear Ms. Bonner:

We have received your claim for the Life Insurance Benefit on your Father, Clarence Bonner.  Please accept our condolences.

We are sorry, but we must deny this claim.

According the Plan Document, **Article XIV, Section 14.09:**

**BENEFICIARY AND MODE OF SETTLEMENT**

*It is the responsibility of each Covered Participant to supply the Fund with properly executed enrollment forms as required by the Fund, designating the beneficiary of any benefit described in this Article.  If a Covered Participant desires to change the designated beneficiary who had been previously designated on the enrollment card, then, it is his responsibility to provide the Fund with a properly executed Request for Change of Beneficiary Card.*

According to the beneficiary card we have on file dated 10/13/93, Clarencia Bonner is the named beneficiary.

If you are dissatisfied with this decision, please complete the enclosed Appeals Committee Review Procedure Form and return it to the Fund. The appeal procedures are written on the back of the enclosed appeal form.

If you are not going to pursue this matter any further, please complete the enclosed *Disclaimer Statement*, have it <u>notarized</u>, and return it in the enclosed envelope as soon as possible, so we may release payment on this claim.

We are sorry we could not be of service to you.

Sincerely,


Tom Martino, Supervisor
Life Insurance Department
Health and Welfare Group


Enclosures

State of _____

County of _____

## DISCLAIMER STATEMENT

I hereby waive all my rights, title and interest in and to the sum of $40,000.00 of the death claim proceeds for the Life Insurance Benefit on the life of Clarence Bonner, Social Security Number 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 issued by the Central States Southeast and Southwest Health and Welfare Fund in connection with the Group Life Policy of the Central States Fund.

_____
Signature of Applicant

_____
Address

_____
City        State        Zip

Subscribed and sworn to before me,
a Notary Public, this _____
day of _____, 2001.

_____
Signature of Notary Public

Ex.# 10



**CENTRAL STATES**
**SOUTHEAST AND**
**SOUTHWEST AREAS**
**HEALTH AND WELFARE AND PENSION FUNDS**

EMPLOYEE TRUSTEES
FRED GEGARE
JERRY YOUNGER
GEORGE J. WESTLEY
CHARLES A. WHOBREY
PHILIP E. YOUNG

EMPLOYER TRUSTEES
HOWARD McDOUGALL
ARTHUR H. BUNTE, JR.
TOM J. VENTURA
DANIEL J. BRUTTO
GARY F. CALDWELL

EXECUTIVE DIRECTOR
THOMAS C. NYHAN

March 25, 2004

Rosemary Bonner
2355 Crestwood Circle
Mobile AL 36617

RE:   Clare
      SSN:
      Claim Number: MD005012
      Date of Loss: December 19, 2003

Dear Mrs. Bonner:

We have received your claim for the Life Insurance Benefit on your husband, Clarence Bonner. Please accept our condolences.

We are sorry, but we must deny this claim.

According the Plan Document, Article XIV, Section 14.09:

**BENEFICIARY AND MODE OF SETTLEMENT**

*It is the responsibility of each Covered Participant to supply the Fund with properly executed enrollment forms as required by the Fund, designating the beneficiary of any benefit described in this Article. If a Covered Participant desires to change the designated beneficiary who had been previously designated on the enrollment card, then, it is his responsibility to provide the Fund with a properly executed Request for Change of Beneficiary Card.*

According to the beneficiary card we have on file dated 10/13/93, Clarencia Bonner is the named beneficiary.

If you are dissatisfied with this decision, please complete the enclosed Appeals Committee Review Procedure Form and return it to the Fund. The appeal procedures are written on the back of the enclosed appeal form.

9377 West Higgins Road
Rosemont, Illinois 60018-4938
Phone: (847) 518 - 9800                                    www.centralstates.org

If you are not going to pursue this matter any further, please complete the enclosed *Disclaimer Statement*, have it <u>notarized</u>, and return it in the enclosed envelope as soon as possible, so we may release payment on this claim.

Based on a review of our records, you have earned continued coverage under the Family/ Spouse Protection Plan. This benefit offered through the TeamCare Program provides free medical coverage for five (5) years from the member's date of death. This coverage ceases if you remarry, become Medicare eligible or gain any other health care coverage. Rita will also be covered for five (5) years or until attaining the age of 19 (or 23 if a full-time student) or gains other health care coverage, *whichever occurs first*.

Please remember that all medical care must be provided by doctors and hospitals participating in the TeamCare Program. Claims will be paid under the Plan in which you were covered immediately prior to the member's death. Medical claims for services rendered by non-participating physicians and hospitals will not be paid.

If you have any questions regarding these benefits, please do not hesitate to call our Toll Free Service at 1-800-323-5000.

We are sorry we could not be of service to you.

Sincerely,


Tom Martino, Supervisor
Life Insurance Department
Health and Welfare Group


Enclosures

Ex.# 11



**CENTRAL STATES
SOUTHEAST AND
SOUTHWEST AREAS
HEALTH AND WELFARE AND PENSION FUNDS**

EMPLOYEE TRUSTEES
FRED GEGARE
JERRY YOUNGER
GEORGE J. WESTLEY
CHARLES A. WHOBREY
PHILIP E. YOUNG

EMPLOYER TRUSTEES
HOWARD McDOUGALL
ARTHUR H. BUNTE, JR.
TOM J. VENTURA
DANIEL J. BRUTTO
GARY F. CALDWELL

EXECUTIVE DIRECTOR
THOMAS C. NYHAN

March 25, 2004

Sandra Bonner
907 Whistler St
Prichard AL 36610

RE:    Claren ⋯
        SSN: ⋯
        Claim Number: MD005012
        Date of Loss: December 19, 2003

Dear Ms. Bonner:

We are writing regarding your application file for the benefit of your daughter, Clarencia for the Life Insurance Benefit on the above named member. Please accept our condolences.

We are currently in the process of denying five (5) other applicants. Due to our Appeal Process, we must allow one hundred and eighty (180) days from the date of this letter to determine if the other applicants will appeal the denial. Upon completion of the one hundred and eighty (180) day period, we will notify you regarding your claim.

Based on a review of our records, Clarencia has earned continued coverage under the Family Protection Plan. This benefit offered through the TeamCare Program provides free medical coverage for five (5) years from the member's date of death or until attaining the age of 19 (23 if a full-time student) or gains other health care coverage, *whichever occurs first.*

Please remember that all medical care must be provided by doctors and hospitals participating in the TeamCare Program. Claims will be paid under the Plan in which you were covered immediately prior to the member's death. Medical claims for services rendered by non-participating physicians and hospitals will not be paid.

If you have any questions regarding these benefits, please do not hesitate to call our Toll Free Service at 1-800-323-5000. Thank you for your patience.

Sincerely,


Denise Alexandersson, Analyst
Life Insurance Department
Health and Welfare Group

Ex. #12

**APPE..LS COMMITTEE REVIEW PROC..DURE**          **RAC**

If you are not satisfied with the Fund's decision, you have the right to ask the Fund's Appeals Committee to review your case (procedures on back). If you would like the Committee to review your case, please complete and return this original form, within 180 days of the decision, to the following address:

RECEIVED
APR 13 2004

Appeals Committee
Central States, Southeast and Southwest Areas & CORRESPONDENCE
Health and Welfare Fund
PO Box 5126
Des Plaines, Illinois 60017-5126

Please be sure to attach a copy of our denial letter to this form when submitting

Clarence Bonner Jr.
_____
Member's Name

3355 Crestwood Circle
_____
Address

Mobile AL 36617
_____
City, State, Zip

(251) 457-0714
_____
Phone Number

Social Security Number

MD005018
_____
Claim Number(s)

RECEIVED
LIFE INSURANCE
APR 1 3 2004

Patient's Name

_____
Claimant's Name

Issue to be reviewed: Benaficiary Settlement wants to contested
ane appeal the claim

Please present your reason for disagreement with the decision and what action you feel should be taken (use additional sheets if necessary):
Please I would like to see
Stop payment until Prove by court copies of but hard on Reco
I wants to contest the paid same claim
on my husband Death Settlement + know
for fact he didn't put one child
Clarencia Bonner Sandra Bonner I wife wanted
to of the life claim my husband I agree
disagree with the decision and he went back to
he's attorney and his attorney told my husband
Clarence that he can claim any one he can
And my husband fill out a beneficiary card with
all five children and included me I he wanted to
Card in my present I think your copies got a
mixed up and I have document from the court
and the two emiror children Rita 15 I am Before Sure I would
Clarencia 15 4-9-04 Be
see a

_____
Member's Signature
Wife Rosemay Bonner

_____
Date

See attach →

RC-MIS Network Printing - RC Appeal RAC.pm - Dec 2002

Attached —

April 7, 204

Also I am sure that my husband wouldn't just put a 5 1/2 year old child down all along as beneficiary for his life claim — my husband had to take a claim card to his ex wife lawyer in 1993 to show the court that he did because his ex wife ask for 1/2 of his life insurance ex wife probably probably sent that card to her daughter Clarencia, but my husband fill another with all five kids and my self when he has me on his pension and my minor child Rita in 03 like us 0, Clarencia was those cards us ment to send of like that. Mr Bovey funeral expense are being depending on his life policy — pretty sure Clarencia at the age 15, not going to take care of that Also I need to see a copy of all cards on file

Thank you

Rose Mary Bovey

Attention ms Judy at Local 991
Union prepare my claim and she
forgot to include my daughter
Rita for they husband Claim
Rita is my minor Child


Sign Rosemary Brown

**CENTRAL STATES SOUTHEAST AND SOUTHWEST AREAS HEALTH AND WELFARE FUND**
**NOTICE OF CLAIM**

FROM: LOCAL NO. *991*                                    DATE *4-7-04*

In order to report a claim for DEATH, ACCIDENTAL DEATH, DISMEMBERMENT, TOTAL & PERMANENT DISABILITY / WAIVER OF PREMIUM, please complete this form in detail and follow the instructions set forth below.

(Please type or print)

| | | | | |
|---|---|---|---|---|
| 1 | Member's Name (Last) *Bonner* (First) *Clarence L.* (MI) | Date of Birth *8-29-47* | | Occupation *9* |
| | Member's Address (No. Street, City, State, Zip Code) *2355 Crestwood Circle Mobile AL 36617* | Member's Phone | | *Truck Driver* |
| 2 | Name and Address of Employer *Yellow Freight System  Virginia Street  Mobile AL* | | Date Last Worked *12-12-03* | |
| 3 | Are you on Medicare? ☐ Yes ☑ No   If yes, send us a copy of your Medicare Card. | | | |

| | | | |
|---|---|---|---|
| 4 | Type of Claim (Check One) | ☑ Member Death | ☐ Member Accidental Dismemberment |
| | | ☐ Member Accidental Death | ☐ Member Total & Permanent Disability (under age 50) |
| | | ☐ Dependent Spouse Death | |
| | | ☐ Dependent Child Death | ☐ Member Total & Permanent Disability (ages 50 thru 59) |

| | |
|---|---|
| 5 | Name and Address of Applicant for Member Death Benefits  *Rita Bonner  2355 Crestwood circle mobile AL 36617*   Telephone No. *251-452-0778*   Relationship to member *Daughter*   Social Security No. *25* |

| 6 | | |
|---|---|---|
| Please Attach the Indicated Documents to this Notice of Claim | **FOR MEMBER DEATH OR ACCIDENTAL DEATH** | ☑ Date of Death *12-19-03* ☐ Member had Waiver of Premium ☐ Member was on TPD   Claim No. |
| | **FOR MEMBER ACCIDENTAL DISMEMBERMENT** | ☐ Date of Accident ☐ Date Member Became Dismembered |
| | **FOR DEPENDENT SPOUSE DEATH** Name: | ☐ Date of Death ☐ Certified Copy of Marriage Certificate |
| ALL DEATH CLAIMS MUST HAVE CERTIFIED DEATH CERTIFICATE | **FOR DEPENDENT CHILD DEATH** Name: | ☐ Date of Death ☐ Certified Copy of Birth Certificate |
| | **FOR MEMBER TOTAL & PERMANENT DISABILITY** Date of Disability | ☐ Copy of Social Security Award ☐ Certified Copy of Birth Certificate ☐ Completed and Signed Health and Welfare Beneficiary Card |

RECEIVED
LIFE INSURANCE
APR 1 3 2004

| 7 | Name and Address of Local Union *Teamsters Local Union 991  115 S. Broad Street  Mobile AL 36602* |
|---|---|
| | Signature of Union Official _____   Signature of Applicant *Rita Gaale Bonner*  *Rosemary Bonner*  MPOR Child |

Mail this completed Notice of Claim, with the Documents requested in Item 6 above, to:
**Central States, Southeast and Southwest Areas**
Health and Welfare Fund
Life Insurance Department
PO Box 5107    Des Plaines IL  60017-5107

**FOR CENTRAL STATES OFFICE USE ONLY**

HWB-1 REV. 2/90

APRIL 7, 2004

To Whom It May Concern:

    I would like to say "Thank You" for the condolences in the passing of my dear husband, Clarence Bonner. I am also very grateful for the benefits my daughter Rita and I will receive Under the Family /Spouse Protection Plan. I received the denial letter to claim for my husband's Life Insurance.

    I'm writing to say I disagree with the decision because I was present when Clarence filled out and mailed the last beneficiary card and Clarencia was not the only name listed on this card. I can remember clearly his concerns about his life insurance because he had just gone through a very bitter divorce.

    I know he was adamant about dividing his insurance between me and his five children equally. I honestly wouldn't have a problem with honoring my husband's wishes as I know he loved all his children equally. I also know there was another card that was filled after the card that you have listed that was mailed by Clarence in my presence.

Sincerely,

*Rosemary Bonner*

Rosemary Bonner

EX.#13

## APPEALS COMMITTEE REVIEW PROCEDURE

**RAC**

If you are not satisfied with the Fund's decision, you have the right to ask the Fund's Appeals Committee to review your case (procedures on back). If you would like the Committee to review your case, please complete and return this original form, within 180 days of the decision, to the following address:

# RECEIVED

APR 2 0 2004

RESEARCH & CORRESPONDENCE

Appeals Committee
Central States, Southeast and Southwest Areas
Health and Welfare Fund
PO Box 5126
Des Plaines, Illinois 60017-5126

RAC 4/13

Please be sure to attach a copy of your denial letter to this form when submitting

**Member's Name** Clarence L. Bonner, Jr.

**Address** 2355 Crestwood Cr.

**City, State, Zip** Mobile, AL 36617

**Phone Number** 251-479-8605

**Social Security Number**

**Claim Number(s)** MD005012

**Patient's Name** Darrell Bonner (Son)

**Claimant's Name** Darrell Bonner (Son)

**Issue to be reviewed:**

Beneficiary Card dated 10/13/93 with Clarencia Bonner as sole beneficiary. There is a second card that was senter

**Please present your reason for disagreement with the decision and what action you feel should be taken (use additional sheets if necessary):**

My father (Clarence Bonner Jr.) mailed in another card with me (Darrell Bonner), Gabrielle Bonner, Gisele Bonner and the other sibling Clarencia Bonner name on it. Clarencia Bonner was only 6 years 9 age in 1993 and in the state of Alabama you must be 18 years 9 age or older to be a beneficiary on an insurance, and I feel like the insurance should be devided equally among his children. There is another card on file that I thank you for your attention in this matter.

Darrell A. Bonner

**Member's Signature**

**Date** 4/16/04

RC -MIS Network Printing - RC Appeal RAC.pm - Dec 2002

Ex. #14



**CENTRAL STATES
SOUTHEAST AND
SOUTHWEST AREAS
PENSION FUND**

7576
326

**RECEIVED**

APR 2 6 2004

CENTRAL STATES
PENSION BENEFITS DIVISION

## PENSION BENEFIT APPEAL FORM
### STEP 1 - BENEFITS CLAIM APPEALS COMMITTEE

Whenever the Pension Fund denies a claim for benefits, in whole or in part, the claimant has the right, under the Pension Plan, to appeal the denial. The Pension Plan provides a two-step appellate review: the first step is a review by the Benefits Claim Appeals Committee, and the second step is a review by the Trustees. If your second and final appeal is denied, you will have the right to bring suit under Section 502(a) of ERISA in an attempt to recover what you believe to be benefits due you under the terms of the Plan, enforce what you believe to be your rights under the terms of the Plan, or to clarify rights to future benefits under the terms of the Plan. To exercise your right to appeal a benefit denial (or other adverse benefit determination by the Pension Fund) to the Benefits Claim Appeals Committee, you must complete and return this form to the address below within 180 days after you have been notified by the Fund of such denial or adverse benefit determination.

Participant's Name : _Clarence Lee Bonner, Jr._  SS#: ____

Claimant's Name (if claimant is not the Participant): _Gabrielle N. Bonner_  SS ____

Please explain, in detail, why you believe that the Fund's denial of your claim, in whole or in part, is incorrect. Attach additional pages, if needed, and copies of any and all documentation that you may have that supports your claim.

_My father, Clarence Lee Bonner, Jr. filed documentation with your company to divide the benefit to the children to the following: Darnell, Gabrielle, Giselle and Clarencia Bonner. According to your documentation of denial dated March 24, 2004, you only list Clarencia Bonner. There should be an additional award listing Darnell, Gabrielle and Giselle._

U.S. Department of Labor regulations require the Benefits Claim Appeals Committee to determine your appeal, and notify you of the result, within 30 days after the Fund receives your request for appeal, unless an extension of this time period is authorized. If your appeal is straightforward, if all necessary research has been done, and if all relevant information is already in file, this 30 day deadline is adequate. However, in many cases it takes longer than 30 days to complete the necessary research and compile all relevant information needed to fully evaluate an appeal. While it is your right to require the Fund to notify you of its decision within 30 days, a more fully informed decision may result if the Fund is allowed the additional time to fully research and evaluate your appeal. We need you to instruct us how to proceed. Please check one of the boxes and sign below:

☐ I request a decision on my appeal within the 30 day time limit. I understand that this decision will be based on the information currently in file.

☒ I authorize the Fund to exceed the 30 day time limit to complete any research necessary for the Benefits



Ex. #15



**CENTRAL STATES**
**SOUTHEAST AND**
**SOUTHWEST AREAS**
**HEALTH AND WELFARE AND PENSION FUNDS**

EMPLOYEE TRUSTEES
FRED GEGARE
JERRY YOUNGER
GEORGE J. WESTLEY
CHARLES A. WHOBREY
PHILIP E. YOUNG

EMPLOYER TRUSTEES
HOWARD McDOUGALL
ARTHUR H. BUNTE, JR.
TOM J. VENTURA
GARY F. CALDWELL
CHRISTOPHER LANGAN

EXECUTIVE DIRECTOR
THOMAS C. NYHAN

May 5, 2004

ROSEMARY BONNER
2355 CRESTWOOD CIRCLE
MOBILE AL 36617

RE:   APPEALS CO            EW
      SSN:
      CLAIM NO:   LIFE INSURANCE BENEFICIARY DISPUTE
      MEMBER:     CLARENCE BONNER, JR.

Dear Mrs. Bonner:

The Appeals Committee met on April 28, 2004 and considered your appeal for Life Insurance Benefits. I regret to inform you that the Committee voted to deny this appeal.

Under the terms of the Plan, Life Insurance Benefits will be issued to the person named on the most current beneficiary card on file. In this case, Clarence Bonner is the beneficiary listed. Therefore, you are not entitled to any benefits.

The Plan states in Article XIV, Section 14.09:

**14.09  BENEFICIARY AND MODE OF SETTLEMENT**

It is the responsibility of each Covered Participant to supply the Fund with properly executed enrollment forms as required by the Fund, designating the beneficiary of any benefit described in this Article. If a Covered Participant desires to change the designated beneficiary who had been previously designated on the enrollment card, then, it is his responsibility to provide the Fund with a properly executed Request for Change of Beneficiary Card.

If a Covered Participant fails to execute proper enrollment forms, then, at his death, benefits will be payable to the first surviving class, as follows:

1.    Covered Participant's Spouse
2.    Covered Participant's Children, in equal shares
3.    Covered Participant's Parents, in equal shares
4.    Covered Participant's Siblings, in equal shares
5.    Covered Participant's Estate

If a Covered Participant's Spouse or Dependent Child pre-decease the Covered Participant, the Spouse's or Dependent Child's Life Insurance Benefit will be payable only to the Covered Participant.

ROSEMARY BONNER
May 5, 2004
Page 2

In the event a Covered Spouse of a Covered Participant dies simultaneously with the Participant, the Spouse's Life Insurance Benefit will be payable to the first surviving class, as follows:

1.    Spouse's Surviving Children, in equal shares
2.    Spouse's Parents, in equal shares
3.    Spouse's Siblings, in equal shares
4.    Spouse's Estate

The Fund reserves the right to make reasonable regulations as to the number of beneficiaries and method of payment of the Life Insurance Benefit. If the Fund receives an order from a divorce or family court which, in the judgment of the Trustees, purports to require that a benefit be payable otherwise than as provided in this section, the Trustees may withhold paying any benefit until all claimants to the benefit exhaust the administrative appeals process required by the Plan.

If you are still dissatisfied with this decision, you may file a second and final appeal. An appeal form is enclosed with this letter which describes the appeals process. If you wish to file a second level appeal, you must complete the enclosed form and return it to the address shown on the form within 180 days.

Sincerely,

On Behalf of the Appeals Committee

Bill Pieper
Manager
Research & Correspondence Department

BP:lmb
231/ 4/28/04

cc:    Life Insurance Department

EX.# 16

14503

6-1-04

Trustee Appellate Review Committee

To whom it concerns,

I am writing for a request for a copy of the beneficiary cards that my husband Clarence Brown Jr. sent in with Gabriel Brown, Sheila Brown, Peter Brown, Marcell Brown, and myself Rosemary N. Brown. Also the beneficiary card with Clarence name on it. And a copy from the life Department stating that they have received the changes in the beneficiary card which should have been sent to my husband Clarence Lee Brown Jr. as shown with this you received it. Also I was like a copy of the guidlines when they first appeal & denial. I will like a copy & request for all what on records.

Thank you

Mrs. Rosemary N. Brown

## TRUSTEE COMMITTEE APPEAL PROCEDURE

**RBT**

RECEIVED

If you are not satisfied with the Appeals Committee decision, you have the right to ask the Fund's Trustee Committee to review your case (procedures on back). If you would like the Trustee Committee to review your case please complete and return this original form, within 180 days of the denial, to the following address:

JUN -4 2004

RESEARCH & CORRESPONDENCE

Trustee Appellate Review Committee
Central States, Southeast and Southwest Areas
Health and Welfare Fund
P. O. Box 5126
Des Plaines, Illinois 60017-5126

Please be sure to attach a copy of our denial letter to this form when submitting.

Clarence L. Bouncer jr.
**Member's Name**

2355 Crestwood Circle
**Address**

Mobile Alabama 36612
**City, State, Zip**

(251) 452-0714
**Phone Number**

_____
**Social Security Number**

Life Insurance Beneficiary Di...
**Claim Number(s)**

MD 008 012
**Patient's Name**

_____
**Claimant's Name**

**Issue to be reviewed:**

Life Insurance Dispute
The Action should be taking to Court And let the Judge Decide go strictly to a Court

**Please present your reason for disagreement with the decision and what action you feel should be taken (use additional sheets if necessary):**

I know know for a fact what my husband Wishes. turn in his present where he fill out 4 beneficiare care with all the kids name on it and it wasn't in 1992 and he wouldn't left my child Rita Bouncer out of the life policy she was a beneficial Bouncer was ? he wouldn't put a minor down alone. I know this is a mess up And I wouldn't wanted his X-wife to touch that money at all Clarencis Bouncer like court say that my husband fear Clarencis bouncer be on the life policy And I am sending the decree thats while these cards came in the that but my husband funeral expense hasn't been paid yet the Action I feel should be taken that you all should forward to the court And let a judge decide who gets what I have spoke with attorney on this matter. one card was sopose have been in for Clarencis Bouncer

Rose Mary Bouncer
**Member's Signature**

6-1-04
**Date**

und the money to Court t the Judge make the decision

Robert Reese funeral Home
251-456-2257 funeral Arrange...

RC - R:\Document Bank\Forms\RC Appeal RBT.wpd - Jul 2003

EX #17



CENTRAL STATES
SOUTHEAST AND
SOUTHWEST AREAS
HEALTH AND WELFARE AND PENSION FUNDS

EMPLOYEE TRUSTEES
FRED GEGARE
JERRY YOUNGER
GEORGE J. WESTLEY
CHARLES A. WHOBREY
PHILIP E. YOUNG

EMPLOYER TRUSTEES
HOWARD McDOUGALL
ARTHUR H. BUNTE, JR.
TOM J. VENTURA
GARY F. CALDWELL
CHRISTOPHER LANGAN

EXECUTIVE DIRECTOR
THOMAS C. NYHAN

JULY 7, 2004

ROSEMARY BONNER
2355 CRESTWOOD CIRCLE
MOBILE AL 36617

RE:   TRUSTEE-REVIEWABLE APPEAL
      MEMBER:       BONNER, JR., DECEASED
      SSN:
      CLAIM NO:   MD005012

Dear Mrs. Bonner:

This is regarding your Trustee Committee Appeal regarding the life insurance benefit for your husband, Clarence.

Per your request enclosed is a copy of the file. Your appeal is scheduled to be presented to the Committee at their July 21, 2004, meeting. A letter will be sent to you after a decision is made.

If you have any questions, please write the Research and Correspondence Department at P.O. Box 5126, Des Plaines, Illinois 60017.

Sincerely,


Cheryl L. Storc
Analyst
Research & Correspondence Department

/cls
117811 / 7/7/04

9377 West Higgins Road
Rosemont, Illinois 60018-4938
Phone: (847) 518-9800

www.centralstates.org

Ex. #18

## TRUSTEE COMMITTEE APPEAL PROCEDURE          RBT

If you are not satisfied with the Appeals Committee decision, you have the right to ask the Fund's Trustee Committee to review your case (procedures on back). If you would like the Trustee Committee to review your case please complete and return this **original** form, within 180 days of the denial, to the following address:

Trustee Appellate Review Committee
Central States, Southeast and Southwest Areas
Health and Welfare Fund
P. O. Box 5126
Des Plaines, Illinois 60017-5126

**RECEIVED**

**AUG 0 3 2004**

**RESEARCH & CORRESPONDENCE**

Please be sure to attach a copy of our denial letter to this form when submitting

*Clarence Bonner Jr.*
**Member's Name**

*2056 N. McVay Dr.*
**Address**

*Mobile, Ala. 36605*
**City, State, Zip**

( )
**Phone Number**

**Social Security Number**

**Claim Number(s)**

**Patient's Name**

*Darrell G. Bonner*
**Claimant's Name**

**Issue to be reviewed:**

_____

_____

_____

**Please present your reason for disagreement with the decision and what action you feel should be taken (use additional sheets if necessary):**

*Dear Sirs, My appeal is based on the fact that my father was under a lot of pressure from a bitter 2nd divorce and having heard from his then (spouse) lawyer to show proof of Clarence Bonner being not beneficiary on his life insurance, He filled out that second card not intending her to be the sole beneficiary, but one of four more beneficiaries, he filled it out and drop it off at the ladies office and they also mailed it in later. I am asking that your Committee look at all of the facts and reconsider all of the situation and circumstances involving this matter. It's not just about money, but its about doing what my father would have wanted, He loved all of his children and he signed that paper under duress, Respectfully, I am also asking that you send me Darrell Bonner copies of all documents and records concerning this matter.*

*Member's Signature*          *7/20/04*
**Member's Signature**          **Date**

Ex.#19

ALL-STATE® LEGAL 800-222-0510   ED11   RECYCLED

August 4, 2004

Central States and Welfare
Trustee Reviewable Appeal
Mr. Ray Hale

To Whom it Concerns

I have received your letter
telling me that you all went before
the committee July 21, 2004 and
received the copy. I ask for

And on the change of beneficiary card
with Clarence Bonds on it.
That's not my husband Clarence
name spell wrong. Also his
Social Security number is wrong
and you need to check the
signature on both cards. the
signature is total different from the
one's he has. everybody name on
his card. Check the Age C. and the
date. different writing. I spoke with
Mr. Judy at the local union hall
she said anybody could pick one up
if so the beneficiary card. he was
the cards at yellow freight & they office
I know my husband didn't change
from all of the childrens. And how
could the change be made in social
security number and he die
December 19, 2003
need to pay close attention to the
signature on both cards

I know my husband knows
his Social Security number and
knows how to spell his name

P.S. I think it security had a
lot to do with the signing
She was taking him through
a battle, so please pay close
attention to the handwriting

Thank you

P.S. my husband pervious expenses
haden't been paid

Also You all didn't send me
a copy where you all telling
my husband that his Social
Security number has been stole or mine
or his name spell wrong, which
you all suppose to bring to his
attention. Thank you

Rose Mary Barnes

Ex.# 20

**CENTRAL STATES**
**SOUTHEAST AND**
     **SOUTHWEST AREAS**
**HEALTH AND WELFARE AND PENSION FUNDS**

EMPLOYEE TRUSTEES
FRED GEGARE
JERRY YOUNGER
GEORGE J. WESTLEY
CHARLES A. WHOBREY
PHILIP E. YOUNG

EMPLOYER TRUSTEES
HOWARD McDOUGALL
ARTHUR H. BUNTE, JR.
TOM J. VENTURA
GARY F. CALDWELL
CHRISTOPHER LANGAN

EXECUTIVE DIRECTOR
THOMAS C. NYHAN

August 26, 2004

Ms. Rosemary Bonner
2355 Crestwood Circle
Mobile, AL 36617

RE: Board of Trustee Appeals Review
SSN:
Claim No.    Life Insurance Beneficiary Dispute
Member: Clarence Bonner, Jr.

Dear Ms. Bonner;

      The Board of Trustee Appeals Committee has received your letter dated August 4, 2004 in support of your administrative appeal in which you allege that the October 13, 1993 Beneficiary Card was either fraudulently completed or that Clarence Bonner's signature was forged. At present, the Trustees do not have sufficient information to approve your claim for the life insurance benefit. However, the Trustees have deferred this matter to conduct an investigation and to allow you the opportunity to submit additional information and documentation to support your appeal.

      The Trustees request that you agree to waive the time limitations in Sections 10.03 through 10.05 of the Plan for Trustees to review your claim. A copy of these Sections are enclosed. A waiver of the time limitations will allow you sufficient time to submit any additional information and time for the Trustees to review your appeal. Unless we receive an objection from you we will assume you agree to waive the time limitations. At present, the Trustees anticipate reviewing any information you submit at the Board of Trustees meeting on October 13, 2004.

      Pursuant to the this  investigation, the Trustees request that you clarify the allegations in your August 4, 2004 letter. Please advise whether you are claiming that the Beneficiary Card dated October 13, 1993 was fraudulently completed and/or whether Clarence Bonner's signature on the Card is a forgery. We also request that you provide any information or documentation supporting your allegations. The type of information and documentation which may support your allegations include, but are not limited to: (1) any information or documentation you have in support of your allegation; (2) any additional examples of Mr. Bonner's signature for the Board to review; (3) a statement from any handwriting expert supporting your allegations; (4) any affidavits of witnesses who have knowledge of any issues you have raised.

Case: 1:04-cv-06839 Document #: 1 Filed: 10/25/04 Page 199 of 213 PageID #:199

Please be advised that absent additional information or documentation supporting your allegation that the Beneficiary Card dated October 13, 1993 was forged, the Trustees will not likely approve your appeal. If your appeal is denied, the life insurance benefit will be paid pursuant the Beneficiary Card dated October 13, 1993. In order for the Trustees to timely proceed with their investigation of this matter, please provide any additional support for your appeal to me within 21 days. If you need additional time or if you have any questions, please contact me.

Sincerely,

On Behalf of the Appeals Committee

Ray A. Hale
Director Strategic Planning

(g)   all other types of adverse benefit determinations which the Fund expressly classifies as Trustee-Reviewable Determinations.

## 10.03 TIME LIMITATIONS FOR APPELLATE REVIEW OF ADVERSE BENEFIT DETERMINATIONS

(a)   Whenever an adverse benefit determination is made by the Fund, the claimant may initiate appellate review of the determination by submission to the Fund, within 180 days after the claimant's receipt of the Fund's notice of such adverse benefit determination, of a request for such appellate review. All requests for appellate review shall be submitted to the Fund, electronically or in writing, in a method or form authorized by the Fund.

(b)   The Fund, upon its receipt of a claimant's timely request for appellate review of an earlier adverse benefit determination upon a claim involving urgent care (as defined in Section 9.02[c]), shall notify the claimant of the benefit determination by the Appeals Committee as soon as possible, taking into account the medical exigencies, but not later than 72 hours after the Fund receives the claimant's request for appellate review.

(c)   The Fund, upon its receipt of a claimant's timely request for appellate review of a Trustee-Reviewable Determination, shall perform and complete appellate review, and shall notify the claimant of the determinations upon completion of such review, in accordance with the following time limitations ("monthly board meeting", for all purposes of this Article X, means a scheduled regular monthly board meeting of the Fund's Board of Trustees as provided in Article VI of the Trust Agreement):

(1)   all appellate review and benefit determinations by the Appeals Committee shall be completed, and the Fund shall provide written notice to the claimant of those determinations, no later than 30 days after the Fund's receipt of the claimant's timely request for appellate review of a Trustee-Reviewable Determination;

(2)   whenever an adverse benefit determination is made by the Appeals Committee at the end of its appellate review, the claimant may initiate appellate review by the Board of Trustees, by request to the Fund within 180 days after the claimant's receipt of the Fund's notice of such determination;

(3)   all appellate review and benefit determinations by the Board of Trustees shall be completed within a reasonable time and at the <u>first</u> monthly board meeting that takes place on a date 30 or more days after the Fund receives the claimant's timely request for appellate review by the Board of Trustees; and

(4)   after appellate review and benefit determinations by the Board of Trustees, the Fund shall provide written notice to the claimant of those determinations by the Trustees no later than 5 days after the determinations are made.

(d)   The Fund, upon its receipt of a claimant's timely request for appellate review of an Other Determination, shall perform and complete appellate review, and shall notify the claimant of the determinations upon completion of such review, in accordance with the following time limitations:

(1)   all appellate review and benefit determinations by the Staff Interim-Review Committee shall be completed, and the Fund shall provide written notice to the claimant of those determinations, no later than 30 days after the Fund's receipt of the claimant's timely request for appellate review of an Other Determination;

(2)   whenever an adverse benefit determination is made by the Staff Interim-Review Committee at the end of its appellate review, the claimant may initiate appellate review by the Staff Final-Review

Committee, by written request to the Fund within 180 days after the claimant's receipt of the Fund's notice of such determination; and

(3)     all appellate review and benefit determinations by the Staff Final-Review Committee shall be completed, and the Fund shall provide written notice to the claimant of those determinations, no later than 30 days after the Fund's receipt of the claimant's timely request for appellate review by the Staff Final-Review Committee.

(e)     The Fund, upon its receipt of a claimant's timely request for appellate review of an adverse benefit determination upon a claim (not involving urgent care) for a benefit, the receipt of which is conditioned by this Plan upon required approval by the Fund in advance of obtaining the medical care, shall arrange a single stage of appellate review within a reasonable period of time appropriate to the medical circumstances, provided that the Appeals Committee shall complete (and send the claimant notice of) the Fund's benefit determination on review no later than 30 days after the Fund receives the claimant's request for appellate review.

(f)     Notice of any adverse benefit determination pursuant to this Section 10.03 shall be provided in accordance with Section 10.04.

## 10.04 NOTICE OF BENEFIT DETERMINATIONS AFTER APPELLATE REVIEW

Whenever a benefit determination is made after appellate review (by the Staff Interim-Review Committee, the Staff Final-Review Committee, the Appeals Committee or the Board of Trustees), the Fund shall provide the claimant with written (or electronic) notice of the determination that shall include statements, in a manner calculated to be understood by the claimant, of the following:

(a)     the specific reason or reasons for each adverse benefit determination;

(b)     references to the specific provisions of this Plan on which each adverse benefit determination is based;

(c)     a statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to the claimant's claim for benefits;

(d)     a description of the Fund's appellate review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action pursuant to Section 502 of the Employee Retirement Income Security Act following an adverse benefit determination at the end of appellate review by the Fund; and

(e)     in the case of any adverse benefit determination relating to disability benefits,

(1)     if an internal rule, guideline, protocol or other similar criterion was relied upon in making the adverse benefit determination, either a statement of the contents of the specific rule, guideline, protocol or other criterion or a statement that the specific rule, guideline, protocol or other similar criterion was relied upon in making the adverse determination and that a copy will be provided free of charge to the claimant upon request; and

(2)     if the adverse benefit determination is based on a medical-necessity requirement or an experimental-treatment exclusion or a similar exclusion or limitation, either an explanation of the scientific or clinical judgment for the determination, applying the terms of this Plan to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge to the claimant upon request.

Ex. #21

**CENTRAL STATES**
**SOUTHEAST AND**
**SOUTHWEST AREAS**
**HEALTH AND WELFARE AND PENSION FUNDS**

EMPLOYEE TRUSTEES
FRED GEGARE
JERRY YOUNGER
GEORGE J. WESTLEY
CHARLES A. WHOBREY
PHILIP E. YOUNG

EMPLOYER TRUSTEES
HOWARD McDOUGALL
ARTHUR H. BUNTE, JR.
TOM J. VENTURA
GARY F. CALDWELL
CHRISTOPHER LANGAN

EXECUTIVE DIRECTOR
THOMAS C. NYHAN

SEPTEMBER 7, 2004

DARRELL BONNER
2056 N. MC VAY DRIVE
MOBILE AL  36605

RE:    TRUSTEE-RE....... APPEAL
       SSN:
       CLAIM NO:   MD005012
       MEMBER:    CLARENCE L. BONNER, JR.

Dear Mr. Bonner :

The Board of Trustee Appeals Committee has received your appeal dated July 20, 2004, in which you allege that the October 13, 1993, beneficiary card was signed by Mr. Bonner under duress. At present, the Trustees do not have sufficient information to approve your claim for the life insurance benefit. However, the Trustees have deferred this matter to conduct an investigation and to allow you the opportunity to submit additional information and documentation to support your appeal.

The Trustees request that you agree to waive the time limitations in Sections 10.03 through 10.05 of the Plan for Trustees to review your claim. A copy of these Sections are enclosed. A waiver of the time limitations will allow you sufficient time to submit any additional information and time for the Trustees to review your appeal. Unless we receive an objection from you, we will assume you agree to wave the time limitations. At present, the Trustees anticipate reviewing any information you submit at the Board of Trustee meeting on October 13, 2004.

Pursuant to this investigation, the Trustees request that you clarify the allegations in your July 20, 2004, letter. We request that you provide any information or documentation supporting your allegations. The type of information and documentation which may support your allegations include, but are not limited to: (1) any information of documentation you have in support of your allegation; (2) any affidavits of witnesses who have knowledge of any issues you have raised.

Please be advised that absent additional information or documentation supporting your allegation regarding Mr. Bonner's intent and subsequent signing of the beneficiary card, the Trustees will not likely approve your appeal. If your appeal is denied, the life insurance benefit will be paid pursuant to the Beneficiary Card dated October 13, 1993. In order for the Trustees to timely proceed with their investigation of this matter, please provide any additional support for your appeal to me within 21 days. If you need any additional time of if you have any questions, please contact me.

Case: 1:04-cv-06839 Document #: 1 Filed: 10/25/04 Page 204 of 213 PageID #:204

Sincerely,

On Behalf of the Trustee Appeals Committee

Ray A. Hale
Director Strategic Planning

RAH:cls
120113 / 9/7/04

Ex.#22

Life insurance dispute} October 5, 2004

Re: Board of Trustee Appeals Review
SSN: 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

Dear Mr. Hale
    I am sorry I didn't get back
with you as soon. I was sick,.
Yes on my August 4, 2004 letter
I ask the Board, To review,
the Cards closely because my husband,
were spell wrong, Social Security number
is wrong. and the signature on the
Card date 10-13-93 looks different
from one dated 9-30-83. I can't
Claim were the cards fraud or
forgery at this Time, that why
I ask the board to review it
Careful. because the name spell
wrong, Social Security number is
wrong. signature don't looks the
same. I am providing some documents
with my husband signature I don't
have a handwriting expert at this time.
As I stated in the 2nd denied
                              over

The Benefit sure go before,
Court and let a judge decide,
because I know my husband wouldn't
Change beneficiary care like that. And,
my husband funeral expenses hasn't
been paid.

Thank you.

Mrs Rosemary Brown

098656287

0864

**C. L. BONNER, JR. 11/92**
**OR ROSE WILLIAMS MOORE**
224 S Garrison Ave Ph 457-4079
Prichard, Al 36610

4-5- 19 97

186.93
186.93

Pay to the
order of __Mobile Gas Ser__ $ 186.93

One Hundred Eighty & 93/00 Dollars

**First Alabama** Mobile, AL.
A Regions BANK

For 11 3963323 - 3200 D23       C. L. Bonner

⑈062005690⑈ 14 2155 0736⑈ 0864

⎯ndowment Department

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

m time to time.

Sign name in full.

Clarence L. Bonner Jr.

**Termination of Insurance.** ...er may cancel any of the optional insurance products obtained at Lender's office at any time. Additionally, if required insurance term... ...ure the loan is repaid, Borrower promises to obtain acceptable substitute insurance. If Borrower is in default, and Lender demands that Borro... ...immediately repay the loan in full, Borrower authorizes the insurer for any and/or all optional insurance products to termin te such policies or coverages upon request of Lender. If any insurance purchased at Lender's office is terminated for any reason, Borrower authorizes and directs that the insurer deliver the premium refund, if any, to the Lender which may at its option apply it to the unpaid balance of the loan or return it to Borrower. Any such application of premium refund will not affect the amount or the date of subsequent payments on the loan, but may reduce the number of such payments.

Borrower should refer to the terms contained in the applicable certificate or policy issued for the exact description of benefits and exclusions.
Borrower is encouraged to inquire about coverage and refund provisions.
The regular monthly loan payment without insurance: $ 409.07 .
I/We request the following insurance:

| Cost/Premium: | Insurance Type: | Insurance Term (in mos.): |
|---|---|---|
| $ ,250.86 | TRUN SINGLE LIFE | 120 |
| $ ,171.78 | TRUN SINGLE DISAB | 60 |
| $NONE | | |
| $NONE | | |
| $ 1,948.22 | SINGLE INVOL UNEMP | 60 |

**TERMS:** In this Disclosure Statement, Note and Security Agreement, the word "Borrower" refers to the persons signing below as Borrower, whether one or more. If more than one Borrower signs, each will be responsible, individually and together, for all promises made and for repaying the loan in full. The word "Lender" refers to the Lender, whose name and address are shown above.

**PROMISE TO PAY:** In return for a loan that Borrower has received, Borrower promises to pay to the order of Lender the Principal amount shown above, plus interest on the unpaid Principal balance from the Date Charges Begin shown above at the rate of interest of 12.8052 % per annum on the N/A month anniversary of the Date of Loan shown above, the rate of interest applicable to the remaining unpaid principal balance shall decrease to N/A % per annum.

At y amount shown above as Points has been paid by Borrower as Points. This amount is considered a prepaid charge and is in addition to interest calculated at the above Rate(s) of interest. Any Points are earned prior to any other interest on the loan balance. In the event of prepayment of the loan, prepaid Points will not be refundable to Borrower.

Principal and interest shall be payable in the monthly installments shown above, except that any appropriate adjustments will be made to the first and final payments, beginning on the first payment date shown above and continuing on the same day in each following month until paid in full unless this s bject to a call provision as indicated, in which event the final payment date may be accelerated. Upon the final payment date or the acceleration of the d e entire outstanding balance of Principal and interest evidenced by this Disclosure Statement, Note and Security Agreement shall be due and payable. A ty payment(s) which Lender accepts after the final payment date or the acceleration thereof do not constitute a renewal or extension of this loan unless Lender so determines.

Each payment will be applied first to interest computed to the date of payment, with the remainder applied to Principal. Lender may collect interest and after maturity upon the unpaid Principal balance at the maximum rate permitted under the then applicable law or the rate of interest prevailing at the time of maturity under this Disclosure Statement, Note and Security Agreement.

First Borrower's Signature _____ Date _____

Second Borrower's Signature _____ Date _____

Borrower's Initials: _____

CitiFinancial Corporation
AL 25738-13 10/99                    Original (Branch)        Copy (Customer)                Page 1 of 4

## LEASE/RENTAL AGREEMENT

_232 South Garrison Ave_ PROPERTY DESCRIBED AS _Prichard Alabama 36610_ , HEREBY LEASES THESE PREMISES TO _MR. Mansur Muhammad_ , THE TENANT. THE TENANT AGREES TO THE FOLLOWING TERMS AND CONDITIONS. THE HEADINGS ARE FOR CONVENIENCE AND DO NOT LIMIT OR AMPLIFY THE TERMS OF THIS LEASE.

01. LEASE TERM: THE TERM OF THIS LEASE IS _1 YR_ AND COMMENCES ON _10-3-97_ AND CONTINUES THEREAFTER UNTIL TERMINATION AS PROVIDED BELOW.

02. DELAY IN TAKING POSSESSION: IF TENANT IS UNABLE TO TAKE POSSESSION ON THE COMMENCEMENT DATE AND FAILS TO PAY THE RENT THEN DUE, THIS LEASE IS TERMINATED.

03. RENT PAYMENTS: THE MONTHLY RENT IS $_250.00_ , WHICH IS PAYABLE, BY MAIL AND IN ADVANCE WITHOUT DEMAND OR NOTICE ON THE FIRST DAY OF EACH AND EVERY MONTH, TO:

_Rose M Moore_
_4508 Ann St_
_Mobile Alabama 3660_

04. LATE PAYMENTS: RENTS RECEIVED AFTER THE TENTH OF THE MONTH ARE SUBJECT TO A LATE FEE OF $_25.00_ . PAYMENTS NOT RECEIVED BY THE FIFTEENTH OF THE MONTH SUBJECTS THE TENANT TO THE INITIATION OF EVICTION PROCEEDINGS AT TENANT'S COST.

05. PARTIAL PAYMENTS: THE ACCEPTANCE BY THE AGENT OF PARTIAL PAYMENTS OF RENT DUE SHALL NOT CONSTITUTE A WAIVER OF ANY RIGHTS OF THE        ʼT LAW
      ᴇᴀSE NOR AFFECT ANY NOTICE OR ᴵ ᵀ
            ᴺ OR COMMEᴺᵀ ᵀᴼ

MOBILE AL 366
PM
05 OCT
2004

Mrs. Rosemary Bonner
2355 Crestwood circle
Mobile, AL. 36617

Central States Southeast and Southwest Areas
health & welfare and pension fund
9377 West Higgins Rd.
Rosemont, Illinois 60018- 4938
Director Strategic Planning
c/o Mr. Roy A. Kehl

60018+4943



**DOCKETED**

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

OCT 2 6 2004

FILED-EDA

# Civil Cover Sheet

2004 OCT 25 PM 3:01

CLERK
U.S. DISTRICT COURT

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use **only** in the Northern District of Illinois.

---

**Plaintiff(s):** Central States, Southeast and Southwest Areas Health and Welfare Fund, and Howard McDougall, trustee

County of Residence: Cook

Plaintiff's Atty:    Anthony E. Napoli
Central States Law Dept.
9377 W. Higgins Rd., Rosemont,
IL 60018
847/518-9800, ext. 3702

**Defendant(s):** Rosemary Bonner, Darrell Bonner, Gabrielle Bonner, Giselle Bonner, and Sandra Bonner, as natural guardian for Clarencia Bonner, a minor,

County of Residence:

Defendant's Atty:

**04C  6839**

---

II. Basis of Jurisdiction:     **3. Federal Question (U.S. not a party)**

III. Citizenship of Principal Parties **(Diversity Cases Only)**

       Plaintiff: **-1 Citizen of This State**
       Defendant: **-2 Citizen of Another State**

**JUDGE FILIP**

**MAGISTRATE JUDGE NOLAN**

IV. Origin :     **1. Original Proceeding**

V. Nature of Suit:     **791 E.R.I.S.A**

VI. Cause of Action:     **29 U.S.C. § 1132(a)(3), 28 U.S.C. §§ 1335, 1397 and 2361. An Interpleader action by Plaintiff regarding payment of a Life Insurance Benefit to the proper beneficiary of a deceased Covered Participant of the Welfare Plan.**

VII. Requested in Complaint

       Class Action: **No**
       Dollar Demand:
       Jury Demand: **No**

VIII. This case **IS NOT** a refiling of a previously dismissed case.

---

Signature: _(signature)_

1-2

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**DOCKETED**

**OCT 2 6 2004**

FILED-EDA
2004 OCT 25 PM 3:01
CLERK
U.S. DISTRICT COURT

In the Matter of

Central States, Southeast and Southwest Areas Health and
Welfare Fund and Howard McDougall, trustee v. Rosemary
Bonner, Darrell Bonner, Gabrielle Bonner, Giselle Bonner, and
Sandra Bonner, as natural guardian for Clarencia Bonner, a minor

Case Number: 04C 6839

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Central States, Southeast and Southwest Areas Health and Welfare Fund and Howard McDougall, trustee

**JUDGE FILIP**

**MAGISTRATE JUDGE NOLAN**

| (A) | (B) |
|---|---|
| **SIGNATURE** | **SIGNATURE** |
| **NAME** Anthony E. Napoli | **NAME** Francis J. Carey |
| **FIRM** Central States Law Department | **FIRM** Central States Law Department |
| **STREET ADDRESS** 9377 W. Higgins Road | **STREET ADDRESS** 9377 W. Higgins Road |
| **CITY/STATE/ZIP** Rosemont, IL 60018-4938 | **CITY/STATE/ZIP** Rosemont, IL 60018-4938 |
| **TELEPHONE NUMBER** (847) 518-9800, Ext, 3702 **FAX NUMBER** (847) 518-9797 | **TELEPHONE NUMBER** (847) 518-9800 **FAX NUMBER** (847) 518-9797 |
| **E-MAIL ADDRESS** tnapoli@centralstatesfunds.org | **E-MAIL ADDRESS** fcarey@centralstatesfunds.org |
| **IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)** 06210910 | **IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)** 00387533 |
| **MEMBER OF TRIAL BAR?** YES ☐ NO ☑ | **MEMBER OF TRIAL BAR?** YES ☑ NO ☐ |
| **TRIAL ATTORNEY?** YES ☑ NO ☐ | **TRIAL ATTORNEY?** YES ☑ NO ☐ |
| | **DESIGNATED AS LOCAL COUNSEL?** YES ☐ NO ☐ |
| (C) | (D) |
| **SIGNATURE** | **SIGNATURE** |
| **NAME** Timothy C. Reuter | **NAME** Thomas M. Weithers |
| **FIRM** Central States Law Department | **FIRM** Central States Law Department |
| **STREET ADDRESS** 9377 W. Higgins Road | **STREET ADDRESS** 9377 W. Higgins Road |
| **CITY/STATE/ZIP** Rosemont, IL 60018-4938 | **CITY/STATE/ZIP** Rosemont, IL 60018-4938 |
| **TELEPHONE NUMBER** (847) 518-9800 **FAX NUMBER** 847/518-9797 | **TELEPHONE NUMBER** (847) 518-9800 **FAX NUMBER** 847/518-9797 |
| **E-MAIL ADDRESS** treuter@centralstatesfunds.org | **E-MAIL ADDRESS** tweithers@centralstatesfunds.org |
| **IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)** 06279373 | **IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)** 06193004 |
| **MEMBER OF TRIAL BAR?** YES ☐ NO ☑ | **MEMBER OF TRIAL BAR?** YES ☑ NO ☐ |
| **TRIAL ATTORNEY?** YES ☑ NO ☐ | **TRIAL ATTORNEY?** YES ☑ NO ☐ |
| **DESIGNATED AS LOCAL COUNSEL?** YES ☐ NO ☐ | **DESIGNATED AS LOCAL COUNSEL?** YES ☐ NO ☐ |

1-3